**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| QUINTON M. THOMAS; ROELIF EARL CARTER; BRADLEY JILES; ANGELA DAVIS; MEREDITH WALKER; BRITTANY ELLIS; DONYA PIERCE; RONALD TUCKER; KEILEE FANT; MAWOUSSIME ADOBOE, SHILITA THOMAS, JAMES REDMOND III, VERONICA MURPHY, et al., | Case No. 4:16-cv-1302 |
| Plaintiffs, | |
| v. | **CLASS ACTION COMPLAINT** (Jury Trial Demanded) |
| CITY OF ST. ANN; CITY OF EDMUNDSON; CITY OF NORMANDY; CITY OF COOL VALLEY; CITY OF VELDA CITY; CITY OF BEVERLY HILLS; CITY OF PAGEDALE; CITY OF CALVERTON PARK; CITY OF ST. JOHN; CITY OF BEL-RIDGE; CITY OF WELLSTON CITY OF VELDA VILLAGE HILLS; and CITY OF BELLEFONTAINE NEIGHBORS, | |
| Defendants. | |

## INTRODUCTION

1.     The Defendant Municipalities, through their police departments, municipal court systems, city prosecuting attorneys' offices, and jails, have terrorized the named Plaintiffs and many thousands of others through a deliberate and coordinated conspiracy established and implemented to fill the Municipalities' coffers by extorting money from thousands of poor,

disproportionately African-American people in the St. Louis region, creating a modern-day police state and debtors' prison scheme that has no place in American society.

2.     The scheme reflects an extraordinary abuse of governmental authority, starting with the over-policing of low income communities of color and the issuance of excessive citations for traffic and other minor municipal code violations, followed by arbitrary fines, penalties, surcharges, and interest charges that pile up like debts to a loan-shark, arrest warrants auto-generated without good cause or even a semblance of due process, and imprisonment— imposed without assistance of counsel—in squalid debtors' prisons. The Defendants' unconstitutional revenue-generation scheme disproportionately targets African-American residents, placing jobs at risk, leaving children without supervision, and debasing fundamental human rights, for as long as it takes to strong-arm payment from Plaintiffs and others.

3.     Plaintiffs are a group of similarly situated individuals who are victims of the Defendants' predatory scheme.  Each of these human beings was locked in a cage by or on behalf of one or more of the 13 municipalities named as Defendants in this lawsuit (the "Defendant Municipalities") solely because he or she was unable to afford a cash payment.  And each was left to languish in filthy, often overcrowded jail cells because he or she could not afford to pay the jacked-up fines, penalties, and other charges that Defendants assessed.  Defendants did not inquire about, much less accommodate, the hardships their extortionate demands placed on Plaintiffs and their families.  Nor did Defendants offer to provide Plaintiffs with counsel who could advise them of their rights or otherwise protect them from Defendants' predatory scheme.[1]

---

[1] The architecture of this illegal scheme has been in place for many years.  *See, e.g.*, T.E. Lauer, *Prolegomenon to Municipal Court Reform in Missouri*, 31 Mo. L. Rev. 69, 88 (1966) ("[I]t seems that many citizens of the state are being confined needlessly in our city jails . . . ."); *id.* at 85 ("[I]t is disgraceful that we do not appoint counsel in our municipal courts to represent indigent persons accused of ordinance violations."); *id.* at 90 ("It is clear that many

4.      Defendants' officials and employees—through their conduct, decisions, training, rules, policies, practices, and procedures—constructed and implemented this unified, conspiratorial scheme for the overriding purpose of raising municipal revenue (and not for any legitimate law enforcement purpose).  In 2015 alone, the Defendant Municipalities issued an average of 1.7 arrest warrants *per household* and one (1) arrest warrant *for every adult*, mostly for allegedly unpaid debt in connection with tickets supposedly involving traffic violations and other petty offenses.[2]

5.      Defendants gained the coercive leverage to effectuate their scheme by resurrecting a modern analogue of debtors' prisons—an institution this country rejected as inhumane more than a century ago.  That leverage has made Defendants' scheme increasingly profitable, generating millions of dollars of revenue over the past several years.  Defendants' law enforcement and municipal court practices focus on maximizing revenue, rather than promoting public safety, administering justice, or providing the bare rudiments of due process.  Defendants are forcing the poorest and most vulnerable citizens to finance a municipal system that is a tool of injustice and oppression.

6.      As a result, this scheme has targeted and persecuted people who live in or travel through Defendants' municipal borders, trapping them for years in a cycle of escalating fees, intractable debt, and imprisonment.  In particular, Defendants' scheme has preyed on the most vulnerable, those living in or near poverty, who are least able to bear, or to avoid, the extortionate costs Defendants have imposed.

---

municipalities have at times conceived of their municipal courts in terms of their revenue-raising ability. . . .").
[2] OFFICE OF STATE COURTS ADMIN., MO. JUDICIAL REPORT SUPP.: FISCAL YEAR 2015, Table 95, http://www.courts.mo.gov/file.jsp?id=96438; U.S. CENSUS BUREAU, PROFILING OF GENERAL POPULATION AND HOUSING CHARACTERISTICS 2010, http://factfinder.census.gov/faces/nav/jsf/pages/index.xhtml.

7.     Thousands of people in the Plaintiffs' position must divert funds from their disability checks, or sacrifice meager earnings their families desperately need for food, diapers, clothing, rent, and utilities, to pay spiraling court fines, fees, costs, and surcharges.  Whether or not valid, a citation for a minor offense—a broken tail light, a lane change without signaling— often generates crippling debts for people like Plaintiffs, resulting in jail time when they cannot afford to pay, deepening their already desperate poverty.

8.     The summary imprisonment Defendants impose on people who appear in the Defendants' municipal courts but who cannot afford to pay the sums of money demanded frightens many away from the courthouse, allowing Defendants to jack up the fines even further and issue arrest warrants—intended to coerce payment—for "Failure to Pay" and "Failure to Appear."  Month after month, year after year, the cycle repeats itself, ensnaring Plaintiffs and those like them in a system from which it is nearly impossible to extricate themselves.

9.     Defendants have abused the legal system to bestow a patina of legitimacy on what is, in reality, extortion.  If private parties had created and implemented this scheme, enforced it by threatening and imposing indefinite incarceration, and milked poor families of millions of dollars, the law would punish them as extortionists and racketeers, and the community would take steps to prevent them from exploiting the most vulnerable of its members.  These predatory practices are no more legitimate—and indeed are more outrageous—when state and local government actors perpetrate them under color of law.

10.    The treatment of the named Plaintiffs reveals a coordinated, systemic effort by Defendants through both police and municipal court practices, to deprive some of the area's poorest residents of their rights under the United States Constitution.  For years, Defendants have engaged in the same conduct, as a matter of policy and practice, against Plaintiffs and thousands

of other impoverished citizens.  These citizens' fundamental constitutional right to liberty, however, does not depend on their income.  Defendants have created or revived *de facto* debtors' prisons, using them as a tool to cow poor people into financing municipal government.  Such flagrant abuse is not consistent with the values this country holds dear, with the rule of law, or with the constitutional guarantee of due process.

11.     Importantly, to enable and perpetuate this unconstitutional scheme, Defendant City of St. Ann acts as a veritable warehouse in which the Defendant Municipalities can deposit excess arrestees.

12.     On their own, the other 12 Defendant Municipalities each lack the capacity to hold more than a few people at a given time, so they contract or otherwise conspire with St. Ann to arrest a significantly greater number of people for alleged municipal ordinance violations and ship them to St. Ann Jail, where arrestees languish until the Defendant Municipalities can extract enough money from the individuals or their families to satisfy the Municipalities' demands. Without the availability of St. Ann's recently-expanded jail, which "sleeps 42, not including a pen for short-timers and a juvenile area,"[3] the Defendant Municipalities would not be able to incarcerate, or threaten to incarcerate, human beings too poor to pay their debts, and the Defendants' unlawful scheme would fall apart.

13.     Plaintiffs, by and through their attorneys, and on behalf of those similarly situated, bring this civil action pursuant to 42 U.S.C. § 1983 and the Fourth, Sixth, and Fourteenth Amendments to the United States Constitution.  Plaintiffs seek in this civil action the vindication of their fundamental rights, compensation for the abuse that Defendants have rained

---

[3] Bogan, Jesse, *A Sense of Change in St. Ann*, ST. LOUIS POST-DISPATCH (Aug. 5, 2012), http://www.stltoday.com/news/local/metro/a-sense-of-change-in-st-ann/article_c2dd4c0b-45fc-552f-8df9-8ec5db29d7cb.html.

down on them, injunctive relief assuring that Defendants will not violate their rights again, and a declaration that the Defendants' conduct is unlawful.[4]

## NATURE OF THE ACTION

14.     Pursuant to policy and practice, Defendants jail people who cannot afford to pay money they supposedly owe Defendants for traffic tickets and other minor alleged municipal code violations.  Defendants jail people for nonpayment without inquiring whether they *can* pay, without considering alternatives to imprisonment as required by federal and Missouri law, and without setting bail and/or bond based on the person's individual circumstances.

15.     Pursuant to policy and practice, Defendants jail indigent people for these alleged debts without informing them of their right to counsel and without providing counsel for those who cannot afford it.

16.     Pursuant to common practice, Defendants arbitrarily and incrementally set and re-set the amount of money they require indigent people to pay for release throughout their indefinite detention, sometimes eventually releasing the person if Defendants determine they cannot extort money from him or her.

17.     Pursuant to policy and practice, Defendants incarcerate individuals indefinitely, unless and until the person, or the person's family or friends, can pay sufficient money to satisfy Defendants.  The conditions of incarceration are so miserable as to intensify the coercive effect.

18.     Pursuant to policy and practice, Defendants issue and enforce invalid arrest warrants, threaten alleged debtors with jail if they do not bring cash to court, hold alleged debtors in jail for a week or more without any judicial appearance, and, without due process, set and

---

[4] The Plaintiffs make the allegations in this Complaint based on personal knowledge as to matters in which they have had personal involvement, and on information and belief as to all other matters.

modify monetary payments necessary for release with no regard for ability to pay or basic fairness. These tactics frighten people away from appearing in court and then punish them for not appearing.

19.     Together these policies and practices constitute and result from a common scheme and coordinated effort between and among the Defendants.

20.     These policies and practices are further reflected in, and caused by, the Defendants' (1) failure to establish consistent procedures, effective training, and meaningful supervision to appropriately guide and monitor the actions of law enforcement officers and other agents of Defendants engaged in law enforcement and municipal court activities; (2) failure to establish reliable systems to detect and appropriately discipline and hold accountable municipal officials for misconduct; and (3) prioritizing revenue generation at the expense of the rights of individuals in the Defendant Municipalities and public safety needs.

21.     The Plaintiffs seek declaratory, injunctive, and compensatory relief.

### JURISDICTION AND VENUE

22.     This is a civil rights action arising under 42 U.S.C. § 1983, 28 U.S.C. § 2201, *et seq.*, and the Fourth, Sixth, and Fourteenth Amendments to the United States Constitution. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

23.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391.

### PARTIES

24.     Plaintiff Quinton M. Thomas is a 28-year-old man.

25.     Plaintiff Roelif Earl Carter is a 63-year-old man.

26.     Plaintiff Bradley Jiles is a 24-year-old man.

27.     Plaintiff Angela Davis is a 44-year-old woman.

28.     Plaintiff Meredith Walker is a 47-year-old woman.

29.     Plaintiff Brittany Ellis is a 26-year-old woman.

30.     Plaintiff Donya Pierce is a 26-year-old woman.

31.     Plaintiff Ronald Tucker is a 51-year-old man.

32.     Plaintiff Keilee Fant is a 37-year-old woman.

33.     Plaintiff Mawoussime Adoboe is a 33-year-old woman.

34.     Plaintiff Shilita Thomas is a 29-year-old woman.

35.     Plaintiff James Redmond III is a 65-year-old man.

36.     Plaintiff Veronica Murphy is a 31-year-old woman.

37.     Defendant City of St. Ann is a municipal corporation, organized under the laws of the State of Missouri.  The City of St. Ann operates the St. Ann Jail, the St. Ann Police Department, and the St. Ann Municipal Court.

38.     Defendant City of Edmundson is a municipal corporation, organized under the laws of the State of Missouri.  The City of Edmundson operates the Edmundson Municipal Court and Edmundson Police Department, and contracts with the City of St. Ann to imprison individuals in the St. Ann Jail.

39.     Defendant City of Normandy is a municipal corporation, organized under the laws of the State of Missouri.  The City of Normandy operates the Normandy Municipal Court and Normandy Policy Department, and contracts with the City of St. Ann to imprison individuals in the St. Ann Jail.

40.     Defendant City of Cool Valley is a municipal corporation, organized under the laws of the State of Missouri.  The City of Cool Valley operates the Cool Valley Municipal

Court and Cool Valley Police Department, and contracts with the City of St. Ann to imprison individuals in the St. Ann Jail.

41.     Defendant City of Velda City is a municipal corporation, organized under the laws of the State of Missouri.  Velda City operates the Velda City Municipal Court and Velda City Police Department, and contracts with the City of St. Ann to imprison individuals in the St. Ann Jail.

42.     Defendant City of Pagedale is a municipal corporation, organized under the laws of the State of Missouri.  The City of Pagedale operates the Pagedale Municipal Court and Pagedale Police Department, and contracts with the City of St. Ann to imprison individuals in the St. Ann Jail.

43.     Defendant City of St. John is a municipal corporation, organized under the laws of the State of Missouri.  The City of St. John operates the St. John Municipal Court and St. John Police Department, and contracts with the City of St. Ann to imprison individuals in the St. Ann Jail.

44.     Defendant City of Bel-Ridge is a municipal corporation, organized under the laws of the State of Missouri.  The City of Bel-Ridge operates the Bel-Ridge Municipal Court and Bel-Ridge Police Department, and contracts with the City of St. Ann to imprison individuals in the St. Ann Jail.

45.     Defendant City of Beverly Hills is a municipal corporation, organized under the laws of the State of Missouri.  The City of Beverly Hills operates the Beverly Hills Municipal Court and Beverly Hills Police Department, and contracts with the City of St. Ann to imprison individuals in the St. Ann Jail.

46.     Defendant City of Bellefontaine Neighbors is a municipal corporation, organized under the laws of the State of Missouri.  The City of Bellefontaine Neighbors operates the Bellefontaine Neighbors Municipal Court and Bellefontaine Neighbors Police Department, and contracts with the City of St. Ann to imprison individuals in the St. Ann Jail.

47.     Defendant City of Calverton Park is a municipal corporation, organized under the laws of the State of Missouri.  The City of Calverton Park operates the Calverton Park Municipal Court and Calverton Park Police Department, and contracts with the City of St. Ann to imprison individuals in the St. Ann Jail.

48.     Defendant City of Velda Village Hills is a municipal corporation, organized under the laws of the State of Missouri.  The City of Velda Village Hills operates the Velda Village Hills Municipal Court and Velda Village Hills Police Department, and contracts with the City of St. Ann to imprison individuals in the St. Ann Jail.

49.     Defendant City of Wellston is a municipal corporation, organized under the laws of the State of Missouri.  The City of Wellston operates the Wellston Municipal Court and Wellston Police Department, and contracts with the City of St. Ann to imprison individuals in the St. Ann Jail.

## FACTUAL ALLEGATIONS

### A.     Factual Background

50.     St. Louis County, Missouri is comprised of 90 municipalities and 81 separate municipal courts.  These municipalities range in population from under 100 people to over 10,000.  The populations of the Municipal Defendants range from 574 in Beverly Hills to 13,020 in St. Ann.

51.     In 2013, the municipal courts of St. Louis City and County collected $61,152,087 in fines and fees.  During that same time, the combined total of court fines and fees collected by Missouri municipal courts was $132,032,351.63.  This means that the municipal courts in the St. Louis region accounted for 46% of all fines and fees collected statewide, despite being home to only 22% of Missourians.[5]

52.     There is little to no oversight of the St. Louis region's municipal courts.  A judicial circuit in Missouri contains on average 8.6 municipal court divisions.  The St. Louis County judicial circuit contains 81 municipal court divisions.  As a result, the presiding judge of St. Louis County's circuit courts must oversee nearly ten times the number of municipal courts and municipal court judges as an average presiding judge in Missouri.[6]

53.     According to the most recent available budget information, court fines and fees are the largest single source of revenue for St. Ann, Beverly Hills, Cool Valley, Edmundson, Normandy, and Velda City—among several other municipalities.  Likewise, Bel-Ridge and St. John receive over twenty percent of their revenue from court fines and fees.

54.     As addressed below, there is direct correlation between the revenue that a particular municipality raises through fines and fees and the population of black and impoverished residents living in that municipality.  That is, Defendants are funding themselves on the backs of their black and impoverished residents.

55.     The brutal efficiency of Defendants' improper scheme is reflected in the fact that only eight of the eighty-one municipal courts in St. Louis County failed to make a profit, when the cost of operating the municipal court was compared to the revenue collected from court fines

---

[5] See Better Together's *Municipal Courts Study*, *available at* http://www.bettertogetherstl.com/studies/public-safety/municipal-courts-report.
[6] *Id.*

and fees.  On average a municipal court in St. Louis County costs $223,149 to operate while bringing in an average of $711,506 in revenue from fines and fees each year.

56.    Several of the Defendant Municipalities are illustrative:[7]

a.    Bel-Ridge gets 24.46% of its general revenue from fines and fees, 83.12% of its population is black and 42.30% are below the poverty line;

b.    Beverly Hills gets 26.37% of its general revenue from fines and fees, 92.6% of its population is black and 17.7% are below the poverty line;

c.    Cool Valley gets 29.11% of its general revenue from fines and fees, 84.53% of its population is black and 14% are below the poverty line;

d.    Edmundson gets 34.86% of its general revenue from fines and fees, 26.38% of its population is black and 19% are below the poverty line;

e.    Normandy gets 40.61% of its general revenue from fines and fees, 69.75% of its population is black and 35.4% are below the poverty line;

f.    St. Ann gets 37.47% of its general revenue from fines and fees, 22.11% of its population is black and 15.1% are below the poverty line;

g.    Velda City gets 21.58% of its general revenue from fines and fees, 95.42% of its population is black and 18.5% are below the poverty line.

57.    Based on data reported by police departments to the Missouri Attorney General, Black residents in the Defendant Municipalities are much more likely to be searched and/or arrested as a result of a vehicle stop.[8]  For example, in 2015:

---

[7] Sources: https://www.courts.mo.gov/file.jsp?id=68844; http://www.bettertogetherstl.com/wp-content/uploads/2014/10/BT-Municipal-Courts-Report-Appendix.pdf.
[8] MISSOURI ATTORNEY GENERAL VEHICLE STOPS REPORT, *available at* https://ago.mo.gov/home/vehicle-stops-report/advanced-search.

a.      In St. Ann, out of 8,140 total vehicle stops, 5.87% of stops of white individuals resulted in a search, whereas 15.34% of stops of black individuals resulted in a search.  While contraband is more likely to be discovered during stops involving both white drivers and black drivers, black drivers are nearly three times more likely to be arrested than white drivers as a result;

b.      In Normandy, out of 4,102 total vehicle stops, 2.44% of stops of white individuals resulted in a search, whereas 6.45% of stops of black individuals resulted in a search. Similarly, 1.15% of stops of white individuals resulted in an arrest, whereas 2.74% of stops of black individuals resulted in an arrest;

c.      In Edmundson, out of 1,267 total vehicle stops, 1.59% of stops of white individuals resulted in a search, whereas 5.73% of stops of black individuals resulted in a search. Similarly, 1.43% of stops of white individuals resulted in an arrest, whereas 4.81% of stops of black individuals resulted in an arrest;

d.      In Beverly Hills, out of 604 total vehicle stops, approximately the same percentage of stops for white and black individuals resulted in a search.  However, only 1.45% of stops of white individuals resulted in an arrest, whereas 8.61% of stops of black individuals resulted in an arrest.

**B.**      **Defendants Operate Their Municipal Courts and Jails as Profit Centers**

58.      Defendants, as a coordinated policy and practice, have improperly used their municipal courts and jails as a profit center rather than a dispenser of justice.[9]  Over the past five years, Defendants have reaped $76,670,220 in revenue from their municipal courts.[10]  In 2014,

---

[9] Unless otherwise stated in this Complaint, the policies, practices, and procedures of Defendants described herein have been in existence for at least the past five years.

[10] OFFICE OF STATE COURTS ADMIN., MO. JUDICIAL REPORT SUPP.: FISCAL YEAR 2011, Table 95, http://www.courts.mo.gov/file.jsp?id=51802; OFFICE OF STATE COURTS ADMIN., MO. JUDICIAL REPORT SUPP.: FISCAL YEAR 2012, Table 94, http://www.courts.mo.gov/file.jsp?id=58805; OFFICE OF STATE COURTS ADMIN., MO. JUDICIAL REPORT SUPP.: FISCAL YEAR 2013, Table 94, http://www.courts.mo.gov/file.jsp?id=68844; OFFICE OF STATE COURTS ADMIN., MO. JUDICIAL REPORT SUPP.: FISCAL YEAR 2014, Table 94, http://www.courts.mo.gov/file.jsp?id=83262;

an astonishing 22.3 percent of Defendants' total revenue was collected through fines, fees, costs and surcharges.[11]  In one town, the City of Calverton Park, municipal court revenues accounted for 43.17% of the municipality's total revenue for 2014.[12]

59.   Well before each fiscal year, Defendants determine the amount of money they need their municipal courts to generate.  Defendants depend on the money collected through these municipal courts to help fund their jails, pay municipal court judicial salaries, pay city attorney's office salaries, and fund other portions of their municipal budgets.

60.   Defendants operate their courts and jails to maximize revenues at the expense of justice.  Defendants make decisions regarding the operation of the courts and the jails—including the assessment of fines, fees, costs, and surcharges; the availability and conditions of payment plans; the determination of amounts required for release from jail; the issuance and withdrawal of arrest warrants; and the refusal to appoint an attorney for indigent defendants—based on their desire to meet fiscal projections rather than on legitimate penological considerations.

61.   In 2015 alone, the Defendant Municipalities issued an average of 1.7 arrest warrants *per household* and one (1) arrest warrant *for every adult*,[13] mostly for minor municipal ordinance violations, like traffic tickets.

---

OFFICE OF STATE COURTS ADMIN., MO. JUDICIAL REPORT SUPP.: FISCAL YEAR 2015, Table 94, http://www.courts.mo.gov/file.jsp?id=96437.

[11] OFFICE OF STATE COURTS ADMIN., MO. JUDICIAL REPORT SUPP.: FISCAL YEAR 2014, Table 94, http://www.courts.mo.gov/file.jsp?id=83262; *General Administration #2*, BETTER TOGETHER ST. LOUIS 8-12 (December 2015), http://www.bettertogetherstl.com/wp-content/uploads/2015/12/Better-Together-General-Administration-Report-2-FINAL-.pdf.

[12] *Id.*

[13] OFFICE OF STATE COURTS ADMIN., MO. JUDICIAL REPORT SUPP.: FISCAL YEAR 2015, Table 95, http://www.courts.mo.gov/file.jsp?id=96438; U.S. CENSUS BUREAU, PROFILING OF GENERAL POPULATION AND HOUSING CHARACTERISTICS 2010, http://factfinder.census.gov/faces/nav/jsf/pages/index.xhtml.

62.     Over the past five years, Defendants, according to their public records, have collected more than $76,670,220 million dollars from their municipal court fines, fees, costs, and surcharges.  The population of these municipalities, including children, is 49,876.[14]

63.     All thirteen (13) of the Defendant Municipalities depend on the St. Ann Jail as a jailing hub, thereby expanding significantly their capacities to boost municipal revenues by arresting, jailing, and coercing payments from more and more poor residents of the St. Louis region for minor traffic tickets.

## C.     The Defendant Municipalities' Unlawful Policies and Practices

64.     The Defendants' unlawful scheme generally works as follows:  an individual is stopped (often illegitimately) in one of the Defendant Municipalities for a traffic offense or other minor violation.  In many cases, these violations are "crimes of poverty," meaning that they result, at least in part, from the individual's inability to pay for things like insurance, vehicle registration fees, etc.

65.     The police officer issues the person a citation and informs her that she can either pay the fine or appear at the municipal court for the relevant jurisdiction at a designated date and time.  In some cases, the person can simply afford to pay the citation and thereby avoid the clutches of the municipal court system.  But many in the St. Louis area are indigent and cannot afford to pay such citations without sacrificing basic necessities like food, diapers, and rent.  For these individuals, the system works differently—it becomes a Kafkaesque web of indignities and incarceration that plunge the victim ever deeper into poverty.

66.     An indigent person who cannot afford to pay a fine from an alleged traffic offense or other minor violation must appear in one of the Defendants' municipal courts.  There, she is

---

[14] U.S. CENSUS BUREAU, ANNUAL ESTIMATES OF THE RESIDENT POPULATION (JULY 1, 2015), http://factfinder.census.gov/faces/nav/jsf/pages/index.xhtml.

forced to wait in line—in some cases, for hours—before being called before a municipal judge who will ask whether she has the money to pay, on the spot, the fine *plus* court costs. The municipal judge does not inquire as to whether the person is indigent or can afford to pay the fine, nor does he offer to provide a lawyer if the person cannot afford one. Instead, the municipal judge asks a simple question:  do you have the money to pay today, yes or no?  In many cases, the answer is no.

67.    In the many cases in which the individual cannot come up with the requisite funds at the courthouse, municipal judges in the Defendant Municipalities regularly employ several tactics to coerce payment: (i) in some cases, the municipal judge instructs the person that she must return to court at a future date and time with the required funds, plus interest, or she will be jailed; (ii) in other cases, the municipal judge instructs the person to see the court clerk to set up a payment plan, which will require the person to pay in installments, subject to exorbitant interest rates, surcharges, and other fees; and (iii) in other cases, the municipal judge detains the person at the courthouse for the remainder of the court session (if not longer), instructing her to contact friends and family to bring money to the courthouse to secure the person's release.

68.    In all three scenarios, the individual faces the possibility of jail time if she is not able to pay the fine and associated court costs, interest, surcharges, and other fees. Municipal court officials in the Defendant Municipalities, including the municipal judges and clerks, regularly instruct court attendees that failure to pay a fine and other costs will result in jail time. Indeed, the residents of the Defendant Municipalities commonly understand that attending a municipal court session without the funds necessary to pay off a citation or other debt can result in jail time, irrespective of whether the individual actually has the ability to pay. Defendants' tactics thus frighten many people, including many of the Plaintiffs, away from municipal court

dates when those individuals do not have enough money to pay their fines and other debts.  This enables the Defendant Municipalities ultimately to squeeze more money from these poor residents.

69.     If an individual misses or is alleged to have missed a court date, the Defendant Municipality's computer system automatically generates an arrest warrant for "Failure to Pay" or "Failure to Appear."  According to recent reports from the state auditor's office, no judge or prosecutor reviews or signs these arrest warrants.[15]

70.     Often, the computer system auto-generates an arrest warrant even where (a) the individual did, in fact, attend the court session, but the municipal clerk or other court official erred in recording the person's absence, (b) the individual did not receive adequate notice of the court date, or (c) the individual had a valid excuse for her absence -- *e.g.*, because she was detained by another municipality, had a court date in another municipality, or was ill.

71.     The Defendant Municipalities issue hundreds, if not thousands, of arrest warrants for  "Failure to Pay" or "Failure to Appear" each year.  These arrest warrants are often pretextual

---

[15] See *Summary of Audit Findings Judiciary---Municipal Divisions, Report No. 2016-046*, *available at* http://app.auditor.mo.gov/AuditReports/AudRpt2.aspx?id=60, which states:

> The Municipal Judge did not sign warrants issued and did not issue written authorization for the Court Clerk/Administrator to sign warrants on his behalf. In addition, the Municipal Judge allowed the Court Clerk/Administrator to use his signature stamp on warrants and failure to appear notices. Without the signature or written authorization, there is no documentation the warrants were authorized. In addition, the municipal division did not always issue warrants timely.

> Supreme Court Rule 37.45 states a warrant shall be signed by the judge or by the clerk of the court when directed by the judge for a specific warrant. To ensure warrants are properly issued in accordance with Supreme Court rules, the Municipal Judge should sign warrants or provide specific written authorization for the Court Clerk/Administrator to sign warrants and discontinue allowing the use of his facsimile signature. In addition, warrants should be issued timely to ensure outstanding court appearances and fines are addressed.

and are simply a mechanism by which the Defendant Municipalities can coerce indigent persons to pay fines and costs that they cannot actually afford.

72.     Irrespective of which jurisdiction issued the warrant for  "Failure to Pay" or "Failure to Appear," the arrest warrant empowers any of the Defendant Municipalities to stop and arrest the individual the warrant identifies.  Having arrested this person, an officer may take the individual to:  (i) the municipal jail of the municipality in which the person was arrested, (ii) the municipal jail of the municipality that issued the arrest warrant, or, in many cases, (iii) the St. Ann jail, which contracts with each of the Defendant Municipalities to provide jailing services.

73.     Once the individual arrives at the jail, she can secure her release immediately if she is able to pay off her entire debt (including any interest, fees, or other costs).  In some cases, a municipal jail will release the individual if she is able to pay a portion of her debt, taking whatever money the individual has on-hand or can obtain from family and friends.

74.     If the individual cannot pay off her debt to the satisfaction of the municipal jail officials, she typically is held in jail for up to three days (and in some cases, even longer).  In some cases, she may be transferred between the Defendants' municipal jails.  But in all cases, the basic construct is the same for people arrested for "Failure to Pay" or "Failure to Appear" in connection with unpaid tickets for traffic violations and other municipal code offenses: one of the Defendants holds the person in jail unless and until she pays off her "debt," generally for at least three days, at which point she is released or passed on to the custody of another municipality, which holds her in jail unless and until she pays off her "debt" to that municipality, and so on.

75.     In almost all cases, an individual arrested for "Failure to Pay" or "Failure to Appear" does not appear before a judge to answer for the alleged crime of failing to attend a

court date.  Instead, after her release from jail, the individual receives a new court date at which a municipal judge will ask the same question:  do you have money today to pay your fines, yes or no?  Not just the original fine for the traffic stop, but now multiplied many times over because of the individual's inability to pay and sometimes because Defendants' abusive tactics have scared away Plaintiffs and others from even coming to court.  In this manner, the cycle repeats itself, month after month, year after year.

76.     The practices described in this "typical" example are ubiquitous in the Defendant Municipalities.   As a matter of policy and practice, municipal officials in the Defendant Municipalities (including judges, police officers, and court clerks, among others) routinely:

    a.    Issue citations for supposed traffic and municipal code violations (which, on information and belief, are the product of discriminatory enforcement of the law);

    b.    Demand payment of fines for such traffic and municipal violations, without any inquiry into whether the person has the ability to pay, and without offering to provide a lawyer if the person is indigent and cannot afford one;

    c.    Establish draconian payment plans with usurious interest rates and other fees for  indigent persons who cannot afford to pay their fines, and without offering nonmonetary alternatives to satisfy the obligation;

    d.    Threaten people, including the indigent, with incarceration under inhumane conditions if they cannot afford to pay their fines, court costs, and other fees;

    e.    Issue auto-generated arrest warrants for "Failure to Appear," even if the person did in fact appear, was unable to appear for good reason (including lack of notice), or was intimidated by municipal officials into not appearing because of the well-founded fear that they would be summarily thrown into jail if they appeared without being able to pay;

    f.    Incarcerate people for their inability to pay fines, court costs, and other fees, or on the basis of unlawful, auto-generated arrest

warrants for "Failure to Pay" or "Failure to Appear" at a court date;

g.    Release people from jail immediately if they are able to pay their outstanding debts to the Defendant Municipality—or, in some cases, a portion of their outstanding debts—even if the purported basis for the arrest was the criminal act of failing to appear at a court date; and

h.    Detain people in local jails for up to three days, if not longer, if they could not afford to pay their outstanding debts, or at least some portion of such debts.

## i.    Debt-Collection Proceedings in the Defendants' Municipal Courts

77.    The Defendants' municipal courts are staffed primarily by municipal judges, city attorneys and/or prosecutors, and court clerks.

78.    There is extraordinary overlap among these court officials in the Defendant Municipalities.  For example, attorneys from a single law firm (with fewer than 20 attorneys) serve as judge, prosecutor, or city attorney in more than 27% of St. Louis County municipalities (at least 25 out of 90), including many of the Defendant Municipalities.  Likewise, in some instances, the city attorney for one municipality serves as the municipal judge in another.  Put simply, Defendants have created and operated an incestuous system with no meaningful lines between prosecutor and judge; it cannot possibly dispense justice.

79.    Although each of the Defendant Municipalities maintains and operates its own municipal court, the policies and practices in these municipalities are virtually the same in all material respects.

80.    Pursuant to policy and practice, Defendants conduct municipal court sessions approximately only one to four times per month.

81.    The purported rationale of these municipal court sessions is to adjudicate traffic violations and other minor offenses; the real purpose, however, is to collect payments, in an

assembly-line fashion, for outstanding tickets from alleged traffic and other minor municipal code violations.

82.     If a person is too poor to pay her debts, her case can go on indefinitely while Defendants impose ever-mounting fees and surcharges for missed debt-collection payments.

83.     A person can end this debt collection process only by paying what the Defendant Municipality claims that she owes, including any surcharges or fees, which can balloon to sums that dwarf the original fine for the minor traffic offense that launched the vicious cycle.

84.     Defendants do not advise people appearing at these municipal court sessions about their relevant rights under federal or Missouri law, including applicable constitutional rights and state-law defenses and procedures, nor do Defendants provide people any realistic avenue of escape from the pernicious web in which they are entangled.

85.     Pursuant to policy and practice, Defendants do not to provide an attorney to people appearing at these municipal court sessions.

86.     Pursuant to imprison those who are unable to satisfy whatever fines and penalties (either in full or as part of a repayment schedule) Defendants set at these municipal court sessions.  Defendants do so without providing due process, without conducting any meaningful or individualized inquiry into a person's ability to pay, and without considering the availability or suitability of alternatives to imprisonment.

87.     Because of Defendants' policy and practice of not appointing counsel, the vast majority of those jailed for failing to satisfy the payment plan condition that Defendants impose, or in connection with an arrest warrant for "Failure to Pay" or "Failure to Appear," have no access to an attorney.

**ii.      Defendants' Flawed and Unlawful Warrant Process**

88.      Pursuant to policy and practice, Defendants apply arbitrary and illegal policies for the issuance and enforcement of arrest warrants for those unable to satisfy Defendants' extortionate demands.

89.      Defendants issue arrest warrants for failure to make a payment by a certain date ("Failure to Pay") without probable cause to believe that the person has the ability to make a payment.  Defendants prey on the unrepresented, refusing to withdraw arrest warrants even for those who are plainly too poor to make payments.

90.      Defendants also routinely issue arrest warrants for "Failure to Appear" at court dates without giving people adequate notice of the supposed obligation to appear, such as when Defendants fail to serve a valid summons or when the Defendants reschedule a hearing without providing reasonable notice.

91.      The arrest warrants that Defendants issue for "Failure to Pay" and "Failure to Appear" at court dates are auto-generated by a computer program, based on information that the municipal court clerks enter manually into the computer.  No judge or magistrate approves these warrants before they are issued.  On information and belief, all of the Defendant Municipalities use this same computer program to generate arrest warrants without judicial involvement in connection with debt-collection proceedings in their municipal courts.

92.      After arresting a person based on a warrant, Defendants routinely demand that she make immediate payment and, if she does not do so, Defendants hold the person in jail and unnecessarily delay presentment in court for days or weeks in an effort to coerce the victim to pay for her freedom, regardless of her indigence.

### iii.    The Arbitrary and Indefinite Detention of the Indigent

93.    After Defendants book a person in jail for either "Failure to Pay" or "Failure to Appear," Defendants offer immediate release in exchange for a cash payment to the municipality on whose behalf they are incarcerating her.  The amount of cash that Defendants require for release is the total debt the person owes from judgments in old traffic and other misdemeanor cases.

94.    Pursuant to policy and practice, Defendants hold people in jail, in abject conditions, for an indeterminate period of several days or more unless and until they or their families pay the municipality the amounts Defendants demand.

95.    For those individuals that Defendants imprison for failing to satisfy a previously established payment schedule, Defendants confiscate any previous amounts paid by the person and reset the person's debts.  Defendants take these actions without providing any meaningful process or access to counsel.

96.    Without affording any legal process, Defendants also tack on a "warrant" fee for the person's missed payment date.  The person is not arraigned on any new charge for "Failure to Pay" or "Failure to Appear" before Defendants impose the additional "warrant" fee, nor do Defendants allow the person a meaningful opportunity to defend against such a potential charge, or show that Defendants have not satisfied its elements.[16]  Again, Defendants appoint no attorney

---

[16] The practice of adding on an illegal warrant recall fee is widespread throughout the region. Counsel for Plaintiffs has sued several municipalities in state court for imposing these fees.  *See White* v. *City of Pine Lawn*, 14SL-CC04194 (St. Louis County Circuit Court, Dec. 2014); *Pruitt v. City of Wellston*, 14SL-CC04192 (St. Louis Co. Cir. Ct., Dec. 2014); *Lampkin v. City of Jennings*, 14SL-CC04207 (St. Louis Co. Cir. Ct., Dec. 2014); *Wann v. City of St. Louis*, 1422-CC10272 (St. Louis City Cir. Ct., Dec. 2014); *Reed v. City of Ferguson*, 14SL-CC04195 (St. Louis Co. Cir. Ct., Dec. 2014); *Eldridge v. City of St. John*, 15SL-00456 (St. Louis Co. Cir. Ct., Feb. 2015); *Watkins v. City of Florissant*, 16SL-CC00165 (St. Louis Co. Cir. Ct., Jan. 2016).

to assist the person on any new charge.  Defendants simply autocratically add the charges to the person's debts.

97.    Through these practices, Defendants strong-arm many impoverished people in the Defendant Municipalities and elsewhere in the metropolitan area to pay Defendants thousands of dollars over a period of many years based on a few relatively inexpensive initial tickets.

98.    If they were able, a person could end this cycle by paying the balance of her debt. It is and has been the policy and practice of the Defendants to allow any inmate at any time to pay the full amount of the debt owed and to be released immediately, terminating all existing "cases" for which debt is being collected.

iv.    **Sequential Detentions on Behalf of Multiple Municipalities**

99.    In many cases, Plaintiffs and others similarly situated receive citations for traffic and other minor violations in multiple different municipalities (in some cases, for the exact same violation, such as a broken taillight).

100.    Many of the Plaintiffs, and others like them, have outstanding debts in several different municipalities that they simply cannot afford to pay.  As these rapidly compounding fines, fees, costs, and surcharges from multiple municipalities pile up, the likelihood that an indigent person will be able to pay off even one municipality diminishes greatly, creating a never-ending spiral of debt, interest charges, missed payments, and incarceration.

101.    Pursuant to policy and practice, Defendants hold inmates in their jails on behalf of multiple municipalities.  In some instances, Defendants imprison people for days or weeks at a time on behalf of multiple municipalities in a sequential fashion (*i.e.*, Defendants hold the inmate in one municipality's jail for multiple other municipalities, one after another).

102.    In other words, as soon as an inmate pays off his debt for one municipality to secure his "release," Defendants return him to his jail cell (or sometimes transfer him to the custody of a different municipality) for the alleged failure to pay debts owed to another municipality.

103.    In this manner, Defendants may hold an indigent person in jail for extended periods of time—weeks or, in some cases, even months—simply because he is too poor to pay off his debts, and his imprisonment only exacerbates his poverty, making him even less able to break out of this vicious cycle of harassment and extortion.

**v.    Defendants Create a Culture of Fear**

104.    Defendants' policies and practices have engendered fear among the poorest residents of the St. Louis metropolitan area.

105.    Many of these residents do not, or are reluctant to, leave their homes, or to travel between municipalities, for fear of being stopped, arrested, and incarcerated based on outstanding debts on traffic tickets that they cannot afford to pay.

106.    They are afraid to appear at the payment window or in Defendants' courts to explain their indigence because they justifiably fear that Defendants will jail them without any meaningful process.  This allows Defendants to jack up the fees even higher.

107.    The fear that Defendants have fostered has further degraded the quality of life of the poorest residents in Defendants' municipalities and elsewhere in the metropolitan area. Many have cut back on food, clothing, utilities, sanitary home repairs, and other basic necessities of life to satisfy, or try to satisfy, Defendants' rapacious demands for money.

### vi.     The Cycle of Debt and Jailing

108.    Like the other impoverished people stuck in the tentacles of Defendants' brutal and pernicious system, Plaintiffs have been overwhelmed by the combination of rapidly compounding fines, fees, costs, and surcharges from multiple municipalities, as well as the cycle of repeated jailings that leads to lost jobs, poor health, and inadequate care for dependents.  After scraping together cash from family and friends and borrowing money to pay off one Defendant, Plaintiffs and other Class members often find themselves under arrest by another Defendant.

109.    For years, Plaintiffs have tried unsuccessfully to navigate this system without financial resources and without the assistance of a lawyer who understands the process—never knowing if arrest awaits when they leave the house, fearing, if they are arrested, indefinite incarceration because of their poverty.  The futility of these efforts fundamentally alters Plaintiffs' lives and often breeds a level of hopelessness that corrodes any bond with the community.

110.    The fear of losing basic rights with no recourse is a daily fact of life for Plaintiffs and thousands of others in the metropolitan area.

## D.     The Defendant Municipalities Act Pursuant to a Common Plan or Scheme

111.    The Defendant Municipalities have acted, and continue to act, in concert to perpetuate this unlawful scheme, incarcerating indigent persons based on their inability to pay fines and associated costs from traffic tickets and other minor municipal violations.

112.    Each of the Defendant Municipalities routinely arrests and detains people on the basis of auto-generated or otherwise unlawful arrest warrants that other Defendant Municipalities issue in connection with unpaid tickets for traffic and other minor offenses.  The Defendant Municipalities know, or should know, that these arrest warrants are unlawful.

113.    Each of the Defendant Municipalities, excluding St. Ann, only has the capacity to hold a few individuals at any given time, which limits those municipalities' ability to generate funds.

114.    In contrast, "[t]he jail in St. Ann is much bigger than others in nearby towns.  It sleeps 42, not including a pen for short-timers and a juvenile area."[17]

115.    St. Ann provides jailing services for each of the other Defendant Municipalities. Pursuant to contractual arrangements, St. Ann charges each of the other Defendant Municipalities a fee for each day St. Ann incarcerates an individual on the municipality's behalf. On information and belief, this fee is $35 per day.

116.    St. Ann routinely holds indigent persons in its jail on behalf of multiple municipalities.  In some instances, St. Ann holds inmates for days or weeks at a time on behalf of the Defendant Municipalities in a sequential fashion (*i.e.*, the inmate is held in St. Ann's jail for multiple other municipalities, one after another).

117.    For example, St. Ann might hold an individual in its jail for three days on behalf of Defendant Municipality X.  Upon the person's "release" from the custody of Defendant Municipality X, St. Ann immediately transfers the person to the custody of Defendant Municipality Y (on whose behalf St. Ann also holds the person).  Thus, the person never sees the light of day.  Instead, St. Ann continues to hold the person in its jail, but now it is on behalf of Defendant Municipality Y (unless, of course, the person can afford to pay for her release).

118.    As described above, there also is substantial overlap among the municipal judges, city attorneys, and prosecutors that form the bedrock of Defendants' municipal court system.

---

[17] Bogan, *supra* at n. 3.

**E.**     **The Named Plaintiffs' Imprisonment**

119.    Defendants' policies and practices in collecting unpaid fines, fees, costs, and surcharges relating to traffic tickets and other minor offenses, for at least the past five years, caused and exemplifies the violations of the named Plaintiffs' fundamental constitutional rights.

   **i.**     **Quinton M. Thomas**

120.    Quinton Thomas is a 28-year-old man who resides in St. Louis, Missouri.  He is African-American.

121.    Mr. Thomas has been jailed in the St. Ann Jail at least three times on warrants issued by Normandy and Edmundson, among other municipalities.   The warrants initially stemmed from minor, driving-related offenses, such as running a stop sign, no proof of insurance, and improper vehicle registration.

122.    In 2012, officers of the Normandy Police Department stopped Mr. Thomas for invalid license plates and failure to register his vehicle.  The officers issued Mr. Thomas citations for these violations totaling $600.

123.    Mr. Thomas could not afford to pay the $600 fine.  Mr. Thomas appeared at the Normandy Municipal Court and explained to the municipal court judge that he could not afford to pay the $600 fine.

124.    The municipal court judge responded that if Mr. Thomas did not pay at least $100, Normandy would issue a warrant for his arrest.  Mr. Thomas responded that he could not afford to pay $100.  He asked whether he could pay $50 instead, and the judge stated that he could not.  Neither the municipal court judge nor any other court official made any inquiry into Mr. Thomas' ability to pay, nor did they appoint an attorney for him.

125.   Neither the municipal court judge nor any other court official offered Mr. Thomas alternatives to the fine, such as community service, even though Mr. Thomas unequivocally informed them that he could not afford to pay even $100 of the fine.

126.   The municipal court judge, apparently indifferent to Mr. Thomas' pleas of indigence, later issued a warrant for his arrest based on Mr. Thomas' failure to pay $100.

127.   In 2013, Mr. Thomas was driving to work and was stopped by officers of the Edmundson Police Department for allegedly failing to make a complete stop at a stop sign.  Mr. Thomas denies running the stop sign.  The officers informed Mr. Thomas that he had outstanding warrants in Normandy, Pine Lawn and St. John, among others.  The Edmundson police officers took Mr. Thomas to the St. Ann Jail.

128.   Officers at the St. Ann Jail informed Mr. Thomas that he could be released if he paid a $150 bond.  There was no bail hearing.  Mr. Thomas could not afford to make this payment and thus was unable to secure his release.  The St. Ann Jail held Mr. Thomas for three days on behalf of Normandy and Edmundson.

129.   The conditions in the St. Ann Jail were terrible.  The jail cells were packed four people to a cell.  The cells were so filthy that Mr. Thomas did not want to make contact with the walls or even the mattresses, which appeared not to have been cleaned in years.  Jail officers provided Mr. Thomas (and other inmates) with a used blanket, but nothing else to separate himself from the disgusting and unsanitary mattress.

130.   The food in the St. Ann Jail was unhealthy and nearly inedible.  Every meal consisted of a bologna sandwich (with greenish meat and hard bread), applesauce, and black coffee.

131.    After three days, the St. Ann Jail "released" Mr. Thomas, and officers from the City of St. John transported Mr. Thomas to the St. John Police Department.

132.    The St. John Police told Mr. Thomas that he had an outstanding warrant for an allegedly-unpaid parking ticket in St. John, information of which Mr. Thomas was previously unaware.  Officers further informed him that, because of additional late fees and fines that had accumulated over time, the amount owed had ballooned from approximately $100 to almost $500.

133.    Police officers in St. John informed Mr. Thomas that they were going to take him to the St. Louis County Justice Center in Clayton unless he could make a payment of at least $120.  There was no bail hearing.  Mr. Thomas contacted his father, who was able to pay the $120 bond to secure Mr. Thomas' release from St. John.

134.    Shortly after his release, Mr. Thomas appeared at the Edmundson Municipal Court and explained to the municipal court judge that he could not afford to pay the $300 citation for running a stop sign.

135.    The municipal court judge was indifferent to Mr. Thomas' pleas of indigence and directed Mr. Thomas to see the municipal court clerk to set up a payment plan.  The payment plan, however, only worsened Mr. Thomas' situation—it included additional fees and costs and exorbitant interest rates, resulting in monthly payments that Mr. Thomas could not afford.

136.    Neither the municipal court judge nor any other court official made any inquiry into Mr. Thomas' ability to pay, nor did they appoint an attorney for Mr. Thomas.

137.    Neither the municipal court judge nor any other court official offered Mr. Thomas alternatives to the fine, such as community service, even though Mr. Thomas unequivocally informed them that he could not afford to pay the fine.

138.   A key reason Mr. Thomas could not afford to make the monthly payments required by the payment plan was that he had outstanding (and continually compounding) fines and court costs stemming from tickets for traffic and other minor violations in several other municipalities, including St. Charles, St. John, and Normandy.

139.   Mr. Thomas missed a monthly payment because he could not afford to make the payment.  Because Mr. Thomas could not afford to make the monthly payments, Edmundson issued a warrant for his arrest for "Failure to Pay" and/or "Failure to Appear."

140.   As a result of the traffic tickets—only one of which resulted from an alleged moving violation—and warrants issued by Edmundson and Normandy, Mr. Thomas' license was suspended in 2013, causing Mr. Thomas to lose his trucking job (which required a commercial driver's license).

141.   In January 2015, officers of the Dellwood Police Department responded to complaints of a domestic disturbance at Mr. Thomas' home stemming from a verbal argument between Mr. Thomas and his girlfriend.  The officers ran Mr. Thomas' and his girlfriend's names and discovered that both had outstanding warrants for unpaid traffic tickets.  Notably, Dellwood did not issue any charges and did not make any arrests in connection with the domestic disturbance complaint.

142.   The officers arrested Mr. Thomas and took him to the St. Louis County Justice Center in Clayton on outstanding warrants for unpaid traffic tickets.  At the Justice Center, jail officers informed Mr. Thomas that they would release him if he paid a bond.  There was no bail hearing.  Mr. Thomas could not afford to make this payment and thus was unable to secure his release. Mr. Thomas was held in Clayton for approximately three days.

143.   After approximately three days, officers at the Justice Center transferred Mr. Thomas to the St. Ann Jail, which held him on behalf of Normandy and Edmundson, among other municipalities, for the outstanding warrants described above.  Officers at the St. Ann Jail informed Mr. Thomas that they would release him if he paid a bond.  There was no bail hearing.  Mr. Thomas was once again unable to pay a bond to secure his release from St. Ann.

144.   As on previous occasions, the St. Ann Jail incarcerated Mr. Thomas in overcrowded and filthy cells, and provided disgusting and unhealthy food.

145.   After at least one day in the St. Ann Jail, officers at the St. Ann Jail transferred Mr. Thomas to the O'Fallon Jail.

146.   Officers at the O'Fallon Jail informed Mr. Thomas that his bond to secure his release was $340.  There was no bail hearing.  Mr. Thomas was able to scrounge together enough money from family and friends to pay a $340 bond to O'Fallon in order to secure his release.

147.   In May 2016, officers of the Beverly Hills Police Department stopped Mr. Thomas for a broken bumper. The officers informed Mr. Thomas that he had outstanding warrants in Normandy and Edmundson, among others, and took Mr. Thomas to the Beverly Hills Police Department.  The officers detained Mr. Thomas at the Beverly Hills Police Department for approximately one hour.

148.   The officers told Mr. Thomas that he would need to pay $300 "to get out."  There was no bail hearing.  Mr. Thomas was unable to pay that bond amount.

149.   While Mr. Thomas was detained at the Beverly Hills Police Department, the officers refused to allow any of Mr. Thomas' friends or family to retrieve the car.  As a result, Mr. Thomas' car was sent to impound.  Mr. Thomas could not afford to get the car out of impound and consequently lost his car permanently.

150.    Officers from the St. Ann Police Department picked Mr. Thomas up from the Beverly Hills Police Department and took him to the St. Ann Jail on behalf of Normandy and Edmundson (in connection with warrants for unpaid traffic tickets and "Failure to Pay" and/or "Failure to Appear" charges, as described above).

151.    As on previous occasions, the St. Ann Jail incarcerated Mr. Thomas in overcrowded and filthy cells, and provided disgusting and unhealthy food.

152.    Mr. Thomas was held in the St. Ann Jail for a day and a half.  Mr. Thomas missed a day of work at his construction job because he was incarcerated.  As a result of missing work due to his incarceration for failure to pay fines and costs from minor, traffic-related offenses, Mr. Thomas was fired from his construction job.

**ii.    Roelif Earl Carter**

153.    Roelif Earl Carter is a 63-year-old husband and the sole provider for his wife and daughter.  He is African-American.

154.    Mr. Carter is a Veteran of the United States Air Force and was honorably discharged from service in 1976.

155.    After his service in the Air Force, Mr. Carter worked for the Ford Motor Company for thirteen years until he suffered a brain aneurysm that left him unable to work.  He currently receives Supplemental Security Income due to his disability.

156.    Mr. Carter has been jailed in the St. Ann Jail on at least four occasions in connection with warrants issued by Normandy and Cool Valley.  The warrants issued by Normandy and Cool Valley initially stemmed from minor traffic infractions, including driving with a suspended license and failure to provide proof of insurance, from the early 2000s.

157.    In October 2002, officers of the Cool Valley Police Department stopped Mr. Carter and issued him a citation for failure to provide proof of insurance.

158.    Mr. Carter could not afford to pay Cool Valley's fine.  On multiple occasions, Mr. Carter appeared at the Cool Valley Municipal Court in connection with the fine for his traffic offense.  Mr. Carter explained to the municipal court judge that he could not afford to pay the citation.  The municipal court judge did not make any inquiry into Mr. Carter's ability to pay, nor did the judge appoint an attorney for Mr. Carter.  Instead, the judge directed Mr. Carter to see the municipal court clerk to set up a payment plan.

159.    The municipal court clerk set up a payment plan for Mr. Carter, requiring him to pay $50 per month until his fine (including court costs, surcharges, and interest) was paid off in full.

160.    When Mr. Carter was able to make his monthly payment (which he was able to do on some occasions), he was not required to appear at scheduled court sessions of the Cool Valley Municipal Court.

161.    However, when Mr. Carter was not able to make his monthly payment, Cool Valley instructed that he was required to appear at scheduled court dates at the Cool Valley Municipal Court.  At these municipal court sessions, the judge inquired only as to whether Mr. Carter had his monthly payment with him.

162.    On each of the occasions Mr. Carter appeared at the Cool Valley Municipal Court, Mr. Carter did not have the requisite funds to make his monthly payment.  Thus, on each occasion, the municipal court judge directed Mr. Carter to sit in the back of the courthouse until the end of the session (which could be up to two hours later), at which point the judge directed Mr. Carter to see the municipal court clerk.  When Mr. Carter left the court, he owed additional

court costs, surcharges, and interest payments that bore no relationship to the actual cost, if any, the court incurred by virtue of the missed payment.

163.   When Mr. Carter was not able to make his monthly payment, the Cool Valley Municipal Court automatically generated a warrant for his arrest (for "Failure to Pay" or "Failure to Appear").  On multiple occasions in the last five years, Cool Valley automatically generated arrest warrants for Mr. Carter for "Failure to Pay" or "Failure to Appear."

164.   Mr Carter had outstanding arrest warrants from Cool Valley from 2002 until early 2016, when ArchCity Defenders secured a dismissal of charges against Mr. Carter.  All of his warrants were for "Failure to Pay" or "Failure to Appear" offenses in connection with traffic-related infractions for which Mr. Carter could not afford to pay the fine.

165.   In November 2012, officers of the Normandy Police Department stopped Mr. Carter and issued him a citation for allegedly running a red light, driving with a suspended license, and no proof of insurance.

166.   Mr. Carter could not afford to pay the fine issued by Normandy.  Mr. Carter knew that many municipalities, including Normandy, did not accept partial payment and engaged in a regular practice of arresting people who were unable to pay their fines.  Because he could not afford to pay the fine, Mr. Carter did not appear at his scheduled court date and Normandy issued an arrest warrant for Mr. Carter for "Failure to Pay" and/or "Failure to Appear."

167.   Following Normandy's issuance of an arrest warrant for Mr. Carter's alleged "Failure to Pay" and/or "Failure to Appear," Mr. Carter has appeared (or attempted to appear) in Normandy Municipal Court on at least two occasions.  On neither occasion did the municipal court judge or any other municipal court official make any inquiry into Mr. Carter's ability to pay, nor did the judge appoint an attorney for Mr. Carter.

168.    On the first occasion, the municipal courthouse was overcrowded and Mr. Carter was unable to get in the door.  Even though Mr. Carter tried to appear for his court date and was unable to do so only because the courthouse was overcrowded, Normandy issued a warrant for Mr. Carter's arrest for "Failure to Pay" and/or "Failure to Appear."

169.    On the second occasion, in or around January 2013, Mr. Carter appeared before a municipal court judge.  The judge asked whether Mr. Carter had money with him to pay the outstanding fines and costs.  Mr. Carter explained that he did not have money with him and could not afford to pay the fine, and asked whether community service was an option since Mr. Carter was indigent and could not afford to pay.  The judge said no to Mr. Carter's request for community service and directed Mr. Carter to see the municipal court clerk.

170.    The municipal court clerk informed Mr. Carter that if he did not pay $100 by the next day, Normandy would issue a warrant for Mr. Carter's arrest.  Mr. Carter could not afford to make the $100 payment, and Normandy thereafter issued a warrant for his arrest.

171.    As of March 2015, Mr. Carter had five outstanding arrest warrants from Normandy, all of which are for "Failure to Pay" or "Failure to Appear" offenses in connection with traffic-related infractions for which Mr. Carter could not afford to pay the fine.

172.    In December 2012, Mr. Carter was pulled over in Ferguson by officers of the Ferguson Police Department.  The officers informed Mr. Carter that he had outstanding warrants in Cool Valley and Normandy (as described above) and took Mr. Carter to the St. Ann Jail.

173.    Officers of the St. Ann Jail informed Mr. Carter that he could be released if he paid a $500 bond.  There was no bail hearing.  Mr. Carter could not afford to make this payment and thus was unable to secure his release.

174.    The St. Ann Jail held Mr. Carter for three days on behalf of Cool Valley.   After three days, Cool Valley "released" Mr. Carter.   However, he remained in the St. Ann Jail, which now held him on behalf of Normandy (based on the outstanding warrants, as described above). The St. Ann Jail officers again informed Mr. Carter that he could be released if he paid a $500 bond.  Again, there was no bail hearing.  And again, Mr. Carter was unable to make this payment to secure his release.

175.    Mr. Carter spent three days in the St. Ann Jail on behalf of Normandy and then—after a total of six days—the St. Ann Jail finally released him.

176.    In or around December 2013, officers of the Ferguson Police Department stopped Mr. Carter and again incarcerated him in the St. Ann Jail on behalf of Cool Valley and Normandy for the same "Failure to Pay" and/or "Failure to Appear" warrants discussed above.

177.    The St. Ann Jail again held Mr. Carter for three days on behalf of Cool Valley and three days on behalf of Normandy (for a total of six days).

178.    After six days, the St. Ann Jail "released" Mr. Carter on behalf of Normandy. However, officers of the St. Ann Jail informed Mr. Carter that they were continuing to hold him on behalf of St. Louis City.  Mr. Carter told the jail officers that he did not have any outstanding warrants in St. Louis City.   The officers, presumably after confirming that Mr. Carter did not have any outstanding warrants in St. Louis City, finally released him at 2:00 a.m.  The officers never allowed Mr. Carter to make a free phone call, nor did they provide him any means of transportation from the Jail.  As a result, Mr. Carter had to walk 15 miles to his home on a cold night, finally reaching his home the next morning.

179.    The conditions in the St. Ann Jail were filthy.  Mr. Carter was given an orange jumpsuit to wear.  The food provided to Mr. Carter was inadequate, sometimes only a honey bun and a packaged pot pie for the whole day.

### iii.    Bradley Jiles

180.    Bradley Jiles is a 24-year-old African American man.

181.    Mr. Jiles has been jailed more than ten times in the last five years in connection with alleged municipal ordinance violations.  Over the span of approximately one year — from the summer of 2014 to the spring of 2015 — Mr. Jiles was jailed on four separate occasions in connection with unpaid fines for traffic and other minor violations.

182.    Particularly, in June 2015, Mr. Jiles was driving to court after work to obtain a replacement title for his car after the original title had been damaged in the rain.  He was driving within the speed limit and was pulled over.  When Mr. Jiles inquired as to why, the officer told him that he was unregistered, had been speeding, and looked suspicious.  The officer said to Mr. Jiles, "I could be an asshole and give you all these tickets because of your attitude."  The officer cited Mr. Jiles for failure to register, improper vehicle registration, and expired license.

183.    Mr. Jiles was arrested and spent two days in St. Louis County Justice Center.  The holding cell was covered with old gum and graffiti.  Mr. Jiles pled guilty and was sentenced to two days of time served.

184.    Officers at the Justice Center then transported Mr. Jiles to the Hazelwood Jail on a warrant for "Failure to Pay" and/or "Failure to Appear" in connection with an unpaid traffic ticket for driving with an expired license.

185.    After 24 to 48 hours, the Hazelwood Jail "released" Mr. Jiles and transported him to the St. Ann Jail on a warrant for "Failure to Pay" and/or "Failure to Appear" in connection with an unpaid traffic ticket in Edmundson for driving with invalid license plates.

186.    Officers at the St. Ann Jail told Mr. Jiles that he could secure his release if he paid several hundred dollars in bond to Edmundson (based on outstanding fines for traffic and other minor violations).  There was no bail hearing.

187.    Mr. Jiles could not afford to pay the bond to secure his release.  As a result, the St. Ann Jail held Mr. Jiles for at least three days.  While he was in the St. Ann Jail, Mr. Jiles repeatedly asked how long he would be held, but was told nothing.

188.    Finally, one of the St. Ann Jail officers noticed in Mr. Jiles's file that Mr. Jiles should have been released.  The St. Ann Jail released Mr. Jiles later that day.

189.    Mr. Jiles lost income because of the amount of time he spent in jail, all for what amounted to routine, unjustified, or discriminatory traffic stops and minor municipal violations.

**iv.    Angela Davis**

190.    Angela Davis is a 44 year-old African-American mother of four.  She resides in St. Louis, Missouri and has worked for Wells Fargo Advisors in Frontenac for the last eight years.

191.    Ms. Davis has appeared before multiple municipal courts, including Normandy and Frontenac, but fears making an appearance if she cannot afford to pay.  She has been told on at least one occasion, by a Normandy court clerk, that she would be locked up if she did not show up to court and pay.

192.    Despite the threat of imprisonment, Ms. Davis was never offered legal counsel by any municipal court.  Nor did any court ever inquire into her ability to pay the fine.  Rather, in

every instance in which Ms. Davis has appeared in municipal court, the municipal court judge has dictated the fine, recited a list of pre-determined options—none of which were suitable for Ms. Davis' individual circumstances—and informed Ms. Davis to speak with the clerk.

193.   Ms. Davis makes every effort to pay off any outstanding debts, but her financial resources remain limited.  She recently paid off her debt in Normandy, which took almost a year at $100/month, a significant financial burden.  She also has sought relief through the "amnesty" program in several municipalities.[18]  Despite her efforts, she still has two warrants in Florissant outstanding with a pending amnesty application.

194.   As a result, Ms. Davis has lived under a cloud of uncertainty that prevents her from living a normal life without fear of imprisonment due to her financial circumstances.  At any time, Defendants—under the guise of a routine traffic stop—can and do arrest and jail Ms. Davis because she is unable to afford earlier fines.

195.   A Sunday evening in September 2013 illustrates the manner in which Defendants punish Ms. Davis for her financial circumstances.  That evening, Ms. Davis was waiting to make a left turn at a Florissant intersection.  She had two passengers in her car.  One of these passengers, Mr. David Hines, is African-American.  The other is white.

---

[18] St. Louis County offers an "amnesty" program in many of its municipal courts on a yearly basis.  *See, e.g.*, http://www.mslaca.org/index.php/amnesty-program/.  Rather than acting as a true amnesty, this program simply allows participants to receive a voucher upon the payment of a $10 processing fee that must be presented at the municipal court's next court date.  At that court date, the participant must also present $100 in cash.  If the participant pays $110, the warrant will not be executed.  Even if the participant pays the $110 and has her warrant recalled, this "amnesty" program does not address the underlying fines and fees.  The participant is placed back on a payment docket and is left without an attorney to negotiate his or her remaining fines.  Additionally, it costs participants $110 per municipality where they have an active warrant.  This can add up quickly to $500-$700 just to have the warrants recalled while the underlying cases remain pending.

196.     While she waited, a police car turned around and pulled up next to her.  After the light turned green, Ms. Davis made a left turn.  The police car flashed its lights and pulled her over.  The officer said he pulled Ms. Davis over because her tags were expired.

197.     The officer ran the names of Ms. Davis and her two passengers.  The search returned multiple warrants for Ms. Davis in Normandy from 2013 (no proof of insurance, failure to register her vehicle, and corresponding violations of "Failure to Pay" and/or "Failure to Appear"), University City from 2012 (failure to register her vehicle and speeding), and Florissant (failure to register her vehicle).

198.     After the police completed their search for outstanding warrants, they arrested Ms. Davis and Mr. Hines.  The white passenger, despite having an outstanding warrant in Washington state, was not arrested.

199.     Over the next 22 hours, Ms. Davis was dragged to four separate jails.  Her first stop was Florissant Jail.  She arrived there around 10:00 or 11:00 p.m. that Sunday night, leaving around 1:00 a.m. on Monday morning.

200.     When she arrived at the Florissant Jail, officers informed her that she could secure her release if she paid a bond of $800, which was far beyond her ability to pay.  There was no bail hearing.  The officers did not inform Ms. Davis how that amount was calculated, nor did any official at the Florissant Jail ask if she would be able to afford payment.  Instead, jail officers told Ms. Davis that she "gotta do some time" in Florissant for at least two-and-a-half hours "for her situation" before she could be passed off to the next municipality.  In the meantime, Florissant forced Ms. Davis to don a prisoner's jumpsuit.

201.     Florissant failed to provide Ms. Davis a court date or any notice of next steps following her imprisonment.  Instead, they handed her off to University City.

202.    Upon arriving at University City, Ms. Davis learned that her sister had paid the $150 bond amount owed University City while Ms. Davis was imprisoned in Florissant. This payment should have been sufficient to secure Ms. Davis' release, but it merely cleared her debt to University City.

203.    University City held Ms. Davis in jail for approximately one hour. The jail was an older facility that was not well maintained, and had not been cleaned for quite some time.

204.    University City next transported Ms. Davis to Frontenac. The Frontenac Jail held Ms. Davis for two hours. Ms. Davis did not know why the Frontenac Jail was holding her, nor did jail officers inform her of the reason for her incarceration.

205.    After two hours, the Frontenac Jail "released" Ms. Davis and gave her a court date. When Ms. Davis later appeared at the Frontenac municipal court, she learned that the reason for her incarceration was an unpaid $21.40 court fee. Ms. Davis lost her freedom in Frontenac for approximately two hours for this *de minimis* fee. No effort was made to address this issue *before* she was jailed or to consider whether she had the ability to pay.

206.    After her "release" from Frontenac, Ms. Davis was next transported to the St. Ann Jail. The St. Ann Jail held Ms. Davis on outstanding warrants in Normandy for unpaid traffic tickets. Officers at the St. Ann Jail made no inquiry into Mr. Davis' ability to pay her outstanding fines.

207.    Ms. Davis spent around six hours locked in the St. Ann Jail, growing increasingly unnerved by sharing a cramped, noisy cell with a schizophrenic inmate who was announcing her intent to kill someone. The guards made no effort to separate this inmate from others or otherwise to assure the safety of Ms. Davis and the other inmates.

208.    Officers at the St. Ann Jail did not tell Ms. Davis why she was in jail and refused to discuss a bond.   The officers told Ms. Davis that she would have to call the Normandy Municipal Court to find out how much money she owed.

209.    The officers, however, did not allow Ms. Davis to make any calls, thereby preventing her from calling the court to determine how much money she owed, from attempting to obtain money from family or friends to secure her release, and from exercising her right to seek legal counsel.

210.    After being detained for around two hours, Ms. Davis' sister paid Ms. Davis' bond for her Normandy warrant.   Officers at the St. Ann Jail refused to release Ms. Davis, however, claiming she had a pending warrant in Berkeley.

211.    Ms. Davis' sister drove to Berkeley twice to pay her sister's bond.   On both occasions, Berkeley officials said that they had notified St. Ann that they did not want to detain Ms. Davis.  Notwithstanding this communication from Berkeley, the St. Ann Jail arbitrarily and petulantly continued to hold Ms. Davis for several more hours.

212.    Finally, the St. Ann Jail released Ms. Davis.  Officers at the St. Ann Jail did not tell Ms. Davis why she had been released; they merely gave Ms. Davis a sheet of paper with a court date, which they had stapled to her belongings.

213.    At no time during her stay in four separate jails did any police officer, guard or other official seek to ascertain Ms. Davis' ability to pay the debts that the municipalities claimed that she owed.

214.    At no time during her stay in four separate jails was Ms. Davis brought before a judge or offered assistance of counsel.

215.    The Defendant Municipalities treated Ms. Davis with disrespect and made no effort to provide due process as they shuffled her from jail to jail.

**v.    Donya Pierce**

216.    Plaintiff Donya Pierce is a 26-year-old African-American mother of two children.

217.    Ms. Pierce is currently employed at Mount Carmel Rehabilitation Center.

218.    In March 2014, officers of the St. Ann Police Department pulled Ms. Pierce over for a routine traffic stop.  Ms. Pierce was driving a male passenger at the time.

219.    The officers searched the vehicle without Ms. Pierce's consent and found that the male passenger was in possession of marijuana.

220.    Although the officers did not find any marijuana in Ms. Pierce's possession, they arrested her for marijuana possession and took her to the St. Ann Jail.  Officers at the St. Ann Jail informed Ms. Pierce that she owed a cash bond of more than $1,000.  There was no bail hearing. Ms. Pierce was unable to afford to pay this bond amount, and thus was unable to secure her release.

221.    The officers also informed Ms. Pierce that she had warrants for traffic-related offenses in St. Ann, Jennings, Hazelwood, University City, Pagedale, and Breckenridge Hills.

222.    The St. Ann Jail held Ms. Pierce for three weeks.  Each week, officers of the St. Ann Jail took Ms. Pierce to appear before a St. Ann Municipal Court judge.  Each time, Ms. Pierce explained that she was innocent of the marijuana charge and pleaded for her release.  Each time, the municipal court judge denied these pleas and sent her back to the St. Ann Jail.

223.    The conditions at the St. Ann Jail were overcrowded and unsanitary.  Although there were only eight beds per cell, roughly 20 women were assigned to each cell.  Women who were ill and experiencing drug withdrawals—the symptoms of which included vomiting,

flatulence, nausea, and disorientation, among many other things—were placed in the same cells, which exacerbated the unsanitary conditions.

224.    Inmates at the St. Ann Jail were not allowed to shower until they had been at the jail for a week.  Further, there were no trashcans in the cells, so inmates regularly piled their trash in the corner.   In addition to being unsanitary, these conditions created a pungent, unpleasant odor in the jail.

225.    The officers at the St. Ann Jail refused to allow Ms. Pierce to use the phone.  As a result, she lost her job and her house.  In addition, Ms. Pierce's son missed approximately four weeks of school and was held back a grade because no one was able to take him to school besides his mother.  Further, Ms. Pierce almost lost custody of her son when one of his teachers called the Child & Family Services Agency when he abruptly stopped coming to school. Because Ms. Pierce could not use the phone, she was unable to call the school to explain to them what was happening.

226.    After three weeks, the St. Ann Jail finally released Ms. Pierce.   St. Ann subsequently dropped the charges against Ms. Pierce for possession of marijuana.

227.    After the St. Ann Jail "released" Ms. Pierce, officers immediately transferred her to the Jennings Jail.   The Jennings Jail held Ms. Pierce for three days in equally unsanitary conditions.

228.    At the end of three days, Ms. Pierce paid $100 to secure her "release" from Jennings.  However, Jennings then transferred Ms. Pierce to the Hazelwood Jail.  Hazelwood detained Ms. Pierce for 12 hours.  Ms. Pierce paid $200 to secure her "release" from Hazelwood. However, Hazelwood then transferred Ms. Pierce to the University City Jail, which held Ms.

Pierce for 12 hours before transferring her to the Pagedale Jail.  Pagedale held Ms. Pierce for 12 hours before finally releasing her.

229.    Each of these incarcerations were in connection with "Failure to Pay" or "Failure to Appear" warrants stemming from unpaid fines for traffic and other minor municipal violations.  On no occasion did any of the jails or jail officers inquire into Ms. Pierce's ability to pay, nor did they hold a bail hearing, provide her an attorney, or offer alternatives to the fine.

**vi.    Brittany Ellis**

230.    Brittany Ellis is a 26 year-old African-American woman.

231.    Ms. Ellis is currently employed as a cook in the Lake St. Charles Retirement Home.

232.    In July 2015, at approximately 9:30 p.m., Ms. Ellis was driving home from her job at the Family Dollar in her mother's truck.

233.    Officers of the St. Ann Police Department stopped Ms. Ellis.  The officers informed Ms. Ellis that they were pulling her over because her license plate information did not match the truck she was driving.  She tried to explain that she was driving her mother's truck, but to no avail.

234.    The officers arrested Ms. Ellis and had the truck she was driving towed.  Ms. Ellis and her mother did not have the $500 required to release the truck from the towing company.  As a result, Ms. Ellis' mother lost the truck permanently.

235.    The officers took Ms. Ellis to the St. Ann Jail.  The St. Ann Jail held Ms. Ellis for approximately eight days.  During that time, no St. Ann official informed Ms. Ellis of her bond amount (if any), the reason for her detention, or for how long she would be held.

236.    The St. Ann Jail mistreated Ms. Ellis.  Officers took Ms. Ellis' glasses and refused to return them to her, even though she explained that she is legally blind.

237.    Ms. Ellis was menstruating during the course of her incarceration at St. Ann. When she asked for sanitary napkins and/or tampons, a St. Ann correctional officer threw a sanitary napkin and tampons at her.  Further, officers did not give her the privacy to go to the bathroom to handle her menstruation.  As a result, Ms. Ellis was forced to change her pads in her cell in front of other inmates and correctional officers.

238.    After eight days, the St. Ann Jail finally "released" Ms. Ellis and immediately transferred her to the St. Louis County Justice Center on a Hazelwood warrant for traffic-related offenses.

239.    The St. Louis County Justice Center held Ms. Ellis for 12 days.  During that time, officers at the Justice Center subjected Ms. Ellis to an extremely invasive search, forcing her to undress in front of a police officer who told her that she had "big breasts."  The officers also forced Ms. Ellis to spread her buttocks for the search, even though Ms. Ellis was in jail for a nonviolent, traffic-related offense.

240.    After 12 days, the St. Louis County Justice Center "release" Ms. Ellis and immediately transferred her to the Ferguson Jail.  The Ferguson Jail held Ms. Ellis for two days. During this time, officers at the Ferguson Jail did not inform her of the bond amount, ultimately releasing her and giving her a court date to appear in Ferguson Municipal Court.

241.    In total, Ms. Ellis was incarcerated for 22 straight days for her inability to pay fines for traffic-related offenses.  Because she was detained for so long, Ms. Ellis was terminated from her job at the Family Dollar (the store informed her that they were unable to hold her position for longer than a week).

242.    Currently, Ms. Ellis has multiple traffic-related tickets assessed against her.   In total, she owes $2,551 to six different municipalities in unpaid fines, court costs, surcharges, and interest.

243.    Ms. Ellis is on payment plans for each of these municipalities.   However, each plan requires monthly payments ranging from $50 to $100 per month.   Ms. Ellis cannot afford to make these monthly payments.   She works as a cook at the Lake St. Charles Retirement Home and receives $680 in income every two weeks.   After paying her rent, utilities, car note, car insurance, and cell phone bill, she cannot afford to make all of her monthly payments, which total $300 or more a month.

244.    Further, the grip of the municipal court system has stymied Ms. Ellis' efforts to increase her income.   Ms. Ellis recently applied for a job as an overnight cleaner at the Hollywood Casino.   However, the Hollywood Casino will not hire Ms. Ellis because she has open arrest warrants for "Failure to Pay" and/or "Failure to Appear."   Thus, Defendant's unlawful revenue-generation scheme not only has confiscated Ms. Ellis' liberty and any spare money she is able to scrounge together, it also has impeded her ability to get a higher paying job that might allow her to finally get out of the Defendant Municipalities' debt.

**vii.    Keilee Fant**

245.    Keilee Fant is a 37-year-old African-American mother of nine who has been working as a Certified Nurse's Assistant for twenty (20) years.

246.    The Defendant Municipalities have jailed Ms. Fant more than seven (7) times in the past twenty (20) years for traffic tickets.   She has served time in jails due to municipal charges from Velda City, Beverly Hills, Berkeley, Ferguson, Jennings, and Maryland Heights, among others.

247.     Every time Ms. Fant was pulled over she was issued multiple citations in a single stop.  This process repeated itself as she traveled through the various municipalities of the St. Louis region to the point where it became nearly impossible to pay all the fines.

248.     Ms. Fant was the subject of numerous warrants for "Failure to Pay" or "Failure to Appear" in municipal court in response to a ticket.  Often, her absence was involuntary, caused by scheduling conflicts between the different municipalities.  Ms. Fant had to choose which court appearance to attend, resulting in a warrant for "Failure to Pay" or "Failure to Appear" at the others.  In some instances, did not appear because of the fear spawned by Defendants' tactics.  She knew that many municipalities did not accept partial payment.  Therefore, when Ms. Fant could not pay a ticket in full, she was afraid that she would be arrested if she appeared.  And of course, she did not have a lawyer to advise her.

249.     On one occasion, the day after Ms. Fant's father passed away, a Berkeley officer and a Ferguson officer arrested her from her mother's home in Berkeley, Missouri.  Ms. Fant pleaded with the officers to allow her to make funeral arrangements.  They refused.  Instead, they arrested her and took her to the Ferguson jail.  Her bond was set at $4,300.  Ms. Fant's mother could only scare up $4,200, which she attempted to pay the Ferguson authorities so that Ms. Fant could attend her father's funeral.  They rejected the offer.  She missed her father's funeral because she could not pay the full amount of the bond Ferguson arbitrarily set.

250.     The official callousness and violations of Ms. Fant's rights did not end there.  She spent *fifty eight (58) days* in the Ferguson jail.  The guards would not allow her to shower nor did the jail provide any hygiene products.  Later, when she was transferred to the Florissant jail, officers harassed Ms. Fant about how she smelled.

251.    In 2008, Ms. Fant was arrested after a traffic stop in Jennings that revealed a warrant for "Failure to Pay" or "Failure to Appear."  Jennings held Ms. Fant in jail for a week, then transferred her to Ferguson.  Ferguson finally transferred her to Berkeley, where she remained for an additional two weeks.  She received no credit for time served.

252.    In 2012, Ms. Fant was jailed in Pine Lawn for "Failure to Pay" or "Failure to Appear."  The Pine Lawn Jail held Ms. Fant with other women in a room the size of a parking lot.  The jail provided her a cup to get water from a spout directly above the toilet.  The guards ignored the women, only acknowledging them if they asked for a phone to call someone about their bond.  Several times, the guards left the women completely unsupervised in the room with a padlocked latch, locking the women in with no way out in case of an emergency.

253.    Ms. Fant eventually paid her $400 bail and was released.

254.    In 2013, Ms. Fant was driving with her children in the car when a police officer pulled her over in Bellefontaine Neighbors.  When the officer ran her name he discovered that she had active warrants in St. Louis County.

255.    Ms. Fant was taken to jail in Jennings. She paid a $200 bond for a warrant in Jennings, but the jail did not release her.  Instead, Jennings transferred her into Velda City's custody, still in the Jennings jail.  When Ms. Fant asked the guards regarding her continued imprisonment, they replied that she was Velda City's prisoner and they did not know anything.

256.    Ms. Fant was held for Velda City for 48 hours.  Still, Jennings did not release her, but instead transferred her into the custody of Bellefontaine.  She paid a $100 bond and was transferred to Clayton, which held her for Normandy, until Maryland Heights picked her up and held her for an additional 72 hours before finally releasing her on recognizance.  Ms. Fant was

informed that she would be assigned a court date, but a court date was never scheduled, leaving her in a perpetual warrant status.

### viii.    Meredith Walker

257.    Meredith Walker is a 47-year-old African-American mother of two living in Florissant, Missouri.

258.    In the last five years, Ms. Walker has been jailed on at least ten occasions by St. Louis municipalities for unpaid fines from traffic tickets and other minor municipal violations; she has paid over $15,000 in fees, court costs, and bond forfeitures, making her unable to provide for herself and her children; and she has lost her license—and consequently, her ability to find employment—because of her inability to afford to pay the fines.

259.    Ms. Walker's traffic tickets continue to plague her to this day, even though she has not been cited for a moving violation in over fifteen years.

260.    At one point, Ms. Walker had warrants out for her arrest in eleven different municipalities, all of which stemmed from unpaid traffic tickets and charges for "Failure to Pay" or "Failure to Appear" in connection with these unpaid traffic tickets.

261.    On one occasion in the Village of Bel-Nor, officers of the Bel-Nor Police Department issued Ms. Walker eight tickets during a single traffic stop, even though her car was not moving at the time of the stop.

262.    In the last five years, Ms. Walker has been jailed in St. Ann (on behalf of Normandy and Velda City), Florissant, Bel Nor, Moline Acres, Ferguson, St. Louis County, St. Louis City, and Pine Lawn.  Each time, officers arrested Ms. Walker on warrants for "Failure to Pay" or "Failure to Appear" that were issued in connection with unpaid traffic tickets that Ms. Walker could not afford to pay.

263.    On almost all of these occasions, Ms. Walker experienced the so-called "muni-shuffle":  she was transferred from one municipal jail to another, paying bonds at each to secure her "release" to the next, or, if she could not afford to pay bond, remaining in jail until jail officials (or the municipality on whose behalf she was held) decided to release her.

264.    Ms. Walker has appeared in the Defendants municipal courts on multiple occasions, including the Normandy Municipal Court and the Velda City Municipal Court, among others.  Not once has a municipal court judge inquired into her ability to pay, informed her of her right to an attorney, afforded her an attorney, or proposed alternatives to payment of a fine (such as community service).

265.    Ms. Walker has tried to pay off her debts, but simply cannot afford to do so.  It is well known in the community that showing up at court without full payment will lead to incarceration.  As a result, Ms. Walker feared that if she went to court without the money to pay her fine, she would immediately be placed in jail.

266.    Ms. Walker has been unsuccessfully trying to pay off approximately $3,000 of fines over the last four years.  On multiple occasions, the Defendants' court clerks have told Ms. Walker that she resolved all her charges, only to discover more charges later.   On other occasions, court clerks have failed to properly record payments made by Ms. Walker.

267.    Ms. Walker's inability to extricate herself from this cycle of debt and jailing imposed by the Defendant Municipalities' municipal court systems has virtually destroyed Ms. Walker's life.

268.    Ms. Walker is unemployed and has been unable to find a new job because of her traffic record and because she does not have a valid license.  Many of the positions for which she is otherwise qualified require a valid driver's license to transport clients.

269.     Ms. Walker has been forced to change her appearance, because she discovered that she was stopped by the Defendant Municipalities' police officers more often when she had dreadlocks in her hair.

270.     Ms. Walker does not have a valid driver's license because she cannot afford to pay off all of her fines, costs, surcharges, and interest.  As a result, Ms. Walker is forced to rely on family and friends to drive her to the store or to her son's basketball games, placing strain on cherished relationships.

271.     Ms. Walker has spent many holidays in jail for unpaid traffic tickets, missing time with family and friends.

272.     Ms. Walker is unable to travel around the St. Louis area, in part because bus service in North County (where she lives) is unreliable, and in part because she is now terrified of the police.

273.     Ms. Walker lost her car, which was impounded by Moline Acres.  Ms. Walker was informed at the impound lot that there was no official record of the vehicle being towed, but that she could get it back for $300.  She refused to pay the bribe, the vehicle was never returned, and she was never compensated for it.

**ix.     Ronald Tucker**

274.     Ronald Tucker is a 51-year-old African-American father of two adult children.

275.     Mr. Tucker was laid off from his job at Casey's Foods in June of 2016, and is currently unemployed. He works independently, doing odd jobs such as installing air conditioning units, repairing cars, and minor construction jobs.

276.     In 2014, officers of the Cool Valley Police Department arrested Mr. Tucker for "Failure to Pay" and/or "Failure to Appear" warrants stemming from unpaid traffic tickets. The

underlying cause of the warrants were tickets for driving without a license and driving without insurance, dating as far back as 2005.

277.    Prior to this arrest, Cool Valley had assessed Mr. Tucker $300 in fines and other charges for these traffic tickets, and had placed him on a payment plan that required $50 monthly payments.  Mr. Tucker was employed at the time and was able to make the $50 payments until he only had $100 in outstanding fines and charges.

278.    In 2012, Mr. Tucker lost his job. At that time, he went to the Cool Valley Municipal Court and attempted to work out a new payment plan with the court clerk.  The clerk refused to make adjustments to Mr. Tucker's payment plan and did not provide him with a court date to speak with the judge.  Instead, the clerk insisted that he would need to make his payment on time or Cool Valley would issue a warrant for his arrest.

279.    Mr. Tucker did not make his next payment due to his lack of income, and Cool Valley issued an arrest warrant for his failure to pay.

280.    When Mr. Tucker was arrested in 2014, officers of the Cool Valley Police Department transported him to the holding facility in the Cool Valley Police Station.

281.    The conditions in the Cool Valley holding facility were the worst that Mr. Tucker has ever experienced.  The cells in which the officers held him and the other inmates were commonly referred to as the "dog cage."

282.    There were no toilets in the cell, so Mr. Tucker had to call one of the guards if he wished to be escorted to the bathroom.  On more than one occasion, the guards would not respond, or would be away from the building for hours at a time, and Mr. Tucker was forced to use the bathroom on the floor of the cell.

283.    Cool Valley did not provide Mr. Tucker and his fellow inmates with a toothbrush, toothpaste, soap, clean clothes, towel, or any other basic hygiene products.  Cool Valley also failed to provide inmates access to a shower.

284.    Cool Valley provided Mr. Tucker with two meals per day, which typically consisted of, ostensibly, old food from McDonalds.  Cool Valley officers would place the food on a tray and slip it under the bars and into the cell, which made Mr. Tucker feel that he was being treated like a dog.

285.    There were no beds in the jail cells, and officers usually would require Mr. Tucker and his fellow inmates to sleep handcuffed to a bench in the cell.  This was made even more uncomfortable by the fact that the jail was extremely cold, and Cool Valley provided inmates with neither blankets nor extra clothes.  To this day, Mr. Tucker often wears warm clothes, even when it is hot outside, out of fear that he will be jailed again.

286.    Cool Valley held Mr. Tucker for three or four days before taking him to appear before a Cool Valley municipal judge.

287.    In court, Mr. Tucker explained to the judge that he could not afford to make the $50 payments because he had lost his job.  Mr. Tucker asked the judge to reduce his payments or allow some other type of accommodation.  The judge refused, telling Mr. Tucker that he had agreed to the previous payment plan and would have to find a way to make the payments.  The judge did not conduct any other inquiry into Mr. Tucker's ability to pay, nor did he appoint an attorney for Mr. Tucker or offer alternatives to payment of the fine, even though Mr. Tucker explained unequivocally that he could not afford to pay $50 per month.

288.    The judge also imposed additional fines and fees for the late payments and for Mr. Tucker's "failure to appear," and told Mr. Tucker that he now owed a total of $385.  Cool Valley released Mr. Tucker from custody and gave him a new payment date.

289.    Once again, Mr. Tucker was unable to make the monthly payments due to his lack of income, and Cool Valley issued another warrant for his arrest.

290.    Shortly thereafter, Mr. Tucker was able to secure legal representation through ArchCity Defenders.  Cool Valley subsequently recalled the warrant, but Mr. Tucker continues to owe hundreds of dollars to the city in fines and fees.

**x.    Shilita Thomas**

291.    Shilita Thomas is a 29-year-old African-American single mother of one child.  Ms. Thomas has been a Certified Nurse's Assistant (CNA) for five years and has been employed at Cooperative Home Health Agency for the past one and a half years.

292.    In 2012, officers of the Ferguson Police Department were dispatched to Ms. Thomas' home to respond to a domestic dispute.  The officers ran Ms. Thomas' name and discovered that she had outstanding warrants for failure to appear in connection with unpaid traffic tickets in several municipalities.

293.    Ms. Thomas was arrested and taken to jail in Ferguson and told that she could "bond out" if she posted a $300 bond.  Ms. Thomas could not afford to pay the bond herself, so she enlisted the help of her family to raise the money.

294.    However, Ms. Thomas was not released upon her family posting her bond; instead, she started a long series of transfers between municipalities on various outstanding warrants.  She was first transferred to Berkeley, where Berkeley correctional officers demanded that she pay $725 in bond and placed a hold her driver's license.  Then she was transferred to

Pine Lawn, where Pine Lawn correctional officers demanded another $300 to $400 and threatened to increase the bond amount "if they decided to." She was then transferred to Jennings, where she was held on behalf of Dellwood and was required to pay another $150 to $200 bond.

295.    Even after enduring all of this, she was not released. Instead, Ms. Thomas continued to be held in the Jennings Jail, now on behalf of Velda City for failure to appear charges stemming from unpaid traffic tickets. The Jennings correctional officers did not tell Ms. Thomas her bond amount. Ms. Thomas was finally "released" when her sister was able to pay a $100 bond. However, Ms. Thomas was not actually released from custody. Instead, she was transferred yet again to St. Louis County, where she was released without paying any bond.

296.    Ms. Thomas never had the ability to post the numerous bonds required of her. Indeed, neither did her family, who was forced to resort to pawning their personal belongings and taking out title loans to afford the approximately $1,725 that she was forced to pay to secure her release from custody for unpaid traffic tickets. At no point did any municipality inquire into her ability to pay or offer any reasonable alternative to payment.

297.    All told, Ms. Thomas was held in jail for approximately four (4) days at the various municipalities. She received one shower. She was often forced to sleep on the floor of a dirty, overcrowded cell with inadequate—or altogether absent—blankets to stave off the cold. She was served old, stale food.

298.    Ms. Thomas was never brought before a judge during her approximately four-day detention at the various municipalities, nor was she offered, let alone informed of, her right to a lawyer.

299.    To this day, Ms. Thomas' child remembers witnessing and asks Ms. Thomas about the events of her mother's arrest, even though she was only three years old at the time the events occurred.

###    xi.    Mawoussime Adoboe

300.    Mawoussime Adoboe is a 33-year-old mother of two children.  Ms. Adoboe has been unemployed since 2012 and relies on welfare and social security to support herself.

301.    On April 15, 2015, Ms. Adoboe was involved in a car accident. The police arrived at the scene of the car accident and conducted a field sobriety test, which police claimed Ms. Adoboe failed.  The police officer cursed at her, called her a "bitch," and said, "You know I don't like you."  The St. John police arrested Ms. Adoboe for driving while intoxicated and took her to the St. John police station.  The arresting police officer told other officers at the jail "not to give her a chance."

302.    The arresting police officer then took Ms. Adoboe to SSM Health DePaul Hospital - St. Louis, where she was administered a shot, although she did not know what it was for.  She was also given a prescription for antibiotics, which the police officer filled before taking Ms. Adoboe to the St. Ann Jail on behalf of St. John.

303.    Ms. Adoboe was held at the St. Ann Jail for eight days on $1,500 bond.  Ms. Adoboe could not afford to pay the $1,500 bond amount, and therefore was not able to secure her release.

304.    After several days, Ms. Adoboe's family and friends were able to pool their financial resources to come up with the $1,500 for bond.  However, when the father of Ms. Adoboe's daughter attempted to post bond, St. Ann refused the payment without providing a reason.

305.    Ms. Adoboe was never brought before a judge during her eight-day detention at the St. Ann jail, nor was she informed of her right to, or offered, a lawyer.

306.    Defendant St. Ann's jail refused to give Ms. Adoboe her medication for her serious chronic medical conditions.

307.    The conditions in St. Ann Jail were filthy.  Ms. Adoboe and other inmates requested supplies to clean their living space, but the guards refused.  The cell in which Ms. Adoboe lived was designed to accommodate six people, but at times up to fifteen people were living in the cell.  When there were more people than beds, inmates were forced to sleep on the floor.

308.    Ms. Adoboe was allowed to shower only once every three days in a bathroom in filthy conditions.

309.    St. Ann Jail Guards tossed cold food and inedible food onto the floor for the inmates to eat.

310.    St. Ann Jail Guards were rude to inmates and indifferent to their needs, and called Ms. Adoboe "crazy" and an "African child" on multiple occasions.

311.    One of Ms. Adoboe's relatives attempted to come to the St. Ann Jail to visit her, but the guards never informed her and she was not allowed to meet with her relative.

312.    Guards at the St. Ann Jail limited inmates' use of phones.  For example, if Ms. Adoboe placed a call and the person did not answer the first time, she was not allowed to call them back.  The guards also limited the content of inmates' phone calls, not allowing Ms. Adoboe to give any in-depth explanations to people on the phone.

313.    After her "release" from the St. Ann Jail, Ms. Adoboe was transferred to the St. Charles Jail in connection with unpaid traffic tickets and "Failure to Pay" or "Failure to Appear"

charges in St. Charles.  Ms. Adoboe was detained in the St. Charles Jail for six days, at which point she was able to post $250 bond to secure her release.

314.    Ms. Adoboe's detention had significant collateral consequences in addition to the suffering Ms. Adoboe endured in St. Ann Jail.  For example, while she was incarcerated, Ms. Adoboe's children were shifted from one person's care to another on three different occasions.

315.    On at least one other occasion, Ms. Adoboe was detained in the St. Ann Jail for a speeding ticket in St. Ann.  Ms. Adoboe was unable to afford the $500 bond and therefore was forced to spend a night in the St. Ann Jail.

**xii.    James Redmond III**

316.    James Redmond III is a 65-year-old African-American man.

317.    In March of 2013, Mr. Redmond was pulled over by Wellston Police for running a stop sign. When officers ran his name and discovered that his license had been suspended, Mr. Redmond was arrested and transported to the Wellston jail.

318.    Wellston officers told Mr. Redmond that he was being held on a $250 bond. Mr. Redmond, who had no income and was living in shelters at the time, told Wellston officers that he did not have the money. The officers responded that he would have to call someone to get the money.

319.    Mr. Redmond remained in the Wellston jail overnight until his stepfather was able to come and bond him out. His stepfather had to take the $250 out of his own rent money. Wellston officers released Mr. Redmond with a court date.

320.    When Mr. Redmond appeared at the court date, the Wellston municipal judge assessed him $500 in fines for driving while suspended and running a stop sign. Mr. Redmond told the judge that he did not have any income and therefore had no way to pay the fines. The

judge stated that this "did not make any difference" and put Mr. Redmond on a payment plan with $100 payments.

321.    Mr. Redmond could not afford to make a payment due to his lack of income and Wellston issued another warrant for his arrest.

322.    This warrant remained active for more than a year before Mr. Redmond was able to secure legal representation through ArchCity Defenders. When ArchCity Defenders began representing Mr. Redmond, he had ten (10) active warrants in seven (7) municipalities throughout St. Louis County, all due to his inability to pay fines and fees stemming from minor traffic offenses.

**xiii.    Veronica Murphy**

323.    Veronica Murphy is a 31-year-old single African-American mother of two young children living in St. Louis, Missouri.

324.    Ms. Murphy single-handedly supports her two minor children on a very limited income.

325.    Ms. Murphy has been jailed in the St. Ann Jail "so many times [she] can't remember" in connection with warrants issued by Bel-Ridge, Normandy, and St. Ann, among others.  The warrants issued by Bel-Ridge initially stemmed from minor traffic infractions issued prior to 2009.  As of this filing, Defendant St. Ann continues to refuse to recall its own warrant against Ms. Murphy for minor alleged municipal infractions until fines are "paid in full."

326.    In April 2009, Ms. Murphy departed the University of Missouri-St. Louis campus after a college class to pick up her son—who was five years old at the time—at his school in Normandy, Missouri.  She never arrived at the school because officers of the Normandy Police Department stopped Ms. Murphy just one block away.

327.    The Normandy Police informed Ms. Murphy that they stopped her pursuant to an alleged warrant from the State of Texas.  The Normandy Police arrested Ms. Murphy and towed her vehicle to an impound lot.

328.    The two young Murphy children—ages three and five at the time—sat at their schools awaiting their mother until the schools were able to contact members of Ms. Murphy's family to care for them.

329.    The Normandy Police took Ms. Murphy to their precinct, fingerprinted and booked her, and notified Texas of her arrest.  The State of Texas informed the Normandy Police that Ms. Murphy was not wanted for extradition.

330.    Instead of releasing Ms. Murphy, Normandy Police checked their computer system and determined Ms. Murphy had an outstanding warrant from Bel-Ridge.  The Normandy Police then transported Ms. Murphy to the St. Ann Jail.

331.    At the St. Ann Jail, Ms. Murphy endured what she now describes as "the worst memories of [her] life" in conditions most inhumane: St. Ann officials (1) forced Ms. Murphy to wear an orange jumpsuit "like [she] was in prison"; and (2) provided inadequate food sometimes consisting of only a honey bun and a packaged pot pie for an entire day—"all because [she is] a single mom who can't pay a traffic ticket," as Ms. Murphy attests.

332.    Ms. Murphy was held in St. Ann Jail for two weeks.

333.    During this time period (which included her birthday), the Murphy children were left motherless while Defendant St. Ann jailed Ms. Murphy on behalf of Bel-Ridge simply because she could not afford to pay the bond amount set by Bel-Ridge, which, on information and belief, exceeded $500.

334.    Once released from St. Ann Jail, Ms. Murphy could not afford to pay to retrieve her vehicle from impound; in fact, Ms. Murphy was never able to afford the impound fees to retrieve her car, and she ultimately lost the 1999 Chevy Cavalier which she once owned outright.

335.    Since her initial two-week incarceration in 2009, Defendants have repeatedly arrested Ms. Murphy based on her inability to pay fines and alleged "Failure to Appear" charges, including a most recent incarceration on Bel-Ridge's warrant in May 2014.

336.    Despite obtaining legal representation from ArchCity Defenders to address her myriad municipal charges, Ms. Murphy still faces imminent arrest in one or more of the Defendant Municipalities as of the filing of this Complaint.

337.    Specifically, in April 2016, St. Ann issued a form recommendation sheet to notify Ms. Murphy that her fines total as much as $620.00 and—using a *literal* rubber stamp—that "WARRANT WILL REMAIN ACTIVE UNTIL PAID IN FULL."

338.    Then, in June 2016, when ArchCity Defenders requested that St. Ann recall the arrest warrant, St. Ann denied the recall request.

339.    Because Ms. Murphy cannot foreseeably afford to pay off St. Ann, this warrant will remain active in perpetuity while Ms. Murphy continues to live in fear of the next time she is pulled over by police in the St. Louis region.

**F.    Class Allegations**

340.    The Plaintiffs bring this action on behalf of themselves and all others similarly situated, for the purpose of asserting the claims alleged in this Complaint on a common basis.

341.    A class action is a superior means, and the only practicable means, by which Plaintiffs and unknown Class members can challenge the Defendants' unlawful debt-collection scheme.

342.    This action is brought and may properly be maintained as a Class action pursuant to Rule 23(a)(1)-(4), Rule 23(b)(2), and Rule 23(b)(3) of the Federal Rules of Civil Procedure.

343.    This action satisfies the numerosity, commonality, typicality, and adequacy requirements of those provisions.

344.    Plaintiffs propose two Classes: a Declaratory and Injunctive Class and a Damages Class.

345.    The Declaratory and Injunctive Class is defined as:  All persons who currently owe or who will incur debts to the Defendants from fines, fees, costs, or surcharges arising from cases in the Defendants' courts.

346.    The Damages Class is defined as: All persons who, from August 9, 2011, until the present, were held in jail by or on behalf of one or more of the Defendants because of the persons' non-payment of a monetary sum required by one or more of the Defendants as a result of the individuals' inability to pay.

**1.      Numerosity.  Fed. R. Civ. P. 23(a)(1)**

347.    Over the past five years, thousands of people have owed and currently owe the Defendants money from old traffic tickets and other minor municipal offenses.  Pursuant to Defendants' policies and practices, Defendants have placed thousands of people, who have indicated that they are too poor to pay their debts in total, on payment plans that are arbitrary, exorbitant, and inconsistent with the debtors' ability to pay.  All of these people are currently being threatened with arrest and jailing if they do not make the payments in the amount or frequency purportedly required by the Defendants.

348.    The Defendants have kept hundreds of people in their jails for non-payment in each of the past five years.  The Defendants retain, and are required by law to retain, records of

these instances.

349.     The Defendants followed and follow materially the same debt-collection policies,

practices, and procedures to accomplish the jailing of the Class members.  For example, pursuant

to the Defendants' policies and practices, those kept in jail by the Defendants for non-payment

did not receive meaningful inquiries into their ability to pay as required by federal and Missouri

law.  Pursuant to Defendants' policies, Defendants made no determinations of indigence, ability

to pay hearings, or evaluations of alternatives to incarceration, and the Defendants provided none

of the relevant state and federal protections for debtors.  Nor were those jailed by the Defendants

provided adequate counsel to represent them.

350.     Those who still owe the Defendants debt payments or who will incur such debts

will be subjected to the same ongoing policies and practices absent the relief sought in this

Complaint.

**2.     Commonality.  Fed. R. Civ. P. 23(a)(2).**

351.     The relief sought is common to all members of the Injunctive and Damages

Classes, and common questions of law and fact exist as to all members of the Classes.  The

Plaintiffs seek relief concerning whether the Defendants' policies, practices, and procedures

violated their rights and relief mandating the Defendants to change their policies, practices, and

procedures so that the Plaintiffs' rights will be protected in the future.

352.     Among the most important, but not the only, common questions of fact are:

a.     Whether the Defendants have a policy and practice of keeping people in their jails who owe money on old judgments unless and until they can pay a monetary sum;

b.     Whether the Defendants have a policy and practice of failing to conduct meaningful inquiries into the ability of a person to pay before jailing the person for non-payment;

c.      Whether the Defendants provide notice to debtors that their ability to pay will be a relevant issue at the proceedings at which they are jailed or kept in jail and whether the Defendants make findings concerning ability to pay and alternatives to incarceration;

d.      Whether the Defendants provide adequate legal representation to those jailed for unpaid debts in proceedings that result in their incarceration;

e.      Whether Defendants' employees and agents have a policy and practice of threatening debtors and families of debtors with incarceration for unpaid debts without informing them of their rights;

f.      Whether the Defendants have a policy and practice of issuing and executing warrants for the arrest of debtors despite lacking probable cause that they have committed any offense and without any notice or opportunity to be heard concerning their ability to pay or the validity of the debt;

g.      Whether the Defendants' above-described policies and practices are part of a common plan or scheme between and among the Defendant Municipalities;

h.      Whether that common scheme or plan seeks to extort funds from poor residents of the St. Louis area by ensnaring them in an escalating spiral of indebtedness and imprisonment; and

i.      Whether Defendants' policies and practices discriminate on the basis of race or other impermissible factors.

353.   Among the most important common question of law are:

a.      Whether keeping people in jail solely because they cannot afford to make a monetary payment is lawful;

b.      Whether people are entitled to a meaningful inquiry into their ability to pay before being jailed by the Defendants for non-payment of debts;

c.      Whether people who cannot afford to pay the Defendants are entitled to the consideration of alternatives to incarceration before being jailed for non-payment of debts;

d.      Whether people are entitled to adequate legal representation in debt-collection proceedings initiated and litigated by Defendants

> prosecutors that result in their incarceration if they cannot afford an attorney;

> e.    Whether the Defendants may jail, threaten to jail, and use other harsh debt-collection measures (such as ordering payment of significant portions of a person's public assistance benefits) against debtors who cannot afford immediately to pay the Defendants in full;

> f.    Whether the Defendants may arrest people based solely on their non-payment without any probable cause that they have committed any willful conduct or other offense and without notice and an opportunity to be heard concerning legal predicates for a valid detention, such as their ability to pay and the validity of the debt.

354.    These common legal and factual questions arise from one central scheme and set of policies and practices: the Defendants' enormously profitable traffic and ordinance debt collection system.   The Defendants operate this scheme openly and in materially the same manner every day, and all of the ancillary factual questions about how that scheme operates are common to all members of the Classes, as well as the resulting legal questions about whether that scheme is unlawful.   The material components of the scheme do not vary from Class member to Class member, and the resolution of these legal and factual issues will determine whether all of the members of the class are entitled to the constitutional relief that they seek.

**3.    Typicality.  Fed. R. Civ. P. 23(a)(3).**

355.    The named Plaintiffs' claims are typical of the claims of the members of the Classes and Subclasses respectively, and they have the same interests in this case as all other members of the Classes that they represent.   Each of them suffered injuries from the failure of the Defendants to comply with the basic constitutional provisions detailed below.   The answer to whether the Defendants' scheme of policies and practices is unconstitutional will determine the claims of the named Plaintiffs and every other Class member.

356.    If the named Plaintiffs succeed in their claims that the Defendants' policies and

practices concerning debt collection for fines, fees, costs, and surcharges violate the law in the ways alleged in each claim of the Complaint, then that ruling will likewise benefit every other member of the Injunctive and Damages Classes.

### 4.    Adequacy.  Fed. R. Civ. P. 23(a)(4).

357.    The named Plaintiffs are adequate representatives of the Classes because they are members of the Classes and because their interests coincide with, and are not antagonistic to, those of the Classes.  There are no known conflicts of interest among Class members, all of whom have a similar interest in vindicating the constitutional rights to which they are entitled.

358.    Plaintiffs are represented by attorneys from Arnold & Porter LLP, a firm with experience litigating complex civil rights matters in federal court and extensive knowledge of both the details of the Defendants' scheme and the relevant constitutional and statutory law. Plaintiffs are also represented by attorneys from ArchCity Defenders, who have extensive experience with the functioning of the entire municipal court system through their representation of numerous impoverished people in the St. Louis area.[19]

---

[19] ArchCity Defenders is a non-profit public interest law firm based in Saint Louis.  It has represented the poor and homeless in cases involving the Municipal Defendants for the past five years and is an expert on the ways in which the Defendants' illegal practices and policies make and keep people poor.  ArchCity Defenders has recently brought class actions in the Eastern District of Missouri restricting the use of chemical munitions on peaceful protesters, is co-counsel on two federal class actions alleging the operation of debtors' prisons in Ferguson and Jennings, Missouri, two additional class actions ending cash bail, and an additional series of state class action suits alleging the imposition of illegal fees and fines in various municipal courts in the St. Louis County region. *See Templeton v. Dotson,* 4:14-cv-01019; *Jenkins et al. v. City of Jennings*, 15-cv-252-CEJ (E.D. Mo. 2015); *Fant et al. v. City of Ferguson*, 15-cv-253-AGF (E.D. Mo. 2015); *Powell v. City of St. Ann* 4:15-cv-840 (E.D. Mo. 2015); *Pierce v. City of Velda City*, 4:15-CV-570 (E.D. Mo. 2015); *White* v. *City of Pine Lawn*, 14SL-CC04194 (St. Louis Co. Cir. Ct., Dec. 2014); *Pruitt v. City of Wellston*, 14SL-CC04192 (St. Louis Co. Cir. Ct., Dec. 2014); *Lampkin v. City of Jennings*, 14SL-CC04207 (St. Louis Co. Cir. Ct., Dec. 2014); *Wann v. City of St. Louis*, 1422-CC10272 (St. Louis City Cir. Ct., Dec. 2014); *Reed v. City of Ferguson*, 14SL-CC04195 (St. Louis Co. Cir. Ct., Dec. 2014); *Eldridge v. City of St. John*, 15SL-00456 (St. Louis Co. Cir. Ct., Feb. 2015); *Watkins v. City of Florissant*, 16SL-CC00165 (St. Louis Co. Cir.

359.    The efforts of Plaintiffs' counsel have so far included extensive investigation over a period of months, including numerous interviews with witnesses, Defendants' employees, Defendants' jail inmates, families, attorneys practicing in the Defendants' Municipal Courts, community members, statewide experts in the functioning of Missouri municipal courts, and national experts in constitutional law, debt collection, bankruptcy law, criminal law, and forced labor.

360.    Counsel have also observed numerous courtroom hearings in the Defendant Municipalities and in other municipalities across the region in order to compile a detailed understanding of state law and practices as they relate to federal constitutional requirements. Counsel have studied the way that these systems function in other cities in order to investigate the wide array of options in practice for municipalities.

361.    As a result, counsel have devoted enormous time and resources to becoming intimately familiar with the Defendants' scheme and with all of the relevant state and federal laws and procedures that can and should govern it.  Counsel also have developed relationships with many of the individuals and families most victimized by the Defendants' practices.

362.    The interests of the members of the Class will be fairly and adequately protected by the Plaintiffs and their attorneys.

**5.    Rule 23(b)(2)**

363.    Class action status is appropriate because the Defendants, through the policies, practices, and procedures that make up their traffic and ordinance debt-collection scheme, have acted and refused to act on grounds generally applicable to the Declaratory and Injunctive

---

Ct., Jan. 2016).  ArchCity Defenders also published an extensive report detailing these practices and policies in the cities of Bel-Ridge, Ferguson, and Florissant in August of 2014.  The report is available at http://www.archcitydefenders.org.

Classes.

364.    A declaration that people in the Defendant Municipalities cannot be held in jail solely because they cannot afford to make a monetary payment will apply to each Class member.

365.    Similarly, a determination that Class members are entitled, as a matter of federal law, to a meaningful inquiry into their ability to pay and an evaluation of alternatives to incarceration before they are jailed by the Defendants for non-payment will apply to each Class member.

366.    The same applies to rulings on the other claims, including: that Class members are entitled to representation by counsel at proceedings initiated and litigated by Defendants' prosecutors in connection with which they are jailed; that the Defendants cannot imprison Class members for debts; that the Defendants cannot collect debts from Class members in a manner that violates and evades all of the relevant protections for other judgment debtors; and that the Defendants cannot issue and execute arrest warrants for traffic debtors without probable cause that they have committed an offense and without notice or a hearing prior to the deprivation of their liberty.

367.    Injunctive relief compelling the Defendants to comply with these constitutional rights will similarly protect each member of the Class from being again subjected to the Defendants' unlawful policies and practices with respect to the debts that they still owe and protect those who will incur such debts in the future from the same unconstitutional conduct. Therefore, declaratory and injunctive relief with respect to the Class as a whole is appropriate.

**6.    Rule 23(b)(3)**

368.    Class treatment under Rule 23(b)(3) is also appropriate because the common questions of law and fact overwhelmingly predominate in this case.  This case turns, for every

Plaintiff, on what the Defendants' policies and practices are and on whether those policies are lawful.

369.    The common questions of law and fact listed above are dispositive questions in the case of every member of the Classes and Subclasses.  The question of liability can therefore be determined on a class-wide basis.  Class-wide treatment of liability is a far superior method of determining the content and legality of the Defendants' policies and practices than individual suits by hundreds or thousands of Defendants' residents.  The question of damages will also be driven by class-wide determinations.

370.    To the extent that individual damages will vary, they will vary depending in large part on the amount of time that a person was unlawfully jailed.  Determining damages for individual Class members can thus typically be handled in a ministerial fashion based on easily verifiable records of the length of unlawful incarceration.  If need be, individual hearings on Class-member specific damages based on special circumstances can be held after Class-wide liability is determined—a method far more efficient than the wholesale litigation of hundreds or thousands of individual lawsuits.

**CLAIMS FOR RELIEF**

**COUNT I**
**Violation of the Fourteenth Amendment — Imprisonment For Inability To Pay**
**(Against All Defendants)**

371.    The preceding paragraphs 1-370 are incorporated herein by reference.

372.    The Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution prohibit imprisoning a person for failure to pay money owed to the government if that person is indigent and unable to pay.

373.    The Municipal Defendants imprisoned and/or threatened to imprison each of the Plaintiffs when they could not afford to pay debts allegedly owed for traffic and other minor offenses without conducting any inquiry into their ability to pay and without conducting any inquiry into alternatives to imprisonment, as required by the United States Constitution.  At any moment, a person with financial resources in the Plaintiffs' positions could have paid a sum of cash and been released from jail.

374.    The Municipal Defendants maintained and continue to maintain a policy and practice of (i) imprisoning, or threatening to imprison, people, including Plaintiffs, when they cannot afford to pay the debts allegedly owed from traffic and other minor offenses, and (ii) keeping people, including Plaintiffs, in jail unless and until they are able to pay arbitrarily determined (and constantly shifting) sums of money.

375.    The Municipal Defendants actions violated, and continue to violate, Plaintiffs' rights, and the rights of others similarly situated, under the Fourteenth Amendment to the United States Constitution.  Defendants are liable under 42 U.S.C. § 1983.

376.    As a direct result of the Defendants' unlawful practices, Plaintiffs and others similarly situated have suffered extensive damages, including, but not limited to, pain and suffering, anxiety, anguish, feeling of unjust treatment, fear, and lost earnings.

377.    On information and belief, the above-described acts of Defendants were done knowingly, intentionally, maliciously, with evil motive, and with deliberate and callous indifference to the constitutional rights of Plaintiffs and those similarly situated.  Accordingly, Plaintiffs are entitled to an award of punitive damages against the Defendants.

**COUNT II**
**Violation of the Sixth and Fourteenth Amendments—Failure to Provide Adequate Counsel**
**(Against All Defendants)**

378.    The preceding paragraphs 1-377 are incorporated herein by reference.

379.   The Defendant Municipalities violated Plaintiffs' rights, and the rights of others similarly situated, to the effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution.  Plaintiffs, and others similarly situated, have been and continue to be imprisoned by the Defendant Municipalities in connection with debt-collection proceedings in which those people jailed are not afforded counsel.

380.   The Defendant Municipalities' policy and practice of not providing adequate counsel at hearings in which indigent people are ordered to be imprisoned in the Defendants' jails for unpaid debts (which are, in turn, based on payment plans arising from traffic and other violations at which the jailed individuals also were unrepresented), violates the Sixth and Fourteenth Amendments to the United States Constitution.  Defendants are liable under 42 U.S.C. § 1983.

381.   As a direct result of the Defendants' unlawful practices, Plaintiffs and others similarly situated have suffered extensive damages, including, but not limited to, pain and suffering, anxiety, anguish, feeling of unjust treatment, fear, and lost earnings.

382.   On information and belief, the above-described acts of Defendants were done knowingly, intentionally, maliciously, with evil motive, and with deliberate and callous indifference to the constitutional rights of Plaintiffs and those similarly situated.  Accordingly, Plaintiffs are entitled to an award of punitive damages against the Defendants.

## COUNT III
### Violation of the Fourteenth Amendment—Indefinite and Arbitrary Detention
### (Against All Defendants)

383.   The preceding paragraphs 1-382 are incorporated herein by reference.

384.   The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits incarcerating people indefinitely and without adequate procedural

protections. The Municipal Defendants have engaged in a policy and practice of jailing the Plaintiffs and others similarly situated without any meaningful legal process through which they can challenge their detention by keeping them confined in the Defendants' jails unless and until they can make arbitrarily and inconsistently established cash payments, in violation of the Fourteenth Amendment. Defendants are liable under 42 U.S.C. § 1983.

385.     As a direct result of the Defendants' unlawful practices, Plaintiffs and others similarly situated have suffered extensive damages, including, but not limited to, pain and suffering, anxiety, anguish, feeling of unjust treatment, fear, and lost earnings.

386.     On information and belief, the above-described acts of Defendants were done knowingly, intentionally, maliciously, with evil motive, and with deliberate and callous indifference to the constitutional rights of Plaintiffs and those similarly situated. Accordingly, Plaintiffs are entitled to an award of punitive damages against the Defendants.

**COUNT IV**
**Violation of the Fourth and Fourteenth Amendments — Issuance of Invalid Warrants**
**(Against All Defendants)**

387.     The preceding paragraphs 1-386 are incorporated herein by reference.

388.     The Defendants' policy and practice is to issue and serve arrest warrants against those who have not paid their debt from old judgments in traffic and other minor cases. These warrants are sought, issued, and served without any inquiry into the person's ability to pay even when the Defendants have prior knowledge that the person is impoverished and unable to pay the debts or possesses other valid defenses.

389.     These warrants are regularly sought, issued, and served without any finding of probable cause that the person has committed the elements of any offense. The Defendants

choose to pursue warrants instead of issuing summons even when it has spoken to people on the phone or in person and has the opportunity to notify them to appear in court.

390.    The Defendants enforce a policy of allowing wealthy residents or residents who can afford to hire an attorney to remove their warrants but refusing to remove warrant. Moreover, the Defendants' policy and practice of not presenting arrestees in court or unreasonably delaying presentment for days or weeks for no legitimate reason is unlawful.

391.    These practices violate the Fourth and Fourteenth Amendments and result in a deprivation of fundamental liberty without adequate due process.  Defendants are liable under 42 U.S.C. § 1983.

392.    As a direct result of the Defendants' unlawful practices, Plaintiffs and others similarly situated have suffered extensive damages, including, but not limited to, pain and suffering, anxiety, anguish, feeling of unjust treatment, fear, and lost earnings.

393.    On information and belief, the above-described acts of Defendants were done knowingly, intentionally, maliciously, with evil motive, and with deliberate and callous indifference to the constitutional rights of Plaintiffs and those similarly situated.  Accordingly, Plaintiffs are entitled to an award of punitive damages against the Defendants.

**COUNT V**
**Violation of the Fourteenth Amendment — Threats of Incarceration to Collect Debts**
**(Against All Defendants)**

394.    Plaintiffs incorporate by reference the allegations in paragraphs 1-393 above.

395.    The United States Supreme Court has held that, when a government seeks to recoup costs of prosecution from indigent defendants—for example, the cost of appointed counsel—it may not take advantage of its position to impose unduly restrictive methods of collection solely because the debt is owed to the government and not to a private creditor.

396.    By incarcerating the Plaintiffs and threatening to incarcerate them, the Defendants take advantage of their  control over the machinery of the penal and police systems to deny debtors the statutory protections that every other debtor may invoke against a private creditor.   This coercive policy and practice constitutes invidious discrimination and violates the fundamental principles of equal protection of the laws.  Defendants are liable under 42 U.S.C. § 1983.

397.    As a direct result of the Defendants' unlawful practices, Plaintiffs and others similarly situated have suffered extensive damages, including, but not limited to, pain and suffering, anxiety, anguish, feeling of unjust treatment, fear, and lost earnings.

398.    On information and belief, the above-described acts of Defendants were done knowingly, intentionally, maliciously, with evil motive, and with deliberate and callous indifference to the constitutional rights of Plaintiffs and those similarly situated.  Accordingly, Plaintiffs are entitled to an award of punitive damages against the Defendants.

### COUNT VI
### Conspiracy to Commit Civil Rights Violations (42 U.S.C. § 1983)
### (Against All Defendants)

399.    The preceding paragraphs 1-398 are incorporated herein by reference.

400.    The Defendant Municipalities, through their police departments, municipal court systems, city prosecuting attorneys' offices, and various other agents, have engaged in a deliberate and coordinated scheme between and amongst the Municipalities that violated Plaintiffs' constitutional rights, and the constitutional rights of others that are similarly situated.

401.    The Defendant Municipalities deliberately coordinated arrests, deprivations of due process, denials of the right to counsel and unlawful detentions that violated the constitutional rights of the Plaintiffs and those similarly situated.

402.    Each Defendant Municipality knowingly and intentionally acted in furtherance of this scheme, including, but not limited to, by arresting and/or holding individuals on behalf of other Defendant Municipalities, by inducing payment of fines improperly imposed by another Defendant Municipality via strong-arm tactics against individuals in their custody, by enforcing warrants issued by other Defendant Municipalities that the Defendant Municipality knew or should have known was invalid, and by passing information between the Defendant Municipalities in facilitation of these violations.

403.    The conspiracy between and among the Defendant Municipalities caused Plaintiffs and those similarly situated to be deprived of their constitutional rights in the manners described in the preceding paragraphs.

404.    Defendants are liable for this conspiracy and its harms under 42 U.S.C. § 1983.

405.    As a direct result of the Defendants' unlawful practices, Plaintiffs and others similarly situated have suffered extensive damages, including, but not limited to, pain and suffering, anxiety, anguish, feeling of unjust treatment, fear, and lost earnings.

406.    On information and belief, the above-described acts of Defendants were done knowingly, intentionally, maliciously, with evil motive, and with deliberate and callous indifference to the constitutional rights of Plaintiffs and those similarly situated.  Accordingly, Plaintiffs are entitled to an award of punitive damages against the Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court issue the following relief:

a.   Certification of the Declaratory and Injunctive Class and Subclasses and the Damages Class, as defined above;

b.   A declaratory judgment that Defendants violated, and continue to violate, Plaintiffs' Fourteenth Amendment due process and equal protection rights by imprisoning them for their inability to pay a debt without conducting any meaningful inquiry into their ability to pay or into any alternatives to incarceration;

c.   A declaratory judgment that Defendants violated, and continue to violate, Plaintiffs' rights under the Sixth and Fourteenth Amendments by imprisoning them without appointing adequate counsel at the proceedings that led to their incarceration;

d.   A declaratory judgment that Defendants violated, and continue to violate, Plaintiffs' constitutional rights by holding them indefinitely and arbitrarily in jail independent of any valid legal process;

e.   A declaratory judgment that Defendants violated, and continue to violate, Plaintiffs' Fourth and Fourteenth Amendment rights by issuing and serving arrest warrants without probable cause to believe that the elements of an offense had been committed, with unreasonable delay prior to presentment, and without providing pre-deprivation of liberty process where such process is easily available to the Defendants;

f.   An order and judgment permanently enjoining Defendants from enforcing the above-described unconstitutional policies and practices against Plaintiffs and others similarly situated;

g.   A declaratory judgment that the Defendant City violated Plaintiffs' equal protection rights by imposing harsh debt collection measures not imposed on debtors whose creditors are private entities

h.   A judgment compensating the Plaintiffs and others similarly situated for the damages that they suffered as a result of the Defendants' unconstitutional and unlawful conduct; and

i.   An order and judgment granting reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and 18 U.S.C. § 1595, and any other relief this Court deems just and proper.

Dated:  August 9, 2016                    Respectfully submitted,


                                          By: */s/ Thomas B. Harvey*_____
                                              Thomas B. Harvey (MBE #61734MO)
                                              Michael-John Voss (MBE #61742MO)
                                              Blake A. Strode (MBE #68422MO)
                                              Nathaniel Carroll (MBE #67988MO)
                                              Edward J. Hall (MBE #0012692IA)
                                              Brendan Roediger, *Of Counsel* (MBE #6287213IL)
                                              ARCHCITY DEFENDERS, INC.
                                              1210 Locust Street
                                              Saint Louis, MO 63103
                                              Tel: (855) 724-2489
                                              Fax:  (314) 925-1307
                                              tharvey@archcitydefenders.org
                                              mjvoss@archcitydefenders.org
                                              bstrode@archcitydefenders.org
                                              ncarroll@archcitydefenders.org
                                              ehall@archcitydefenders.org
                                              broedige@slu.edu


                                              Robert Weiner *(pro hac vice motion to be filed)*
                                              David B. Bergman *(pro hac vice motion to be filed)*
                                              ARNOLD & PORTER LLP
                                              601 Massachusetts Ave., N.W.
                                              Washington, D.C. 20001
                                              Tel:  (202) 942-5000
                                              Fax:  (202 942-5999
                                              Robert.Weiner@aporter.com
                                              David.Bergman@aporter.com


                                              S. Zachary Fayne *(pro hac vice motion to be filed)*
                                              ARNOLD & PORTER LLP
                                              Three Embarcadero Center, 10th Floor
                                              San Francisco, CA 94111
                                              Tel:  (415) 471-3114
                                              Fax:  (415) 471-3400
                                              Zachary.Fayne@aporter.com


                                              *Attorneys for Plaintiffs*