# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

|  |  |
|---|---|
| QUINTON M. THOMAS; ROELIF EARL CARTER; BRADLEY JILES; ANGELA DAVIS; MEREDITH WALKER; BRITTANY ELLIS; DONYA PIERCE; MAWOUSSIME ADOBOE ; VERONICA MURPHY; CHARLES RILEY, et al., | ) ) ) ) ) ) ) ) ) ) Case No. 4:16-cv-1302 |
| Plaintiffs, | ) ) |
| v. | ) (Jury Trial Demanded) ) |
| CITY OF ST. ANN, | ) ) |
| Defendant. | ) ) |

## SECOND AMENDED CLASS ACTION COMPLAINT

### INTRODUCTION

1.     The City of St. Ann, through its police department, municipal court system, prosecuting attorney's office, and jail, has terrorized the named Plaintiffs and many thousands of others through a deliberate policy established and implemented to fill the city's coffers by extorting money from thousands of poor, disproportionately African-American people in the St. Louis region, creating a modern-day police state and debtors' prison scheme that has no place in American society.

2.     The scheme reflects an extraordinary abuse of governmental authority, starting with the over-policing of low-income communities of color and the issuance of excessive citations for traffic and other minor municipal code violations, followed by arbitrary fines, penalties, surcharges, and interest charges that pile up like debts to a loan-shark, arrest warrants

auto-generated without good cause or even a semblance of due process, and imprisonment—imposed without assistance of counsel—in squalid debtors' prisons. This unconstitutional revenue-generation scheme disproportionately targets African-American residents, placing jobs at risk, leaving children without supervision, and debasing fundamental human rights, for as long as it takes to strong-arm payment from Plaintiffs and others.

3.     Plaintiffs are a group of similarly situated individuals who are victims of this predatory scheme. Each of these human beings was locked in a cell in the City of St. Ann solely because he or she was unable to afford a cash payment. And each was left to languish in filthy, often overcrowded jail cells because he or she could not afford to pay jacked-up fines, penalties, and other charges. Defendant did not inquire about, much less accommodate, the hardships its extortionate demands placed on Plaintiffs and their families. Nor did Defendant offer to provide Plaintiffs with counsel who could advise them of their rights or otherwise protect them from this predatory scheme.[1]

4.     St. Ann's officials and employees—through their conduct, decisions, training, rules, policies, practices, and procedures—constructed and implemented this scheme for the overriding purpose of raising municipal revenue (and not for any legitimate law enforcement purpose).

5.     Defendant gained the coercive leverage to effectuate this scheme by resurrecting a modern analogue of debtors' prisons—an institution this country rejected as inhumane more than

---

[1] The architecture of this illegal scheme has been in place for many years. *See, e.g.*, T.E. Lauer, *Prolegomenon to Municipal Court Reform in Missouri*, 31 Mo. L. Rev. 69, 88 (1966) ("[I]t seems that many citizens of the state are being confined needlessly in our city jails . . . ."); *id.* at 85 ("[I]t is disgraceful that we do not appoint counsel in our municipal courts to represent indigent persons accused of ordinance violations."); *id.* at 90 ("It is clear that many municipalities have at times conceived of their municipal courts in terms of their revenue-raising ability. . . .").

a century ago. That leverage has made the scheme increasingly profitable. St. Ann's law enforcement and municipal court practices focus on maximizing revenue, rather than promoting public safety, administering justice, or providing the bare rudiments of due process. Defendant has forced the poorest and most vulnerable citizens to finance a municipal system that is a tool of injustice and oppression.

6.     As a result, this scheme has targeted and persecuted people who live in or travel through St. Ann and its neighboring municipalities' borders, trapping people for years in a cycle of escalating fees, intractable debt, and imprisonment. In particular, Defendant has preyed on the most vulnerable, those living in or near poverty, who are least able to bear, or to avoid, the extortionate costs this system has imposed.

7.     Thousands of people in the Plaintiffs' position must divert funds from their disability checks, or sacrifice meager earnings their families desperately need for food, diapers, clothing, rent, and utilities, to pay spiraling court fines, fees, costs, and surcharges. Whether or not valid, a citation for a minor offense—a broken tail light, a lane change without signaling—often generates crippling debts for people like Plaintiffs, resulting in jail time when they cannot afford to pay, deepening their already desperate poverty.

8.     The summary imprisonment imposed on people who have appeared in the municipal courts of St. Ann and its neighboring municipalities but who could not afford to pay the sums of money demanded has frightened many away from the courthouse, allowing Defendant to jack up the fines even further and issue arrest warrants—intended to coerce payment—for "Failure to Pay" and "Failure to Appear." Month after month, year after year, the cycle has repeated itself, ensnaring Plaintiffs and those like them in a system from which it has been nearly impossible to extricate themselves.

9.     Defendant has abused the legal system to bestow a patina of legitimacy on what is, in reality, extortion.  If private parties had created and implemented this scheme, enforced it by threatening and imposing indefinite incarceration, and milked poor families of millions of dollars, the law would punish them as extortionists and racketeers, and the community would take steps to prevent them from exploiting the most vulnerable of its members.  These predatory practices are no more legitimate—and indeed are more outrageous—when state and local government actors perpetrate them under color of law.

10.     The treatment of the named Plaintiffs reveals a coordinated, systemic effort to deprive some of the area's poorest residents of their rights under the United States Constitution. For years, Defendant has engaged in the same conduct, as a matter of policy and practice, against Plaintiffs and thousands of other impoverished citizens.  These citizens' fundamental constitutional right to liberty, however, does not depend on their income.  Defendant has created or revived a *de facto* debtors' prison, using it as a tool to cow poor people into financing municipal government.  Such flagrant abuse is not consistent with the values this country holds dear, with the rule of law, or with the constitutional guarantee of due process.

11.     Importantly, to enable and perpetuate this unconstitutional scheme, the City of St. Ann acts as a veritable warehouse in which other neighboring municipalities can deposit excess arrestees.[2]  On their own, each of these other neighboring municipalities lacks the capacity to hold more than a few people at a given time, so they contract with St. Ann to arrest a significantly greater number of people for alleged municipal ordinance violations and ship them

---

[2] Plaintiffs originally named twelve of these municipalities—Edmundson, Normandy, Cool Valley, Velda City, Beverly Hills, Pagedale, Calverton Park, St. John, Bel-Ridge, Wellston, Velda Village Hills, and Bellefontaine Neighbors—as defendants along with the City of St. Ann. Pursuant to this Court's April 24, 2017 Order, Plaintiffs are filing this Second Amended Complaint against the City of St. Ann only.

to St. Ann Jail, where arrestees languish until the municipalities can extract enough money from the individuals or their families to satisfy their demands. Without the availability of St. Ann's recently-expanded jail, which "sleeps 42, not including a pen for short-timers and a juvenile area,"[3] these other municipalities would not be able to incarcerate, or threaten to incarcerate, human beings too poor to pay their debts.

12.     Plaintiffs, by and through their attorneys, and on behalf of those similarly situated, bring this civil action pursuant to 42 U.S.C. § 1983 and the Fourth, Sixth, and Fourteenth Amendments to the United States Constitution. Plaintiffs seek in this civil action the vindication of their fundamental rights, compensation for the abuse that Defendant has rained down on them, injunctive relief assuring that Defendant will not violate their rights again, and a declaration that the Defendant's conduct is unlawful.[4]

## **NATURE OF THE ACTION**

13.     Pursuant to policy and practice, Defendant has jailed people who cannot afford to pay money they supposedly owe Defendant or neighboring municipalities for traffic tickets and other minor alleged municipal code violations. Defendant has jailed people for nonpayment without inquiring whether they *can* pay, without considering alternatives to imprisonment as required by federal and Missouri law, and without setting bail and/or bond based on the person's individual circumstances.

---

[3] Bogan, Jesse, *A Sense of Change in St. Ann*, ST. LOUIS POST-DISPATCH (Aug. 5, 2012), http://www.stltoday.com/news/local/metro/a-sense-of-change-in-st-ann/article_c2dd4c0b-45fc-552f-8df9-8ec5db29d7cb.html.

[4] The Plaintiffs make the allegations in this Complaint based on personal knowledge as to matters in which they have had personal involvement, and on information and belief as to all other matters.

14. Pursuant to policy and practice, Defendant has jailed indigent people for these alleged debts without informing them of their right to counsel and without providing counsel for those who cannot afford it.

15. Pursuant to common practice, Defendant has arbitrarily and incrementally set and re-set the amount of money it requires indigent people to pay for release throughout their indefinite detention, sometimes eventually releasing the person if Defendant determines it cannot extort money from him or her.

16. Pursuant to policy and practice, Defendant has incarcerated individuals indefinitely, unless and until the person, or the person's family or friends, can pay sufficient money to satisfy Defendant. The conditions of incarceration are so miserable as to intensify the coercive effect.

17. Pursuant to policy and practice, Defendant has issued and enforced invalid arrest warrants, threatened alleged debtors with jail if they do not bring cash to court, held alleged debtors in jail for a week or more without any judicial appearance, and, without due process, set and modified monetary payments necessary for release with no regard for ability to pay or basic fairness. These tactics frighten people away from appearing in court and then punish them for not appearing.

18. These policies and practices are further reflected in, and caused by, Defendant's (1) failure to establish consistent procedures, effective training, and meaningful supervision to appropriately guide and monitor the actions of law enforcement officers and other agents of Defendant engaged in law enforcement and municipal court activities; (2) failure to establish reliable systems to detect and appropriately discipline and hold accountable municipal officials

for misconduct; and (3) prioritizing revenue generation at the expense of legitimate public safety needs and the rights of thousands of St. Louis County residents.

19.     The Plaintiffs seek declaratory, injunctive, and compensatory relief.

## JURISDICTION AND VENUE

20.     This is a civil rights action arising under 42 U.S.C. § 1983, 28 U.S.C. § 2201, *et seq*., and the Fourth, Sixth, and Fourteenth Amendments to the United States Constitution.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

21.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391.

## PARTIES

22.     Plaintiff Quinton M. Thomas is a 28-year-old man.

23.     Plaintiff Roelif Earl Carter is a 63-year-old man.

24.     Plaintiff Bradley Jiles is a 24-year-old man.

25.     Plaintiff Angela Davis is a 44-year-old woman.

26.     Plaintiff Meredith Walker is a 47-year-old woman.

27.     Plaintiff Brittany Ellis is a 26-year-old woman.

28.     Plaintiff Donya Pierce is a 26-year-old woman.

29.     Plaintiff Mawoussime Adoboe is a 33-year-old woman.

30.     Plaintiff Veronica Murphy is a 31-year-old woman.

31.     Plaintiff Charles Riley is a 58-year-old-man.

32.     Defendant City of St. Ann is a municipal corporation, organized under the laws of the State of Missouri.  The City of St. Ann operates the St. Ann Jail, the St. Ann Police Department, and the St. Ann Municipal Court.

# FACTUAL ALLEGATIONS

## A.      Factual Background

33.      St. Louis County, Missouri is comprised of 90 municipalities and 81 separate municipal courts.  These municipalities range in population from under 100 people to over 10,000.  The population of the City of St. Ann is estimated to be 12,812.

34.      In 2013, the municipal courts of St. Louis City and County collected $61,152,087 in fines and fees.  During that same time, the combined total of court fines and fees collected by Missouri municipal courts was $132,032,351.63.  This means that the municipal courts in the St. Louis region accounted for 46% of all fines and fees collected statewide, despite being home to only 22% of Missourians.[5]

35.      In recent years, there has been little to no oversight of the St. Louis region's municipal courts.  A judicial circuit in Missouri contains on average 8.6 municipal court divisions.  The St. Louis County judicial circuit contains 81 municipal court divisions.  As a result, the presiding judge of St. Louis County's circuit courts must oversee nearly ten times the number of municipal courts and municipal court judges as an average presiding judge in Missouri.[6]

36.      According to the most recent available information (FY 2015), court fines and fees were the largest single source of revenue for St. Ann.[7]  In 2013, St. Ann received 37.47% of its general revenue from fines and fees.[8]  In 2014, this number was 28.85%.[9]

---

[5] *See* Better Together's *Municipal Courts Study*, *available at* http://www.bettertogetherstl.com/studies/public-safety/municipal-courts-report.
[6] *Id.*
[7] Annual Budget, StAnnMo.org http://www.stannmo.org/DocumentCenter/View/2596.
[8] Sources: https://www.courts.mo.gov/file.jsp?id=68844; http://www.bettertogetherstl.com/wp-content/uploads/2014/10/BT-Municipal-Courts-Report-Appendix.pdf.

37.     Based on data reported by police departments to the Missouri Attorney General, black residents in St. Ann are much more likely to be searched and/or arrested as a result of a vehicle stop.[10]  For example, in 2015, in St. Ann, out of 8,140 total vehicle stops, 5.87% of stops of white individuals resulted in a search, whereas 15.34% of stops of black individuals resulted in a search.  While contraband is equally likely to be discovered during stops involving both white drivers and black drivers, black drivers are nearly three times more likely to be arrested than white drivers as a result.[11]

## B.     Defendant Has Operated Its Municipal Court and Jail as a Profit Center

38.     Defendant has improperly used its municipal court and jail as a profit center rather than a dispenser of justice.[12]  Between 2012 and 2016, Defendant reaped $13.9 million in revenue from its municipal court.[13]

39.     Well before each fiscal year, Defendant determines the amount of money it needs its municipal court to generate.  Defendant depends on the money collected through its municipal

---

[9] OFFICE OF STATE COURTS ADMIN., MO. JUDICIAL REPORT SUPP.: FISCAL YEAR 2014, Table 94, http://www.courts.mo.gov/file.jsp?id=83262; *General Administration #2*, BETTER TOGETHER ST. LOUIS 8-12 (December 2015), http://www.bettertogetherstl.com/wp-content/uploads/2015/12/Better-Together-General-Administration-Report-2-FINAL-.pdf.

[10] MISSOURI ATTORNEY GENERAL VEHICLE STOPS REPORT, *available at* https://ago.mo.gov/home/vehicle-stops-report/advanced-search.

[11] John Eligon, *Missouri Reports Wide Racial Disparity in Traffic Stops*, NEW YORK TIMES (Jun. 1, 2015), https://www.nytimes.com/2015/06/02/us/big-disparity-for-blacks-pulled-over-in-missouri.html.

[12] Unless otherwise stated in this Complaint, the policies, practices, and procedures of Defendant described herein have been in existence for at least the past five years.

[13] OFFICE OF STATE COURTS ADMIN., MO. JUDICIAL REPORT SUPP.: FISCAL YEAR 2012, Table 94, http://www.courts.mo.gov/file.jsp?id=58805; OFFICE OF STATE COURTS ADMIN., MO. JUDICIAL REPORT SUPP.: FISCAL YEAR 2013, Table 94, http://www.courts.mo.gov/file.jsp?id=68844; OFFICE OF STATE COURTS ADMIN., MO. JUDICIAL REPORT SUPP.: FISCAL YEAR 2014, Table 94, http://www.courts.mo.gov/file.jsp?id=83262; OFFICE OF STATE COURTS ADMIN., MO. JUDICIAL REPORT SUPP.: FISCAL YEAR 2015, Table 94, http://www.courts.mo.gov/file.jsp?id=96437; OFFICE OF STATE COURTS ADMIN., MO. JUDICIAL REPORT SUPP.: FISCAL YEAR 2016, Table 94, https://www.courts.mo.gov/file.jsp?id=109581.

court to help fund its jail, pay municipal court judicial salaries, pay city attorney's office salaries, and fund other portions of its municipal budget.

40.    Defendant has operated its court and jail to maximize revenues at the expense of justice.  Defendant has made decisions regarding the operation of the court and the jail—including the assessment of fines, fees, costs, and surcharges; the availability and conditions of payment plans; the determination of amounts required for release from jail; the issuance and withdrawal of arrest warrants; and the refusal to appoint an attorney for indigent defendants—based on its desire to meet fiscal projections rather than on legitimate penological considerations.

41.    In 2015 alone, Defendant issued one arrest warrant per every five adults residing in the City, affecting two out of every five households,[14] mostly for minor municipal ordinance violations like traffic tickets.

42.    In addition, St. Ann provides jailing services for several neighboring municipalities.  Pursuant to contractual arrangements, St. Ann charges each of these municipalities a fee for each day St. Ann incarcerates an individual on the municipality's behalf. On information and belief, this fee is $35 per day.

43.    At least 14 of Defendant's neighboring municipalities depend on the St. Ann Jail as a jailing hub, thereby expanding significantly those municipalities' capacities to boost municipal revenues by arresting, jailing, and coercing payments from more and more poor residents of the St. Louis region for minor traffic tickets.

---

[14] OFFICE OF STATE COURTS ADMIN., MO. JUDICIAL REPORT SUPP.: FISCAL YEAR 2015, Table 95, http://www.courts.mo.gov/file.jsp?id=96438; U.S. CENSUS BUREAU, PROFILING OF GENERAL POPULATION AND HOUSING CHARACTERISTICS 2010, http://factfinder.census.gov/faces/nav/jsf/pages/index.xhtml.

## C.  Defendant's Unlawful Policies and Practices

44.    In a typical case, an individual is stopped (often illegitimately) in St. Ann or one of its neighboring municipalities for a traffic offense or other minor violation.  In many cases, these violations are "crimes of poverty," meaning that they result, at least in part, from the individual's inability to pay for things like insurance, vehicle registration fees, etc.

45.    The police officer issues the person a citation and informs her that she can either pay the fine or appear at the municipal court for the relevant jurisdiction at a designated date and time.  In some cases, the person can simply afford to pay the citation and thereby avoid the clutches of the municipal court system.  But many in the St. Louis area are indigent and cannot afford to pay such citations without sacrificing basic necessities like food, diapers, and rent.  For these individuals, the system works differently—it becomes a Kafkaesque web of indignities and incarceration that plunge the victim ever deeper into poverty.

46.    An indigent person who cannot afford to pay a fine from an alleged traffic offense or other minor violation must appear in a municipal court.  There, she is forced to wait in line— in some cases, for hours—before being called before a municipal judge who will ask whether she has the money to pay, on the spot, the fine *plus* court costs.  The municipal judge does not inquire as to whether the person is indigent or can afford to pay the fine, nor does he offer to provide a lawyer if the person cannot afford one.  Instead, the municipal judge asks a simple question:  do you have the money to pay today, yes or no?  In many cases, the answer is no.

47.    In the many cases in which the individual cannot come up with the requisite funds at the courthouse, municipal judges or others within the St. Ann jailing orbit regularly employ several tactics to coerce payment: (i) in some cases, the municipal judge or other municipal official instructs the person that she must return to court at a future date and time with the

required funds, plus interest, or she will be jailed; (ii) in other cases, the municipal judge or other municipal official instructs the person to see the court clerk to set up a payment plan, which will require the person to pay in installments, subject to exorbitant interest rates, surcharges, and other fees; and (iii) in other cases, the municipal judge or other municipal official detains the person at the courthouse for the remainder of the court session (if not longer), instructing her to contact friends and family to bring money to the courthouse to secure the person's release.

48.    In all three scenarios, the individual faces the possibility of jail time if she is not able to pay the fine and associated court costs, interest, surcharges, and other fees.  Municipal court officials, including the municipal judges and clerks, regularly instruct court attendees that failure to pay a fine and other costs will result in jail time.  Indeed, residents of St. Ann and its neighboring municipalities commonly understand that attending a municipal court session without the funds necessary to pay off a citation or other debt can result in jail time, irrespective of whether the individual actually has the ability to pay.  Defendant's tactics thus frighten many people, including many of the Plaintiffs, away from municipal court dates when those individuals do not have enough money to pay their fines and other debts.  This ultimately enables St. Ann and paying customers of the St. Ann Jail to squeeze more money from these poor residents.

49.    If an individual misses or is alleged to have missed a court date, the court's computer system automatically generates an arrest warrant for "Failure to Pay" or "Failure to Appear."  According to recent reports from the state auditor's office, no judge or prosecutor reviews or signs these arrest warrants.[15]

---

[15] See *Summary of Audit Findings Judiciary---Municipal Divisions, Report No. 2016-046*, *available at* http://app.auditor.mo.gov/AuditReports/AudRpt2.aspx?id=60, which states:

50.     Often, the computer system auto-generates an arrest warrant even where (a) the individual did, in fact, attend the court session, but the municipal clerk or other court official erred in recording the person's absence, (b) the individual did not receive adequate notice of the court date, or (c) the individual had a valid excuse for her absence -- *e.g.*, because she was detained by another municipality, had a court date in another municipality, or was ill.

51.     Defendant has issued hundreds, if not thousands, of arrest warrants for "Failure to Pay" or "Failure to Appear" each year.  These arrest warrants are often pretextual and are simply a mechanism by which Defendant can coerce indigent persons to pay fines and costs that they cannot actually afford.

52.     The arrest warrant empowers any municipality to stop and arrest the individual the warrant identifies.  Having arrested this person, an officer may take the individual to:  (i) the municipal jail of the municipality in which the person was arrested, (ii) the municipal jail of the municipality that issued the arrest warrant, or, in many cases, (iii) the St. Ann Jail, which contracts with neighboring municipalities to provide jailing services.

53.     Once the individual arrives at the St. Ann Jail, she can secure her release immediately if she is able to pay off her entire debt (including any interest, fees, or other costs).

The Municipal Judge did not sign warrants issued and did not issue written authorization for the Court Clerk/Administrator to sign warrants on his behalf. In addition, the Municipal Judge allowed the Court Clerk/Administrator to use his signature stamp on warrants and failure to appear notices. Without the signature or written authorization, there is no documentation the warrants were authorized. In addition, the municipal division did not always issue warrants timely.

Supreme Court Rule 37.45 states a warrant shall be signed by the judge or by the clerk of the court when directed by the judge for a specific warrant. To ensure warrants are properly issued in accordance with Supreme Court rules, the Municipal Judge should sign warrants or provide specific written authorization for the Court Clerk/Administrator to sign warrants and discontinue allowing the use of his facsimile signature. In addition, warrants should be issued timely to ensure outstanding court appearances and fines are addressed.

In some cases, the St. Ann Jail will release the individual if she is able to pay a portion of her debt, taking whatever money the individual has on-hand or can obtain from family and friends.

54.     In almost all cases, an individual arrested for "Failure to Pay" or "Failure to Appear" does not appear before a judge to answer for the alleged crime of failing to attend a court date. Instead, after her release from the St. Ann Jail, the individual receives a new court date at which a municipal judge will ask the same question: do you have money today to pay your fines, yes or no? Not just the original fine for the traffic stop, but now multiplied many times over because of the individual's inability to pay and sometimes because the municipality's abusive tactics have scared away Plaintiffs and others from even coming to court. In this manner, the cycle repeats itself, month after month, year after year.

55.     The practices described in this "typical" example are ubiquitous in St. Ann. As a matter of policy and practice, municipal officials in St. Ann (including judges, police officers, and court clerks, among others) have routinely:

> a.      Issued citations for supposed traffic and municipal code violations (which, on information and belief, are the product of discriminatory enforcement of the law);
>
> b.      Demanded payment of fines for such traffic and municipal violations, without any inquiry into whether the person has the ability to pay, and without offering to provide a lawyer if the person is indigent and cannot afford one;
>
> c.      Established draconian payment plans with usurious interest rates and other fees for indigent persons who cannot afford to pay their fines, and without offering nonmonetary alternatives to satisfy the obligation;
>
> d.      Threatened people, including the indigent, with incarceration under inhumane conditions if they cannot afford to pay their fines, court costs, and other fees;
>
> e.      Issued auto-generated arrest warrants for "Failure to Appear," even if the person did in fact appear, was unable to appear for good

reason (including lack of notice), or was intimidated by municipal officials into not appearing because of the well-founded fear that they would be summarily thrown into jail if they appeared without being able to pay;

f.  Denied appointment of counsel for indigent defendants who face incarceration for failing to satisfy a payment plan condition imposed by Defendant;

g.  Incarcerated people for their inability to pay fines, court costs, and other fees, or on the basis of unlawful, auto-generated arrest warrants for "Failure to Pay" or "Failure to Appear" at a court date;

h.  Released people from jail immediately if they are able to pay their outstanding debts to Defendant —or, in some cases, a portion of their outstanding debts—even if the purported basis for the arrest was the criminal act of failing to appear at a court date; and

i.  Detained people in local jails for up to three days, if not longer, if they could not afford to pay their outstanding debts, or at least some portion of such debts.

### i.  Debt-Collection Proceedings in Defendant's Municipal Court

56.  Defendant's municipal court is staffed primarily by its municipal court judge, the city prosecutor, court clerk, and other court staff.

57.  In April 2016, St. Ann moved to a consolidated municipal court system, whereby the presiding Judge of St. Louis County approved the administrative handling of several municipalities' court cases through the St. Ann municipal courts.  The municipalities included in the "Consolidated Municipal Courts" are (as of this filing): the City of Vinita Park, the City of Northwoods, the City of Charlack, the City of Wellston, and the City of Beverly Hill.

58.  There is extraordinary overlap among the court officials in the St. Louis County municipalities, including St. Ann.  For example, attorneys at a single law firm (with fewer than 20 attorneys) serve as judge, prosecutor, or city attorney in more than 27% of St. Louis County municipalities (at least 25 out of 90), including St. Ann.  In some instances, the city attorney for

one municipality serves as the municipal judge in another. In St. Ann, attorneys from the same firm serve as both municipal prosecutor and city attorney.

59. The purported function of the St. Ann municipal court is to adjudicate traffic violations and other minor offenses; the real purpose, however, is to collect payments, in an assembly-line fashion, for outstanding tickets from alleged traffic and other minor municipal code violations.

60. If a person is too poor to pay her debts, her case can go on indefinitely, subjecting her to multiple arrests and ever-mounting fees.

61. A person can end this debt collection process only by paying what Defendant claims that she owes, including any surcharges or fees, which can balloon to sums that dwarf the original fine for the minor traffic offense that launched the vicious cycle.

62. In many cases, Defendant has not advised people appearing at these municipal court sessions about their relevant rights under federal or Missouri law, including applicable constitutional rights and state-law defenses and procedures, nor has Defendant provided people any realistic avenue of escape from the pernicious web in which they are entangled.

63. In many cases, Defendant, pursuant to policy and practice, has not provided an attorney to people appearing at these municipal court sessions.

64. In many cases, Defendant, pursuant to policy and practice, has imprisoned those who are unable to satisfy whatever fines and penalties (either in full or as part of a repayment schedule) Defendant has set at these municipal court sessions. Defendant has done so without providing due process, without conducting any meaningful or individualized inquiry into a person's ability to pay, and without considering the availability or suitability of alternatives to imprisonment.

65.     Because of Defendant's policy and practice of not appointing counsel, the vast majority of those jailed for failing to satisfy the payment plan conditions that Defendant has imposed, or in connection with an arrest warrant for "Failure to Pay" or "Failure to Appear," have no access to an attorney.

**ii.     Defendant's Flawed and Unlawful Warrant Process**

66.     Pursuant to policy and practice, Defendant has applied arbitrary and illegal policies for the issuance and enforcement of arrest warrants for those unable to satisfy Defendant's extortionate demands.

67.     Defendant has issued arrest warrants for failure to make a payment by a certain date ("Failure to Pay") without probable cause to believe that the person has the ability to make a payment.  Defendant has preyed on the unrepresented, refusing to withdraw arrest warrants even for those who are plainly too poor to make payments.

68.     Defendant has also routinely issued arrest warrants for "Failure to Appear" at court dates without giving people adequate notice of the supposed obligation to appear, such as when Defendant has failed to serve a valid summons or when Defendant has rescheduled a hearing without providing reasonable notice.

69.     The arrest warrants that Defendant has issued for "Failure to Pay" and "Failure to Appear" at court dates have been auto-generated by a computer program, based on information that the municipal court clerks entered manually into the computer.  No judge or magistrate approved these warrants before they were issued.

70.     After arresting a person based on a warrant, Defendant has routinely demanded that she make immediate payment and, if she has not done so, Defendant has held the person in

jail and unnecessarily delayed presentment in court for days or weeks in an effort to coerce the victim to pay for her freedom, regardless of her indigence.

### iii. The Arbitrary and Indefinite Detention of the Indigent

71.    After booking a person in jail for either "Failure to Pay" or "Failure to Appear," Defendant has offered immediate release in exchange for a cash payment.  The amount of cash that Defendant has required for release has often been the total debt the person owes from judgments in old traffic and other misdemeanor cases.

72.    Defendant also jails people for "Failure to Pay" or "Failure to Appear" warrants that neighboring municipalities issue.

73.    Particularly given Defendant's frequent interactions with these neighboring municipalities and the substantial overlap among these municipalities in personnel involved in the courts, jails, and law enforcement, Defendant knows, or should know, that these warrants arise from the person's inability to pay a debt owed to the neighboring municipality.

74.    On those occasions that Defendant has jailed people for "Failure to Pay" or "Failure to Appear" warrants issued by neighboring municipalities, Defendant has offered immediate release in exchange for a cash payment, and the amount of cash that Defendant and the neighboring municipality have required for release has often been the total debt the person owes from judgments in old traffic and other misdemeanor cases.

75.    Pursuant to policy and practice, Defendant has held people in jail, in abject conditions, for an indeterminate period of several days or more unless and until they or their families have paid Defendant or the neighboring municipalities the amounts demanded.

76.    For those individuals imprisoned for failing to satisfy a previously-established payment schedule, Defendant has confiscated any previous amounts paid by the person and reset

the person's debts. Defendant has taken these actions without providing any meaningful process or access to counsel.

77.     Through these practices, Defendant has strong-armed many impoverished people in St. Ann and elsewhere in the metropolitan area to pay Defendant and the municipalities relying on the St. Ann Jail thousands of dollars over a period of many years based on a few relatively inexpensive initial tickets.

78.     If they were able, a person could end this cycle by paying the balance of her debt. It is and has been the policy and practice of Defendant to allow any inmate at any time to pay the full amount of the debt owed and to be released immediately, terminating all existing "cases" for which debt is being collected.

### iv.     Sequential Detentions on Behalf of Multiple Municipalities

79.     In many cases, Plaintiffs and others similarly situated receive citations for traffic and other minor violations in multiple different municipalities (in some cases, for the exact same violation, such as a broken taillight).

80.     Many of the Plaintiffs, and others like them, have outstanding debts in several different municipalities that they simply cannot afford to pay. As these rapidly compounding fines, fees, costs, and surcharges from multiple municipalities pile up, the likelihood that an indigent person will be able to pay off even one municipality diminishes greatly, creating a never-ending spiral of debt, interest charges, missed payments, and incarceration.

81.     Pursuant to policy and practice, Defendant has held inmates in its jail on behalf of multiple municipalities. In some instances, Defendant has imprisoned people for days or weeks at a time on behalf of multiple municipalities in a sequential fashion (*i.e.*, Defendant holds the inmate in its jail for multiple other municipalities, one after another).

82. In other words, as soon as an inmate has paid off his debt for one municipality to secure his "release," Defendant has returned him to his jail cell for the alleged failure to pay debts owed to another municipality.

83. In this manner, Defendant may have held an indigent person in jail for an extended period of time—weeks or, in some cases, even months—simply because he was too poor to pay off his debts, with his imprisonment only exacerbating his poverty, making him even less able to break out of this vicious cycle of harassment and extortion.

**v.     Defendant Creates a Culture of Fear**

84. Defendant's policies and practices, as well as those of neighboring municipalities, have engendered fear among the poorest residents of the St. Louis metropolitan area.

85. Many of these residents do not, or are reluctant to, leave their homes, or to travel between municipalities, for fear of being stopped, arrested, and incarcerated based on outstanding debts on traffic tickets that they cannot afford to pay.

86. They are afraid to appear at the payment window or in the courts of Defendant and nearby municipalities to explain their indigence because they justifiably fear that Defendant will jail them without any meaningful process. This allows Defendant and other municipalities to jack up the fees even higher.

87. Defendant plays an especially critical role in this scheme due to its centralized jailing function.

88. The fear that Defendant has fostered has further degraded the quality of life of the poorest residents in St. Ann and elsewhere in the metropolitan area. Many have cut back on food, clothing, utilities, sanitary home repairs, and other basic necessities of life to satisfy, or try to satisfy, Defendant's rapacious demands for money.

### vi. The Deplorable Conditions of the St. Ann Jail

89.     As a matter of policy and practice, St. Ann detains inmates jailed for non-payment of debts in overcrowded cells where St. Ann ignored basic principles of hygiene, sanitation, medical and mental health care, and inmate safety.

90.     Officers of the St. Ann Jail have routinely:

a.      Denied inmates toothbrushes, toothpaste, and soap;

b.      Detained inmates in dirty cells that reek of human waste and bodily odors and fluids;

c.      Forced inmates to wear the same clothes for days and weeks without access to laundry or clean undergarments;

d.      Forced inmates to endure days, or even weeks, without providing access to a shower;

e.      Detained inmates in cold temperatures, even where the inmates have been huddled together with a single thin blanket and have begged guards for warm blankets;

f.      Detained inmates in conditions that cause them to develop illnesses and infections in open wounds that spread to other inmates;

g.      Detained inmates in conditions in which they are required to sleep next to an open unclean toilet, atop which sits a water faucet from which they must use their unclean cupped hands as vessels to drink water in an unsanitary manner, leading inmates to suffer dehydration;

h.      Refused to provide women adequate hygiene products for menstruation;

i.      Forced inmates to sleep amidst refuse because of the lack of adequate trash removal;

j.        Denied inmates vital medical care and prescription medication, even when their families begged for permission to bring medications to the jail;

k.        Failed to provide inmates who have serious mental health issues with necessary mental health treatment or prescription medication;

l.        Provided inmates food so insufficient and uniform that they lose significant amounts of weight and lack essential nutrients;

m.        Deprived inmates of books, legal materials, exercise, television, internet, and natural light; and

n.        Sexually abused and physically beaten inmates, which results from a culture of unaccountability and abuse due to inadequate training and supervision.

91.      These abuses and deprivations are accompanied by other pervasive humiliations. Jail guards routinely taunt impoverished people who are unable to pay for their release, and humiliate the inmates with degrading epithets, many focus on how bad the inmates look and smell after languishing in the St. Ann Jail.

92.      The totality of these conditions described by the Plaintiffs and by numerous witnesses amounts to unlawful punishment. St. Ann has designed and maintained a jail that is degrading and humiliating in order to punish debtors for not paying their debts and to discourage them from missing payments to Defendant and its neighboring municipalities. The purpose and effect is to coerce debtors to borrow money or use money otherwise needed for the basic necessities of life in order to avoid incarceration in the St. Ann Jail.

93.      The jail conditions created and perpetuated by Defendant would be unconstitutional under the Eighth Amendment even for convicted prisoners. Defendant forces

these conditions on pretrial detainees and post-judgment debtors jailed solely because of their inability to make monetary payments and not pursuant to any criminal sentence.

94. The use of the St. Ann Jail and its deplorable conditions for discrete and indefinite periods of confinement has the purpose and effect of punishing and coercing indigent people rather than achieving any lawful goal.

### vii. The Cycle of Debt and Jailing

95. Like the other impoverished people stuck in this brutal and pernicious system, Plaintiffs have been overwhelmed by the combination of rapidly compounding fines, fees, costs, and surcharges from multiple municipalities, as well as the cycle of repeated jailings that leads to lost jobs, poor health, and inadequate care for dependents. After scraping together cash from family and friends and borrowing money to pay off one municipality, Plaintiffs and other Class members often find themselves under arrest by or on behalf of another municipality.

96. For years, Plaintiffs have tried unsuccessfully to navigate this system without financial resources and without the assistance of a lawyer who understands the process—never knowing if arrest awaits when they leave the house, fearing, if they are arrested, indefinite incarceration because of their poverty. The futility of these efforts fundamentally alters Plaintiffs' lives and often breeds a level of hopelessness that corrodes any bond with the community.

97. The fear of losing basic rights with no recourse is a daily fact of life for Plaintiffs and thousands of others in the metropolitan area.

### D. The Named Plaintiffs' Imprisonment

98. Defendant's policies and practices in collecting unpaid fines, fees, costs, and surcharges relating to traffic tickets and other minor offenses, for at least the past five years, caused and exemplifies the violations of the named Plaintiffs' fundamental constitutional rights.

### i. Quinton M. Thomas

99. Quinton Thomas is a 28-year-old man who resides in St. Louis, Missouri. He is African-American.

100. Mr. Thomas has been jailed in the St. Ann Jail at least three times on warrants issued by Normandy and Edmundson, among other municipalities. The warrants initially stemmed from minor, driving-related offenses, such as running a stop sign, no proof of insurance, and improper vehicle registration.

101. In 2012, officers of the Normandy Police Department stopped Mr. Thomas for invalid license plates and failure to register his vehicle. The officers issued Mr. Thomas citations for these violations totaling $600.

102. Mr. Thomas could not afford to pay the $600 fine. Mr. Thomas appeared at the Normandy Municipal Court and explained to the municipal court judge that he could not afford to pay the $600 fine.

103. The municipal court judge responded that if Mr. Thomas did not pay at least $100, Normandy would issue a warrant for his arrest. Mr. Thomas responded that he could not afford to pay $100. He asked whether he could pay $50 instead, and the judge stated that he could not. Neither the municipal court judge nor any other court official made any inquiry into Mr. Thomas' ability to pay, nor did they appoint an attorney for him.

104. Neither the municipal court judge nor any other court official offered Mr. Thomas alternatives to the fine, such as community service, even though Mr. Thomas unequivocally informed them that he could not afford to pay even $100 of the fine.

105. The municipal court judge, apparently indifferent to Mr. Thomas' pleas of indigence, later issued a warrant for his arrest based on Mr. Thomas' failure to pay $100.

106.     In 2013, Mr. Thomas was driving to work and was stopped by officers of the Edmundson Police Department for allegedly failing to make a complete stop at a stop sign. Mr. Thomas denies running the stop sign. The officers informed Mr. Thomas that he had outstanding warrants in Normandy, Pine Lawn and St. John, among others. The Edmundson police officers took Mr. Thomas to the St. Ann Jail.

107.     Officers at the St. Ann Jail informed Mr. Thomas that he could be released if he paid a $150 bond. There was no bail hearing. Mr. Thomas could not afford to make this payment and thus was unable to secure his release. The St. Ann Jail held Mr. Thomas for three days on behalf of Normandy and Edmundson. Officers at the St. Ann Jail were aware, or should have been aware, that the basis for Mr. Thomas' incarceration was his inability to pay fines from minor, traffic-related offenses.

108.     The conditions in the St. Ann Jail were terrible. The jail cells were packed four people to a cell. The cells were so filthy that Mr. Thomas did not want to make contact with the walls or even the mattresses, which appeared not to have been cleaned in years. Jail officers provided Mr. Thomas (and other inmates) with a used blanket, but nothing else to separate himself from the disgusting and unsanitary mattress.

109.     The food in the St. Ann Jail was unhealthy and nearly inedible. Every meal consisted of a bologna sandwich (with greenish meat and hard bread), applesauce, and black coffee.

110.     After three days, the St. Ann Jail "released" Mr. Thomas, and officers from the City of St. John transported Mr. Thomas to the St. John Police Department.

111.     The St. John Police told Mr. Thomas that he had an outstanding warrant for an allegedly-unpaid parking ticket in St. John, information of which Mr. Thomas was previously

unaware. Officers further informed him that, because of additional late fees and fines that had accumulated over time, the amount owed had ballooned from approximately $100 to almost $500.

112.  Police officers in St. John informed Mr. Thomas that they were going to take him to the St. Louis County Justice Center in Clayton unless he could make a payment of at least $120. There was no bail hearing. Mr. Thomas contacted his father, who was able to pay the $120 bond to secure Mr. Thomas' release from St. John.

113.  Shortly after his release, Mr. Thomas appeared at the Edmundson Municipal Court and explained to the municipal court judge that he could not afford to pay the $300 citation for running a stop sign.

114.  The municipal court judge was indifferent to Mr. Thomas' pleas of indigence and directed Mr. Thomas to see the municipal court clerk to set up a payment plan. The payment plan, however, only worsened Mr. Thomas' situation—it included additional fees and costs and exorbitant interest rates, resulting in monthly payments that Mr. Thomas could not afford.

115.  Neither the municipal court judge nor any other court official made any inquiry into Mr. Thomas' ability to pay, nor did they appoint an attorney for Mr. Thomas.

116.  Neither the municipal court judge nor any other court official offered Mr. Thomas alternatives to the fine, such as community service, even though Mr. Thomas unequivocally informed them that he could not afford to pay the fine.

117.  A key reason Mr. Thomas could not afford to make the monthly payments required by the payment plan was that he had outstanding (and continually compounding) fines and court costs stemming from tickets for traffic and other minor violations in several other municipalities, including St. Charles, St. John, and Normandy.

118.     Mr. Thomas missed a monthly payment because he could not afford to make the payment.  Because Mr. Thomas could not afford to make the monthly payments, Edmundson issued a warrant for his arrest for "Failure to Pay" and/or "Failure to Appear."

119.     As a result of the traffic tickets—only one of which resulted from an alleged moving violation—and warrants issued by Edmundson and Normandy, Mr. Thomas' license was suspended in 2013, causing Mr. Thomas to lose his trucking job (which required a commercial driver's license).

120.     In January 2015, officers of the Dellwood Police Department responded to complaints of a domestic disturbance at Mr. Thomas' home stemming from a verbal argument between Mr. Thomas and his girlfriend.  The officers ran Mr. Thomas' and his girlfriend's names and discovered that both had outstanding warrants for unpaid traffic tickets.  Notably, Dellwood did not issue any charges and did not make any arrests in connection with the domestic disturbance complaint.

121.     The officers arrested Mr. Thomas and took him to the St. Louis County Justice Center in Clayton on outstanding warrants for unpaid traffic tickets.  At the Justice Center, jail officers informed Mr. Thomas that they would release him if he paid a bond.  There was no bail hearing.  Mr. Thomas could not afford to make this payment and thus was unable to secure his release. Mr. Thomas was held in Clayton for approximately three days.

122.     After approximately three days, officers at the Justice Center transferred Mr. Thomas to the St. Ann Jail, which held him on behalf of Normandy and Edmundson, among other municipalities, for the outstanding warrants described above.  Officers at the St. Ann Jail were aware, or should have been aware, that the basis for Mr. Thomas's incarceration was his inability to pay fines from minor, traffic-related offenses.  Officers at the St. Ann Jail informed

Mr. Thomas that they would release him if he paid a bond. There was no bail hearing. Mr. Thomas was once again unable to pay a bond to secure his release from St. Ann.

123. As on previous occasions, the St. Ann Jail incarcerated Mr. Thomas in overcrowded and filthy cells, and provided disgusting and unhealthy food.

124. After at least one day in the St. Ann Jail, officers at the St. Ann Jail transferred Mr. Thomas to the O'Fallon Jail.

125. Officers at the O'Fallon Jail informed Mr. Thomas that his bond to secure his release was $340. There was no bail hearing. Mr. Thomas was able to scrounge together enough money from family and friends to pay a $340 bond to O'Fallon in order to secure his release.

126. In May 2016, officers of the Beverly Hills Police Department stopped Mr. Thomas for a broken bumper. The officers informed Mr. Thomas that he had outstanding warrants in Normandy and Edmundson, among others, and took Mr. Thomas to the Beverly Hills Police Department. The officers detained Mr. Thomas at the Beverly Hills Police Department for approximately one hour.

127. The officers told Mr. Thomas that he would need to pay $300 "to get out." There was no bail hearing. Mr. Thomas was unable to pay that bond amount.

128. While Mr. Thomas was detained at the Beverly Hills Police Department, the officers refused to allow any of Mr. Thomas' friends or family to retrieve the car. As a result, Mr. Thomas' car was sent to impound. Mr. Thomas could not afford to get the car out of impound and consequently lost his car permanently.

129. Officers from the St. Ann Police Department picked Mr. Thomas up from the Beverly Hills Police Department and took him to the St. Ann Jail on behalf of Normandy and

Edmundson (in connection with warrants for unpaid traffic tickets and "Failure to Pay" and/or "Failure to Appear" charges, as described above).

130.     As on previous occasions, the St. Ann Jail incarcerated Mr. Thomas in overcrowded and filthy cells, and provided disgusting and unhealthy food.  Also as on previous occasions, officers at the St. Ann Jail were aware, or should have been aware, that the basis for Mr. Thomas' incarceration was his inability to pay fines from minor, traffic-related offenses.

131.     Mr. Thomas was held in the St. Ann Jail for a day and a half.  Mr. Thomas missed a day of work at his construction job because he was incarcerated.  As a result of missing work due to his incarceration for failure to pay fines and costs from minor, traffic-related offenses, Mr. Thomas was fired from his construction job.

**ii.     Roelif Earl Carter**

132.     Roelif Earl Carter is a 63-year-old husband and the sole provider for his wife and daughter.  He is African-American.

133.     Mr. Carter is a Veteran of the United States Air Force and was honorably discharged from service in 1976.

134.     After his service in the Air Force, Mr. Carter worked for the Ford Motor Company for thirteen years until he suffered a brain aneurysm that left him unable to work.  He currently receives Supplemental Security Income due to his disability.

135.     Mr. Carter has been jailed in the St. Ann Jail on at least four occasions in connection with warrants issued by Normandy and Cool Valley.  The warrants issued by Normandy and Cool Valley initially stemmed from minor traffic infractions, including driving with a suspended license and failure to provide proof of insurance, from the early 2000s.

136.     In October 2002, officers of the Cool Valley Police Department stopped Mr. Carter and issued him a citation for failure to provide proof of insurance.

137.     Mr. Carter could not afford to pay Cool Valley's fine.  On multiple occasions, Mr. Carter appeared at the Cool Valley Municipal Court in connection with the fine for his traffic offense.  Mr. Carter explained to the municipal court judge that he could not afford to pay the citation.  The municipal court judge did not make any inquiry into Mr. Carter's ability to pay, nor did the judge appoint an attorney for Mr. Carter.  Instead, the judge directed Mr. Carter to see the municipal court clerk to set up a payment plan.

138.     The municipal court clerk set up a payment plan for Mr. Carter, requiring him to pay $50 per month until his fine (including court costs, surcharges, and interest) was paid off in full.

139.     When Mr. Carter was able to make his monthly payment (which he was able to do on some occasions), he was not required to appear at scheduled court sessions of the Cool Valley Municipal Court.

140.     However, when Mr. Carter was not able to make his monthly payment, Cool Valley instructed that he was required to appear at scheduled court dates at the Cool Valley Municipal Court.  At these municipal court sessions, the judge inquired only as to whether Mr. Carter had his monthly payment with him.

141.     On each of the occasions Mr. Carter appeared at the Cool Valley Municipal Court, Mr. Carter did not have the requisite funds to make his monthly payment.  Thus, on each occasion, the municipal court judge directed Mr. Carter to sit in the back of the courthouse until the end of the session (which could be up to two hours later), at which point the judge directed Mr. Carter to see the municipal court clerk.  When Mr. Carter left the court, he owed additional

court costs, surcharges, and interest payments that bore no relationship to the actual cost, if any, the court incurred by virtue of the missed payment.

142.    When Mr. Carter was not able to make his monthly payment, the Cool Valley Municipal Court automatically generated a warrant for his arrest (for "Failure to Pay" or "Failure to Appear"). On multiple occasions in the last five years, Cool Valley automatically generated arrest warrants for Mr. Carter for "Failure to Pay" or "Failure to Appear."

143.    Mr. Carter had outstanding arrest warrants from Cool Valley from 2002 until early 2016, when ArchCity Defenders secured a dismissal of charges against Mr. Carter. All of his warrants were for "Failure to Pay" or "Failure to Appear" offenses in connection with traffic-related infractions for which Mr. Carter could not afford to pay the fine.

144.    In November 2012, officers of the Normandy Police Department stopped Mr. Carter and issued him a citation for allegedly running a red light, driving with a suspended license, and no proof of insurance.

145.    Mr. Carter could not afford to pay the fine issued by Normandy. Mr. Carter knew that many municipalities, including Normandy, did not accept partial payment and engaged in a regular practice of arresting people who were unable to pay their fines. Because he could not afford to pay the fine, Mr. Carter did not appear at his scheduled court date and Normandy issued an arrest warrant for Mr. Carter for "Failure to Pay" and/or "Failure to Appear."

146.    Following Normandy's issuance of an arrest warrant for Mr. Carter's alleged "Failure to Pay" and/or "Failure to Appear," Mr. Carter has appeared (or attempted to appear) in Normandy Municipal Court on at least two occasions. On neither occasion did the municipal court judge or any other municipal court official make any inquiry into Mr. Carter's ability to pay, nor did the judge appoint an attorney for Mr. Carter.

147.    On the first occasion, the municipal courthouse was overcrowded and Mr. Carter was unable to get in the door.  Even though Mr. Carter tried to appear for his court date and was unable to do so only because the courthouse was overcrowded, Normandy issued a warrant for Mr. Carter's arrest for "Failure to Pay" and/or "Failure to Appear."

148.    On the second occasion, in or around January 2013, Mr. Carter appeared before a municipal court judge.  The judge asked whether Mr. Carter had money with him to pay the outstanding fines and costs.  Mr. Carter explained that he did not have money with him and could not afford to pay the fine, and asked whether community service was an option since Mr. Carter was indigent and could not afford to pay.  The judge said no to Mr. Carter's request for community service and directed Mr. Carter to see the municipal court clerk.

149.    The municipal court clerk informed Mr. Carter that if he did not pay $100 by the next day, Normandy would issue a warrant for Mr. Carter's arrest.  Mr. Carter could not afford to make the $100 payment, and Normandy thereafter issued a warrant for his arrest.

150.    As of March 2015, Mr. Carter had five outstanding arrest warrants from Normandy, all of which are for "Failure to Pay" or "Failure to Appear" offenses in connection with traffic-related infractions for which Mr. Carter could not afford to pay the fine.

151.    In December 2012, Mr. Carter was pulled over in Ferguson by officers of the Ferguson Police Department.  The officers informed Mr. Carter that he had outstanding warrants in Cool Valley and Normandy (as described above) and took Mr. Carter to the St. Ann Jail.

152.    Officers at the St. Ann Jail were aware, or should have been aware, that the basis for Mr. Carter's incarceration was his inability to pay fines from minor, traffic-related offenses .Officers of the St. Ann Jail informed Mr. Carter that he could be released if he paid a $500

bond.  There was no bail hearing.  Mr. Carter could not afford to make this payment and thus was unable to secure his release.

153.    The St. Ann Jail held Mr. Carter for three days on behalf of Cool Valley.  After three days, Cool Valley "released" Mr. Carter.  However, he remained in the St. Ann Jail, which now held him on behalf of Normandy (based on the outstanding warrants, as described above).  The St. Ann Jail officers again informed Mr. Carter that he could be released if he paid a $500 bond.  Again, there was no bail hearing.  And again, Mr. Carter was unable to make this payment to secure his release.

154.    Mr. Carter spent three days in the St. Ann Jail on behalf of Normandy and then—after a total of six days—the St. Ann Jail finally released him.

155.    In or around December 2013, officers of the Ferguson Police Department stopped Mr. Carter and again incarcerated him in the St. Ann Jail on behalf of Cool Valley and Normandy for the same "Failure to Pay" and/or "Failure to Appear" warrants discussed above.  Again, officers at the St. Ann Jail were aware, or should have been aware, that the basis for Mr. Carter's incarceration was his inability to pay fines from minor, traffic-related offenses.

156.    The St. Ann Jail again held Mr. Carter for three days on behalf of Cool Valley and three days on behalf of Normandy (for a total of six days).

157.    After six days, the St. Ann Jail "released" Mr. Carter on behalf of Normandy.  However, officers of the St. Ann Jail informed Mr. Carter that they were continuing to hold him on behalf of St. Louis City.  Mr. Carter told the jail officers that he did not have any outstanding warrants in St. Louis City.  The officers, presumably after confirming that Mr. Carter did not have any outstanding warrants in St. Louis City, finally released him at 2:00 a.m.  The officers never allowed Mr. Carter to make a free phone call, nor did they provide him any means of

transportation from the Jail.  As a result, Mr. Carter had to walk 15 miles to his home on a cold night, finally reaching his home the next morning.

158.    St. Ann subjected Mr. Carter to the same deplorable jail conditions experienced by the other Plaintiffs and all others detained in the St. Ann Jail.  The conditions in the St. Ann Jail were filthy.  Mr. Carter was given an orange jumpsuit to wear.  The food provided to Mr. Carter was inadequate, sometimes only a honey bun and a packaged pot pie for the whole day.

**iii.    Bradley Jiles**

159.    Bradley Jiles is a 24-year-old African American man.

160.    Mr. Jiles has been jailed more than ten times in the last five years in connection with alleged municipal ordinance violations.  Over the span of approximately one year — from the summer of 2014 to the spring of 2015 — Mr. Jiles was jailed on four separate occasions in connection with unpaid fines for traffic and other minor violations.

161.    Particularly, in June 2015, Mr. Jiles was driving to court after work to obtain a replacement title for his car after the original title had been damaged in the rain.  He was driving within the speed limit and was pulled over.  When Mr. Jiles inquired as to why, the officer told him that he was unregistered, had been speeding, and looked suspicious.  The officer said to Mr. Jiles, "I could be an asshole and give you all these tickets because of your attitude."  The officer cited Mr. Jiles for failure to register, improper vehicle registration, and expired license.

162.    Mr. Jiles was arrested and spent two days in St. Louis County Justice Center.  The holding cell was covered with old gum and graffiti.  Mr. Jiles pled guilty and was sentenced to two days of time served.

163.     Officers at the Justice Center then transported Mr. Jiles to the Hazelwood Jail on a warrant for "Failure to Pay" and/or "Failure to Appear" in connection with an unpaid traffic ticket for driving with an expired license.

164.     After 24 to 48 hours, the Hazelwood Jail "released" Mr. Jiles and transported him to the St. Ann Jail on a warrant for "Failure to Pay" and/or "Failure to Appear" in connection with an unpaid traffic ticket in Edmundson for driving with invalid license plates.

165.     Officers at the St. Ann Jail were aware, or should have been aware, that the basis for Mr. Jiles's incarceration was his inability to pay fines from minor, traffic-related offenses. Officers at the St. Ann Jail told Mr. Jiles that he could secure his release if he paid several hundred dollars in bond to Edmundson (based on outstanding fines for traffic and other minor violations).  There was no bail hearing.

166.     Mr. Jiles could not afford to pay the bond to secure his release.  As a result, the St. Ann Jail held Mr. Jiles for at least three days.   While he was in the St. Ann Jail, Mr. Jiles repeatedly asked how long he would be held, but was told nothing.

167.     Finally, one of the St. Ann Jail officers noticed in Mr. Jiles's file that Mr. Jiles should have been released.  The St. Ann Jail released Mr. Jiles later that day.

168.     St. Ann subjected Mr. Jiles to the same deplorable jail conditions experienced by the other Plaintiffs and all others detained in the St. Ann Jail.

169.     Mr. Jiles lost income because of the amount of time he spent in jail, all for what amounted to routine, unjustified, or discriminatory traffic stops and minor municipal violations.

####### iv.    **Angela Davis**

170.    Angela Davis is a 44-year-old African-American mother of four.  She resides in St. Louis, Missouri and has worked for Wells Fargo Advisors in Frontenac for the last eight years.

171.    Ms. Davis has appeared before multiple municipal courts, including Normandy and Frontenac, but fears making an appearance if she cannot afford to pay.  She has been told on at least one occasion, by a Normandy court clerk, that she would be locked up if she did not show up to court and pay.

172.    Despite the threat of imprisonment, Ms. Davis was never offered legal counsel by any municipal court.  Nor did any court ever inquire into her ability to pay the fine.  Rather, in every instance in which Ms. Davis has appeared in municipal court, the municipal court judge has dictated the fine, recited a list of pre-determined options—none of which were suitable for Ms. Davis' individual circumstances—and informed Ms. Davis to speak with the clerk.

173.    Ms. Davis makes every effort to pay off any outstanding debts, but her financial resources remain limited.  She recently paid off her debt in Normandy, which took almost a year at $100/month, a significant financial burden.  She also has sought relief through the "amnesty" program in several municipalities.[16]  Despite her efforts, she still has two warrants in Florissant outstanding with a pending amnesty application.

---

[16] St. Louis County offers an "amnesty" program in many of its municipal courts on a yearly basis.  *See, e.g.*, http://www.mslaca.org/index.php/amnesty-program/.  Rather than acting as a true amnesty, this program simply allows participants to receive a voucher upon the payment of a $10 processing fee that must be presented at the municipal court's next court date.  At that court date, the participant must also present $100 in cash.  If the participant pays $110, the warrant will not be executed.  Even if the participant pays the $110 and has her warrant recalled, this "amnesty" program does not address the underlying fines and fees.  The participant is placed back on a payment docket and is left without an attorney to negotiate his or her remaining fines.  Additionally, it costs participants $110 per municipality where they have an active warrant.  This

174.     As a result, Ms. Davis has lived under a cloud of uncertainty that prevents her from living a normal life without fear of imprisonment due to her financial circumstances.

175.     A Sunday evening in September 2013 illustrates the manner in which Ms. Davis has been punished for her financial circumstances.  That evening, Ms. Davis was waiting to make a left turn at a Florissant intersection.  She had two passengers in her car.  One of these passengers, Mr. David Hines, is African-American.  The other is white.

176.     While she waited, a police car turned around and pulled up next to her.  After the light turned green, Ms. Davis made a left turn.  The police car flashed its lights and pulled her over.  The officer said he pulled Ms. Davis over because her tags were expired.

177.     The officer ran the names of Ms. Davis and her two passengers.  The search returned multiple warrants for Ms. Davis in Normandy from 2013 (no proof of insurance, failure to register her vehicle, and corresponding violations of "Failure to Pay" and/or "Failure to Appear"), University City from 2012 (failure to register her vehicle and speeding), and Florissant (failure to register her vehicle).

178.     After the police completed their search for outstanding warrants, they arrested Ms. Davis and Mr. Hines.  The white passenger, despite having an outstanding warrant in Washington state, was not arrested.

179.     Over the next 22 hours, Ms. Davis was dragged to four separate jails.  Her first stop was Florissant Jail.  She arrived there around 10:00 or 11:00 p.m. that Sunday night, leaving around 1:00 a.m. on Monday morning.

180.     When she arrived at the Florissant Jail, officers informed her that she could secure her release if she paid a bond of $800, which was far beyond her ability to pay.  There was no

---

can add up quickly to $500-$700 just to have the warrants recalled while the underlying cases remain pending.

bail hearing. The officers did not inform Ms. Davis how that amount was calculated, nor did any official at the Florissant Jail ask if she would be able to afford payment. Instead, jail officers told Ms. Davis that she "gotta do some time" in Florissant for at least two-and-a-half hours "for her situation" before she could be passed off to the next municipality. In the meantime, Florissant forced Ms. Davis to don a prisoner's jumpsuit.

181.    Florissant failed to provide Ms. Davis a court date or any notice of next steps following her imprisonment. Instead, they handed her off to University City.

182.    Upon arriving at University City, Ms. Davis learned that her sister had paid the $150 bond amount owed University City while Ms. Davis was imprisoned in Florissant. This payment should have been sufficient to secure Ms. Davis' release, but it merely cleared her debt to University City.

183.    University City held Ms. Davis in jail for approximately one hour. The jail was an older facility that was not well maintained, and had not been cleaned for quite some time.

184.    University City next transported Ms. Davis to Frontenac. The Frontenac Jail held Ms. Davis for two hours. Ms. Davis did not know why the Frontenac Jail was holding her, nor did jail officers inform her of the reason for her incarceration.

185.    After two hours, the Frontenac Jail "released" Ms. Davis and gave her a court date. When Ms. Davis later appeared at the Frontenac municipal court, she learned that the reason for her incarceration was an unpaid $21.40 court fee. Ms. Davis lost her freedom in Frontenac for approximately two hours for this *de minimis* fee. No effort was made to address this issue *before* she was jailed or to consider whether she had the ability to pay.

186.    After her "release" from Frontenac, Ms. Davis was next transported to the St. Ann Jail. Officers at the St. Ann Jail were aware, or should have been aware, that the basis for Ms.

Davis' incarceration was her inability to pay fines from minor, traffic-related offenses. The St. Ann Jail held Ms. Davis on outstanding warrants in Normandy for unpaid traffic tickets. Officers at the St. Ann Jail made no inquiry into Ms. Davis' ability to pay her outstanding fines.

187. St. Ann subjected Ms. Davis to the same deplorable jail conditions experienced by the other Plaintiffs and all others detained in the St. Ann Jail. Ms. Davis spent around six hours locked in the St. Ann Jail, growing increasingly unnerved by sharing a cramped, noisy cell with a schizophrenic inmate who was announcing her intent to kill someone. The guards made no effort to separate this inmate from others or otherwise to assure the safety of Ms. Davis and the other inmates.

188. Officers at the St. Ann Jail did not tell Ms. Davis why she was in jail and refused to discuss a bond. The officers told Ms. Davis that she would have to call the Normandy Municipal Court to find out how much money she owed.

189. The officers, however, did not allow Ms. Davis to make any calls, thereby preventing her from calling the court to determine how much money she owed, from attempting to obtain money from family or friends to secure her release, and from exercising her right to seek legal counsel.

190. After being detained for around two hours, Ms. Davis' sister paid Ms. Davis' bond for her Normandy warrant. Officers at the St. Ann Jail refused to release Ms. Davis, however, claiming she had a pending warrant in Berkeley.

191. Ms. Davis' sister drove to Berkeley twice to pay her sister's bond. On both occasions, Berkeley officials said that they had notified St. Ann that they did not want to detain Ms. Davis. Notwithstanding this communication from Berkeley, the St. Ann Jail arbitrarily and petulantly continued to hold Ms. Davis for several more hours.

192.     Finally, the St. Ann Jail released Ms. Davis.  Officers at the St. Ann Jail did not tell Ms. Davis why she had been released; they merely gave Ms. Davis a sheet of paper with a court date, which they had stapled to her belongings.

193.     At no time during her stay in four separate jails did any police officer, guard or other official seek to ascertain Ms. Davis' ability to pay the debts that the municipalities claimed that she owed.

194.     At no time during her stay in four separate jails was Ms. Davis brought before a judge or offered assistance of counsel.

195.     The municipalities treated Ms. Davis with disrespect and made no effort to provide due process as they shuffled her from jail to jail.

**v.     Donya Pierce**

196.     Plaintiff Donya Pierce is a 26-year-old African-American mother of two children.

197.     Ms. Pierce is currently employed at Mount Carmel Rehabilitation Center.

198.     In March 2014, officers of the St. Ann Police Department pulled Ms. Pierce over for a routine traffic stop.  Ms. Pierce was driving a male passenger at the time.

199.     The officers searched the vehicle without Ms. Pierce's consent and found that the male passenger was in possession of marijuana.

200.     Although the officers did not find any marijuana in Ms. Pierce's possession, they arrested her for marijuana possession and took her to the St. Ann Jail.  Officers at the St. Ann Jail informed Ms. Pierce that she owed a cash bond of more than $1,000.  There was no bail hearing. Ms. Pierce was unable to afford to pay this bond amount, and thus was unable to secure her release.

201.     The officers also informed Ms. Pierce that she had warrants for traffic-related offenses in St. Ann, Jennings, Hazelwood, University City, Pagedale, and Breckenridge Hills.

202.     The St. Ann Jail held Ms. Pierce for three weeks.  Each week, officers of the St. Ann Jail took Ms. Pierce to appear before a St. Ann Municipal Court judge.  Each time, Ms. Pierce explained that she was innocent of the marijuana charge and pleaded for her release.  Each time, the municipal court judge denied these pleas and sent her back to the St. Ann Jail.

203.     St. Ann subjected Ms. Pierce to the same deplorable jail conditions experienced by the other Plaintiffs and all others detained in the St. Ann Jail.  The conditions were overcrowded and unsanitary.  Although there were only eight beds per cell, roughly 20 women were assigned to each cell.  Women who were ill and experiencing drug withdrawals—the symptoms of which included vomiting, flatulence, nausea, and disorientation, among many other things—were placed in the same cells, which exacerbated the unsanitary conditions.

204.     Inmates at the St. Ann Jail were not allowed to shower until they had been at the jail for a week.  Further, there were no trashcans in the cells, so inmates regularly piled their trash in the corner.  In addition to being unsanitary, these conditions created a pungent, unpleasant odor in the jail.

205.     The officers at the St. Ann Jail refused to allow Ms. Pierce to use the phone.  As a result, she lost her job and her house.  In addition, Ms. Pierce's son missed approximately four weeks of school and was held back a grade because no one was able to take him to school besides his mother.  Further, Ms. Pierce almost lost custody of her son when one of his teachers called the Child & Family Services Agency when he abruptly stopped coming to school.  Because Ms. Pierce could not use the phone, she was unable to call the school to explain to them what was happening.

206.     After three weeks, the St. Ann Jail finally released Ms. Pierce.  St. Ann subsequently dropped the charges against Ms. Pierce for possession of marijuana.

**vi.     Brittany Ellis**

207.     Brittany Ellis is a 26-year-old African-American woman.

208.     Ms. Ellis is currently employed as a cook in the Lake St. Charles Retirement Home.

209.     In July 2015, at approximately 9:30 p.m., Ms. Ellis was driving home from her job at the Family Dollar in her mother's truck.

210.     Officers of the St. Ann Police Department stopped Ms. Ellis.  The officers informed Ms. Ellis that they were pulling her over because her license plate information did not match the truck she was driving.  She tried to explain that she was driving her mother's truck, but to no avail.

211.     The officers arrested Ms. Ellis and had the truck she was driving towed.  Ms. Ellis and her mother did not have the $500 required to release the truck from the towing company.  As a result, Ms. Ellis' mother lost the truck permanently.

212.     The officers took Ms. Ellis to the St. Ann Jail.  The St. Ann Jail held Ms. Ellis for approximately eight days.  During that time, no St. Ann official informed Ms. Ellis of her bond amount (if any), the reason for her detention, or for how long she would be held.

213.     St. Ann subjected Ms. Ellis to the same deplorable jail conditions experienced by the other Plaintiffs and all others detained in the St. Ann Jail.  Officers at the St. Ann Jail mistreated Ms. Ellis.  Officers took Ms. Ellis' glasses and refused to return them to her, even though she explained that she is legally blind.

214.     Ms. Ellis was menstruating during the course of her incarceration at St. Ann. When she asked for sanitary napkins and/or tampons, a St. Ann correctional officer threw a sanitary napkin and tampons at her.  Further, officers did not give her the privacy to go to the bathroom to handle her menstruation.  As a result, Ms. Ellis was forced to change her pads in her cell in front of other inmates and correctional officers.

215.     After eight days, the St. Ann Jail finally "released" Ms. Ellis and immediately transferred her to the St. Louis County Justice Center on a Hazelwood warrant for traffic-related offenses.

216.     The St. Louis County Justice Center held Ms. Ellis for 12 days.  During that time, officers at the Justice Center subjected Ms. Ellis to an extremely invasive search, forcing her to undress in front of a police officer who told her that she had "big breasts."  The officers also forced Ms. Ellis to spread her buttocks for the search, even though Ms. Ellis was in jail for a nonviolent, traffic-related offense.

217.     After 12 days, the St. Louis County Justice Center "release" Ms. Ellis and immediately transferred her to the Ferguson Jail.  The Ferguson Jail held Ms. Ellis for two days. During this time, officers at the Ferguson Jail did not inform her of the bond amount, ultimately releasing her and giving her a court date to appear in Ferguson Municipal Court.

218.     In total, Ms. Ellis was incarcerated for 22 straight days for her inability to pay fines for traffic-related offenses.  Because she was detained for so long, Ms. Ellis was terminated from her job at the Family Dollar (the store informed her that they were unable to hold her position for longer than a week).

219.    Currently, Ms. Ellis has multiple traffic-related tickets assessed against her.   In total, she owes $2,551 to six different municipalities in unpaid fines, court costs, surcharges, and interest.

220.    Ms. Ellis is on payment plans for each of these municipalities.   However, each plan requires monthly payments ranging from $50 to $100 per month.   Ms. Ellis cannot afford to make these monthly payments.   She works as a cook at the Lake St. Charles Retirement Home and receives $680 in income every two weeks.   After paying her rent, utilities, car note, car insurance, and cell phone bill, she cannot afford to make all of her monthly payments, which total $300 or more a month.

221.    Further, the grip of the municipal court system has stymied Ms. Ellis' efforts to increase her income.   Ms. Ellis recently applied for a job as an overnight cleaner at the Hollywood Casino.   However, the Hollywood Casino will not hire Ms. Ellis because she has open arrest warrants for "Failure to Pay" and/or "Failure to Appear."   Thus, Defendant's unlawful revenue-generation scheme not only has confiscated Ms. Ellis' liberty and any spare money she is able to scrounge together, it also has impeded her ability to get a higher paying job that might allow her to finally get out of debt.

**vii.    Meredith Walker**

222.    Meredith Walker is a 47-year-old African-American mother of two living in Florissant, Missouri.

223.    In the last five years, Ms. Walker has been jailed on at least ten occasions by St. Louis municipalities for unpaid fines from traffic tickets and other minor municipal violations; she has paid over $15,000 in fees, court costs, and bond forfeitures, making her unable to provide

for herself and her children; and she has lost her license—and consequently, her ability to find employment—because of her inability to afford to pay the fines.

224.    Ms. Walker's traffic tickets continue to plague her to this day, even though she has not been cited for a moving violation in over fifteen years.

225.    At one point, Ms. Walker had warrants out for her arrest in eleven different municipalities, all of which stemmed from unpaid traffic tickets and charges for "Failure to Pay" or "Failure to Appear" in connection with these unpaid traffic tickets.

226.    In the last five years, Ms. Walker has been jailed in St. Ann on behalf of Normandy, Velda Village Hills, Calverton Park and Velda City.  Each time, officers arrested Ms. Walker on warrants for "Failure to Pay" or "Failure to Appear" that were issued in connection with unpaid traffic tickets that Ms. Walker could not afford to pay.

227.    On almost all of these occasions, Ms. Walker experienced the so-called "muni-shuffle": she was transferred from one municipal jail to another, paying bonds at each to secure her "release" to the next. A $500 bond was posted to secure Ms. Walker's release from Normandy on February 7, 2012; a $500 bond was posted to secure Ms. Walker's release from Calverton Park on November 1, 2012; a $100 bond was posted to secure Ms. Walker's release from Velda Village Hills; a $500 bond was posted to secure Ms. Walker's release from Normandy on February 4, 2014. Ms. Walker's mother or stepfather paid the bonds when they were able.  If neither Ms. Walker or a relative could afford to pay bond, Ms. Walker remained in jail until jail officials (or the municipality on whose behalf she was held) decided to release her.

228.    Ms. Walker has tried to pay off her debts to the municipalities, but simply cannot afford to do so.  It is well known in the community that showing up at court without full payment

will lead to incarceration.  As a result, Ms. Walker feared that if she went to court without the money to pay her fine, she would immediately be placed in jail.

229.    Ms. Walker has been unsuccessfully trying to pay off approximately $3,000 of fines over the last four years.  On multiple occasions, court clerks have told Ms. Walker that she resolved all her charges, only to discover more charges later.  On other occasions, court clerks have failed to properly record payments made by Ms. Walker.

230.    Ms. Walker's inability to extricate herself from this cycle of debt and jailing has virtually destroyed Ms. Walker's life.

231.    Ms. Walker is unemployed and has been unable to find a new job because of her traffic record and because she does not have a valid license.  Many of the positions for which she is otherwise qualified require a valid driver's license to transport clients.

232.    Ms. Walker has been forced to change her appearance, because she discovered that she was stopped by police officers more often when she had dreadlocks in her hair.

233.    Ms. Walker does not have a valid driver's license because she cannot afford to pay off all of her fines, costs, surcharges, and interest.  As a result, Ms. Walker is forced to rely on family and friends to drive her to the store or to her son's basketball games, placing strain on cherished relationships.

234.    Ms. Walker has spent many holidays in jail for unpaid traffic tickets, missing time with family and friends.

235.    Ms. Walker is unable to travel around the St. Louis area, in part because bus service in North County (where she lives) is unreliable, and in part because she is now terrified of the police.

**viii.    Mawoussime Adoboe**

236.    Mawoussime Adoboe is a 33-year-old mother of two children.  Ms. Adoboe has been unemployed since 2012 and relies on welfare and social security to support herself.

237.    On April 15, 2015, Ms. Adoboe was involved in a car accident.  The police arrived at the scene of the car accident and conducted a field sobriety test, which police claimed Ms. Adoboe failed.  The police officer cursed at her, called her a "bitch," and said, "You know I don't like you."  The St. John police arrested Ms. Adoboe for driving while intoxicated and took her to the St. John police station.  The arresting police officer told other officers at the jail "not to give her a chance."

238.    The arresting police officer then took Ms. Adoboe to SSM Health DePaul Hospital - St. Louis, where she was administered a shot, although she did not know what it was for.  She was also given a prescription for antibiotics, which the police officer filled before taking Ms. Adoboe to the St. Ann Jail on behalf of St. John.

239.    Ms. Adoboe was held at the St. Ann Jail for eight days on $1,500 bond.  Ms. Adoboe could not afford to pay the $1,500 bond amount, and therefore was not able to secure her release.

240.    After several days, Ms. Adoboe's family and friends were able to pool their financial resources to come up with the $1,500 for bond.  However, when the father of Ms. Adoboe's daughter attempted to post bond, St. Ann refused the payment without providing a reason.

241.    Ms. Adoboe was never brought before a judge during her eight-day detention at the St. Ann jail, nor was she informed of her right to, or offered, a lawyer.

242.	St. Ann's jail refused to give Ms. Adoboe her medication for her serious chronic medical conditions.

243.	St. Ann subjected Ms. Adoboe to the same deplorable jail conditions experienced by the other Plaintiffs and all others detained in the St. Ann Jail. The conditions in St. Ann Jail were filthy. Ms. Adoboe and other inmates requested supplies to clean their living space, but the guards refused. The cell in which Ms. Adoboe lived was designed to accommodate six people, but at times up to fifteen people were living in the cell. When there were more people than beds, inmates were forced to sleep on the floor.

244.	Ms. Adoboe was allowed to shower only once every three days in a bathroom in filthy conditions.

245.	St. Ann Jail Guards tossed cold food and inedible food onto the floor for the inmates to eat.

246.	St. Ann Jail Guards were rude to inmates and indifferent to their needs, and called Ms. Adoboe "crazy" and an "African child" on multiple occasions.

247.	One of Ms. Adoboe's relatives attempted to come to the St. Ann Jail to visit her, but the guards never informed her and she was not allowed to meet with her relative.

248.	Guards at the St. Ann Jail limited inmates' use of phones. For example, if Ms. Adoboe placed a call and the person did not answer the first time, she was not allowed to call them back. The guards also limited the content of inmates' phone calls, not allowing Ms. Adoboe to give any in-depth explanations to people on the phone.

249.	After her "release" from the St. Ann Jail, Ms. Adoboe was transferred to the St. Charles Jail in connection with unpaid traffic tickets and "Failure to Pay" or "Failure to Appear"

charges in St. Charles. Ms. Adoboe was detained in the St. Charles Jail for six days, at which point she was able to post $250 bond to secure her release.

250. Ms. Adoboe's detention had significant collateral consequences in addition to the suffering Ms. Adoboe endured in St. Ann Jail. For example, while she was incarcerated, Ms. Adoboe's children were shifted from one person's care to another on three different occasions.

251. On at least one other occasion, Ms. Adoboe was detained in the St. Ann Jail for a speeding ticket in St. Ann. Ms. Adoboe was unable to afford the $500 bond and therefore was forced to spend a night in the St. Ann Jail.

**ix. Veronica Murphy**

252. Veronica Murphy is a 31-year-old single African-American mother of two young children living in St. Louis, Missouri.

253. Ms. Murphy single-handedly supports her two minor children on a very limited income.

254. Ms. Murphy has been jailed in the St. Ann Jail "so many times [she] can't remember" in connection with warrants issued by Bel-Ridge, Normandy, and St. Ann, among others. The warrants issued by Bel-Ridge initially stemmed from minor traffic infractions issued prior to 2009.

255. In April 2009, Ms. Murphy departed the University of Missouri-St. Louis campus after a college class to pick up her son—who was five years old at the time—at his school in Normandy, Missouri. She never arrived at the school because officers of the Normandy Police Department stopped Ms. Murphy just one block away.

256.     The Normandy Police informed Ms. Murphy that they stopped her pursuant to an alleged warrant from the State of Texas.  The Normandy Police arrested Ms. Murphy and towed her vehicle to an impound lot.

257.     The two young Murphy children—ages three and five at the time—sat at their schools awaiting their mother until the schools were able to contact members of Ms. Murphy's family to care for them.

258.     The Normandy Police took Ms. Murphy to their precinct, fingerprinted and booked her, and notified Texas of her arrest.  The State of Texas informed the Normandy Police that Ms. Murphy was not wanted for extradition.

259.     Instead of releasing Ms. Murphy, Normandy Police checked their computer system and determined Ms. Murphy had an outstanding warrant from Bel-Ridge.  The Normandy Police then transported Ms. Murphy to the St. Ann Jail.

260.     St. Ann subjected Ms. Murphy to the same deplorable jail conditions experienced by the other Plaintiffs and all others detained in the St. Ann Jail.  At the St. Ann Jail, Ms. Murphy endured what she now describes as "the worst memories of [her] life" in conditions most inhumane: St. Ann officials (1) forced Ms. Murphy to wear an orange jumpsuit "like [she] was in prison"; and (2) provided inadequate food sometimes consisting of only a honey bun and a packaged pot pie for an entire day—"all because [she is] a single mom who can't pay a traffic ticket," as Ms. Murphy attests.

261.     Ms. Murphy was held in St. Ann Jail for two weeks.

262.     During this time period (which included her birthday), the Murphy children were left motherless while Defendant St. Ann jailed Ms. Murphy on behalf of Bel-Ridge simply

because she could not afford to pay the bond amount set by Bel-Ridge, which, on information and belief, exceeded $500.

263. Once released from St. Ann Jail, Ms. Murphy could not afford to pay to retrieve her vehicle from impound; in fact, Ms. Murphy was never able to afford the impound fees to retrieve her car, and she ultimately lost the 1999 Chevy Cavalier which she once owned outright.

264. Since her initial two-week incarceration in 2009, Ms. Murphy has repeatedly been arrested based on her inability to pay fines and alleged "Failure to Appear" charges, including a most recent incarceration on Bel-Ridge's warrant in May 2014.

265. Despite obtaining legal representation from ArchCity Defenders to address her myriad municipal charges, Ms. Murphy still faces imminent arrest in one or more of the Defendant Municipalities as of the filing of this Complaint.

266. Specifically, in April 2016, St. Ann issued a form recommendation sheet to notify Ms. Murphy that her fines total as much as $620.00 and—using a *literal* rubber stamp—that "WARRANT WILL REMAIN ACTIVE UNTIL PAID IN FULL."

267. Then, in June 2016, when ArchCity Defenders requested that St. Ann recall the arrest warrant, St. Ann denied the recall request.

268. Because Ms. Murphy cannot foreseeably afford to pay off St. Ann, this warrant will remain active in perpetuity while Ms. Murphy continues to live in fear of the next time she is pulled over by police in the St. Louis region.

### x.  Charles Riley

269. Charles Riley is a 58 year-old man who resides in St. Louis, Missouri. He is African-American.

270. At all relevant times herein, Mr. Riley has had a disability related to back problems and back pain, and thus receives only $1,100 of monthly income in the form of Social Security disability payments.

271. Mr. Riley has been jailed by St. Ann twice in his lifetime for alleged minor municipal ordinance infractions.

272. On one Friday evening, October 25, 2013, Mr. Riley was driving his own vehicle when a St. Ann police officer pulled him over, allegedly for rolling through a stop sign.

273. The St. Ann officer informed Mr. Riley that he had an active failure to appear warrant in the municipality of Florissant, Missouri.

274. The St. Ann officer instructed Mr. Riley to step out of the vehicle. Mr. Riley complied, and the St. Ann officer placed Mr. Riley under arrest.

275. Mr. Riley then asked the St. Ann officer to allow Mr. Riley to turn off his vehicle to get his keys and his cell phone. The St. Ann officer denied Mr. Riley's request, left the car running, and told Mr. Riley "We're going to tow it anyway."

276. The St. Ann officer placed Mr. Riley into the St. Ann police car and drove Mr. Riley to the St. Ann police station, where the officer asked Mr. Riley, "Do you have $350 to post bond?"

277. Mr. Riley informed the St. Ann police officer that he could not afford to pay the $350 bond, and asked the officer what the bond was for. The St. Ann officer replied, "Why should we believe you are going to come to court for us when you didn't go to court for them [Florissant]?" There was no bail hearing.

278.    St. Ann then locked Mr. Riley in a small jail cell with two (and at one point, three) other adult men, claiming that Mr. Riley should just wait because "Florissant is on their way."

279.    St. Ann subjected Mr. Riley to the same deplorable jail conditions experienced by the other Plaintiffs and all others detained in the St. Ann Jail.  The jail cells were packed full of people.  The cells were so filthy that Mr. Riley did not want to make contact with the walls or even the sleeping pads, which were dirty and appeared uncleaned.

280.    The St. Ann Jail provided Mr. Riley with no hygiene or personal care items: no soap, no washrags, no toothbrushes, no toothpaste, and no deodorant.  The cell contained a toilet fixture with a water faucet on its top, from which Mr. Riley and the other cellmates had to use their own cupped, dirty hands to capture drinking water.

281.    Mr. Riley and the other inmates were served food by St. Ann that was unhealthy and nearly inedible.  Every meal consisted of a bologna sandwich or canned spaghetti.  Some breakfasts included a pre-packaged cinnamon roll and old milk.

282.    Officers at the St. Ann Jail did not allow Mr. Riley or his cellmates to take a shower for several days.  In fact, the only time the St. Ann Jail allowed Mr. Riley to take a shower was after two days, when one St. Ann jail officer—a cousin of a friend of Mr. Riley's then-girlfriend—specifically allowed Mr. Riley to take a shower after being contacted by the officer's cousin.  When the officer called to Mr. Riley to allow him to shower, one of Mr. Riley's cellmates begged for one, too, and the officer permitted only Mr. Riley and that cellmate to shower.

283.    Mr. Riley had difficulty sleeping during his five days in the St. Ann Jail.  St. Ann's jail officers provided Mr. Riley (and the other inmates) a thin sheet and pillow as bedding

to use on the thin, dirty sleeping pads, which provided little warmth and no support.  Mr. Riley had informed the St. Ann jail officers about his disability, his back injury, and his resulting chronic back pain, but the St. Ann jailers told Mr. Riley he could not receive any special accommodation or medicine because "Florissant is coming to get you soon."  Additionally, there were no windows in the St. Ann Jail cell, nor any clocks to tell whether it was morning or night, and the jail lights were always turned on.

284.    Sometime during Mr. Riley's incarceration at the St. Ann Jail, Mr. Riley's girlfriend (now his wife) called Florissant police, who informed her at that time that they did not have any record of Mr. Riley being in custody in St. Ann, and that he was not on their list to be picked up.

285.    Mr. Riley's then-girlfriend also contacted a private attorney—who Mr. Riley later learned was and is a prosecutor and city counselor in several other municipalities—for assistance in securing Mr. Riley's release.  On information and belief, sometime on that Sunday (October 27, 2013), the attorney contacted someone at St. Ann's government or jail to request Mr. Riley's release.

286.    Then, on Monday morning, the St. Ann jailers called out Mr. Riley's name and instructed him to stand near an intercom in the Jail.  The voice of a person Mr. Riley believed to be a judge's clerk or prosecutor's assistant—not a judge—spoke through the intercom and stated "You've been charged with running a stop sign. How do you want to plea?"

287.    Mr. Riley asked the voice on the intercom why he had to enter a plea at that time, and why he could not simply be given a summons and court date.  The voice on the intercom replied: "We're trying to make it so you can go home and you don't have to come back.  If you plea guilty to the charges, we can let you go.  We'll send some paperwork down to you."  The

voice on the intercom did not provide Mr. Riley any notice of his right to counsel, nor did the voice seek to determine Mr. Riley's ability to pay any fines or fees associated with the proposed guilty plea.

288.    Mr. Riley felt he had to go along with St. Ann's plan in order to be released expediently, as it was the only option presented to him.

289.    Then, Mr. Riley was placed back in his cell to wait until that Monday evening, when the plea paperwork finally arrived.  Mr. Riley signed it, at which time the St. Ann jailers reassured Mr. Riley that Florissant was going to come get him.

290.    The rest of Monday night passed, along with all day Tuesday, while Mr. Riley continued to languish in the St. Ann Jail, waiting on Florissant.

291.    Finally, after five days in the St. Ann Jail, on the afternoon of Wednesday, October 30, 2013, the Florissant police arrived at the St. Ann Jail to pick up Mr. Riley.  Mr. Riley then spent several hours in a Florissant police van, picking up and dropping off other jailed individuals from other municipalities, before arriving at the Florissant police station early Wednesday evening.  His then-girlfriend posted a $300 bond to free Mr. Riley from Florissant's jail.

292.    The next day, Mr. Riley returned to St. Ann to free his vehicle from impound.  St. Ann said it was going to cost $400-500 to get the vehicle released.  Mr. Riley told St. Ann he did not have the money, so he asked if he could go to the tow yard and collect his personal belongings from the vehicle.

293.    St. Ann officials told Mr. Riley he had to pay them $100 for the right to access the vehicle for the limited purpose of collecting his personal belongings.  Mr. Riley paid St. Ann's $100 demand.

294. When Mr. Riley arrived at the tow yard with which St. Ann contracted to store inmates' vehicles, an employee at the tow yard would not permit Mr. Riley to collect his items, stating that he was "not supposed to do that," but took another $20 from Mr. Riley and went to the vehicle himself, bringing back Mr. Riley's cell phone, keys, wallet, and garage door opener.

295. The tow yard employee informed Mr. Riley he had 30 days to pay to get his vehicle out of impound (at a daily fee of approximately $100) or the vehicle would be sold.

296. Mr. Riley could not afford this amount of money, and lost his vehicle—a convertible Ford Mustang—along with approximately $300 worth of personal tools in the trunk of the vehicle.

297. In addition to the loss of his personal vehicle and tools, Mr. Riley endured physical pain and mental anguish during the five days he spent caged in St. Ann's Jail, and also suffered embarrassment in front of friends and family, as his incarceration prevented Mr. Riley from participating in a dear friend's wedding as a groomsman on October 26, 2013.

**E.** **Class Allegations**

298. The Plaintiffs bring this action on behalf of themselves and all others similarly situated, for the purpose of asserting the claims alleged in this Complaint on a common basis.

299. A class action is a superior means, and the only practicable means, by which Plaintiffs and unknown Class members can challenge the Defendant's unlawful debt-collection scheme.

300. This action is brought and may properly be maintained as a Class action pursuant to Rule 23(a)(1)-(4), Rule 23(b)(2), and Rule 23(b)(3) of the Federal Rules of Civil Procedure.

301. This action satisfies the numerosity, commonality, typicality, and adequacy requirements of those provisions.

302.     Plaintiffs propose two Classes: a Declaratory and Injunctive Class and a Damages Class.

303.     The Declaratory and Injunctive Class is defined as:  All persons who currently owe or who will incur debts to the Defendant from fines, fees, costs, or surcharges arising from cases in the Defendant's courts.

304.     The Damages Class is defined as: All persons who, from August 9, 2011, until the present, were held in jail by or on behalf of Defendant because of the persons' non-payment of a monetary sum required by Defendant or a neighboring municipality as a result of the individuals' inability to pay.

**1.     Numerosity.  Fed. R. Civ. P. 23(a)(1)**

305.     Over the past five years, thousands of people have owed and currently owe Defendant or neighboring municipalities money from old traffic tickets and other minor municipal offenses.  Pursuant to Defendant's policies and practices, Defendant has placed thousands of people, who have indicated that they are too poor to pay their debts in total, on payment plans that are arbitrary, exorbitant, and inconsistent with the debtors' ability to pay.  All of these people are currently being threatened with arrest and jailing if they do not make the payments in the amount or frequency purportedly required by Defendant.

306.     Defendant has kept hundreds of people in its jail for non-payment in each of the past five years.  Defendant retains, and is required by law to retain, records of these instances.

307.     Pursuant to Defendant's policies and practices, those kept in jail by Defendant for non-payment did not receive meaningful inquiries into their ability to pay as required by federal and Missouri law.  Pursuant to Defendant's policies, Defendant made no determinations of indigence, ability to pay hearings, or evaluations of alternatives to incarceration, and Defendant

provided none of the relevant state and federal protections for debtors. Nor were those jailed by Defendant provided adequate counsel to represent them.

308. Those who still owe Defendant debt payments or who will incur such debts likely will be subjected to the same ongoing policies and practices absent the relief sought in this Complaint.

### 2. Commonality. Fed. R. Civ. P. 23(a)(2).

309. The relief sought is common to all members of the Injunctive and Damages Classes, and common questions of law and fact exist as to all members of the Classes. The Plaintiffs seek relief concerning whether Defendant's policies, practices, and procedures violated their rights and relief mandating Defendant to change its policies, practices, and procedures so that the Plaintiffs' rights will be protected in the future.

310. Among the most important, but not the only, common questions of fact are:

   a. Whether Defendant has a policy and practice of keeping people in its jail who owe money on old judgments unless and until they can pay a monetary sum;

   b. Whether Defendant has a policy and practice of failing to conduct meaningful inquiries into the ability of a person to pay before jailing the person for non-payment;

   c. Whether Defendant provides notice to debtors that their ability to pay will be a relevant issue at the proceedings at which they are jailed or kept in jail and whether Defendant makes findings concerning ability to pay and alternatives to incarceration;

   d. Whether Defendant provides adequate legal representation to those jailed for unpaid debts in proceedings that result in their incarceration;

   e. Whether Defendant's employees and agents have a policy and practice of threatening debtors and families of debtors with incarceration for unpaid debts without informing them of their rights;

f. Whether Defendant has a policy and practice of issuing and executing warrants for the arrest of debtors despite lacking probable cause that they have committed any offense and without any notice or opportunity to be heard concerning their ability to pay or the validity of the debt;

g. Whether Defendant seeks to extort funds from poor residents of the St. Louis area by ensnaring them in an escalating spiral of indebtedness and imprisonment;

h. Whether Defendant's policies and practices discriminate on the basis of race or other impermissible factors; and

i. Whether the St. Ann Jail conditions are and have been unsanitary, unsafe, and inhumane in the ways described in this Second Amended Complaint.

311. Among the most important common question of law are:

a. Whether keeping people in jail solely because they cannot afford to make a monetary payment is lawful;

b. Whether people are entitled to a meaningful inquiry into their ability to pay before being jailed by Defendant for non-payment of debts;

c. Whether people who cannot afford to pay Defendant are entitled to the consideration of alternatives to incarceration before being jailed for non-payment of debts;

d. Whether people are entitled to adequate legal representation in debt-collection proceedings initiated and litigated by Defendant prosecutors that result in their incarceration if they cannot afford an attorney;

e. Whether Defendant may jail, threaten to jail, and use other harsh debt-collection measures (such as ordering payment of significant portions of a person's public assistance benefits) against debtors who cannot afford immediately to pay Defendant in full;

f. Whether Defendant may arrest people based solely on their non-payment without any probable cause that they have committed any willful conduct or other offense and without notice and an opportunity to be heard concerning legal predicates for a valid detention, such as their ability to pay and the validity of the debt; and

g.      Whether the jail conditions described in the Second Amended Complaint violate federal law.

**3.      Typicality.  Fed. R. Civ. P. 23(a)(3).**

312.    The named Plaintiffs' claims are typical of the claims of the members of the Classes and Subclasses respectively, and they have the same interests in this case as all other members of the Classes that they represent.  Each of them suffered injuries from the failure of Defendant to comply with the basic constitutional provisions detailed below.  The answer to whether Defendant's policies and practices ae unconstitutional will determine the claims of the named Plaintiffs and every other Class member.

313.    If the named Plaintiffs succeed in their claims that the Defendant's policies and practices concerning debt collection for fines, fees, costs, and surcharges violate the law in the ways alleged in each claim of the Complaint, then that ruling will likewise benefit every other member of the Injunctive and Damages Classes.

**4.      Adequacy.  Fed. R. Civ. P. 23(a)(4).**

314.    The named Plaintiffs are adequate representatives of the Classes because they are members of the Classes and because their interests coincide with, and are not antagonistic to, those of the Classes.  There are no known conflicts of interest among Class members, all of whom have a similar interest in vindicating the constitutional rights to which they are entitled.

315.    Plaintiffs are represented by attorneys from Arnold & Porter Kaye Scholer LLP, a firm with experience litigating complex civil rights matters in federal court and extensive knowledge of both the details of the Defendant's scheme and the relevant constitutional and statutory law.  Plaintiffs are also represented by attorneys from ArchCity Defenders, who have extensive experience with the functioning of the entire municipal court system through their

representation of numerous impoverished people in the St. Louis area.[17]

316.    The efforts of Plaintiffs' counsel have so far included extensive investigation over a period of months, including numerous interviews with witnesses, Defendant's employees, Defendant's jail inmates, families, attorneys practicing in the Defendant's Municipal Courts, community members, statewide experts in the functioning of Missouri municipal courts, and national experts in constitutional law, debt collection, bankruptcy law, criminal law, and forced labor.

317.    Counsel have also observed numerous courtroom hearings in St. Ann and other municipalities across the region in order to compile a detailed understanding of state law and practices as they relate to federal constitutional requirements.  Counsel have studied the way that these systems function in other cities in order to investigate the wide array of options in practice for municipalities.

318.    As a result, counsel have devoted enormous time and resources to becoming

---

[17]  ArchCity Defenders is a non-profit public interest law firm based in Saint Louis.  It has represented the poor and homeless in cases involving municipalities in the St. Louis region for the past five years and is an expert on the ways in which Defendant's illegal practices and policies make and keep people poor.  ArchCity Defenders has recently brought class actions in the Eastern District of Missouri restricting the use of chemical munitions on peaceful protesters, is co-counsel on two federal class actions alleging the operation of debtors' prisons in Ferguson and Jennings, Missouri, two additional class actions ending cash bail, and an additional series of state class action suits alleging the imposition of illegal fees and fines in various municipal courts in the St. Louis County region. *See Templeton v. Dotson,* 4:14-cv-01019; *Jenkins et al. v. City of Jennings*, 15-cv-252-CEJ (E.D. Mo. 2015); *Fant et al. v. City of Ferguson*, 15-cv-253-AGF (E.D. Mo. 2015); *Powell v. City of St. Ann* 4:15-cv-840 (E.D. Mo. 2015); *Pierce v. City of Velda City*, 4:15-CV-570 (E.D. Mo. 2015); *White* v. *City of Pine Lawn*, 14SL-CC04194 (St. Louis Co. Cir. Ct., Dec. 2014); *Pruitt v. City of Wellston*, 14SL-CC04192 (St. Louis Co. Cir. Ct., Dec. 2014); *Lampkin v. City of Jennings*, 14SL-CC04207 (St. Louis Co. Cir. Ct., Dec. 2014); *Wann v. City of St. Louis*, 1422-CC10272 (St. Louis City Cir. Ct., Dec. 2014); *Reed v. City of Ferguson*, 14SL-CC04195 (St. Louis Co. Cir. Ct., Dec. 2014); *Eldridge v. City of St. John*, 15SL-00456 (St. Louis Co. Cir. Ct., Feb. 2015); *Watkins v. City of Florissant*, 16SL-CC00165 (St. Louis Co. Cir. Ct., Jan. 2016).  ArchCity Defenders also published an extensive report detailing these practices and policies in the cities of Bel-Ridge, Ferguson, and Florissant in August of 2014.  The report is available at http://www.archcitydefenders.org.

intimately familiar with the Defendant's scheme and with all of the relevant state and federal laws and procedures that can and should govern it. Counsel also have developed relationships with many of the individuals and families most victimized by Defendant's practices.

319. The interests of the members of the Class will be fairly and adequately protected by the Plaintiffs and their attorneys.

**5.     Rule 23(b)(2)**

320. Class action status is appropriate because Defendant, through its policies, practices, and procedures that make up its traffic and ordinance debt-collection scheme, has acted and refused to act on grounds generally applicable to the Declaratory and Injunctive Classes.

321. A declaration that Defendant cannot jail people solely because they cannot afford to make a monetary payment will apply to each Class member.

322. Similarly, a determination that Class members are entitled, as a matter of federal law, to a meaningful inquiry into their ability to pay and an evaluation of alternatives to incarceration before they are jailed by Defendant for non-payment will apply to each Class member.

323. The same applies to rulings on the other claims, including: that Class members are entitled to representation by counsel at proceedings initiated and litigated by Defendant's prosecutors in connection with which they are jailed; that the Defendant cannot imprison Class members for debts; that the Defendant cannot collect debts from Class members in a manner that violates and evades all of the relevant protections for other judgment debtors; and that the Defendant cannot issue and execute arrest warrants for traffic debtors without probable cause that they have committed an offense and without notice or a hearing prior to the deprivation of

their liberty.

324.    Injunctive relief compelling Defendant to comply with these constitutional rights will similarly protect each member of the Class from being again subjected to the Defendant's unlawful policies and practices with respect to the debts that they still owe and protect those who will incur such debts in the future from the same unconstitutional conduct. Therefore, declaratory and injunctive relief with respect to the Class as a whole is appropriate.

**6.     Rule 23(b)(3)**

325.    Class treatment under Rule 23(b)(3) is also appropriate because the common questions of law and fact overwhelmingly predominate in this case. This case turns, for every Plaintiff, on what the Defendant's policies and practices are and on whether those policies are lawful.

326.    The common questions of law and fact listed above are dispositive questions in the case of every member of the Classes and Subclasses. The question of liability can therefore be determined on a class-wide basis. Class-wide treatment of liability is a far superior method of determining the content and legality of the Defendant's policies and practices than individual suits by hundreds or thousands of Defendant's residents. The question of damages will also be driven by class-wide determinations.

327.    To the extent that individual damages will vary, they will vary depending in large part on the amount of time that a person was unlawfully jailed. Determining damages for individual Class members can thus typically be handled in a ministerial fashion based on easily verifiable records of the length of unlawful incarceration. If need be, individual hearings on Class-member specific damages based on special circumstances can be held after Class-wide

liability is determined—a method far more efficient than the wholesale litigation of hundreds or thousands of individual lawsuits.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the Fourteenth Amendment—Imprisonment For Inability To Pay

328.     Plaintiffs incorporate by reference all previous and subsequent paragraphs of this complaint as if fully set forth herein.

329.     The Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution prohibit imprisoning a person for failure to pay money owed to the government if that person is indigent and unable to pay.

330.     Defendant, through its police department, municipal court system, city prosecuting attorneys' office, and jail, imprisoned and/or threatened to imprison each of the Plaintiffs when they could not afford to pay debts allegedly owed for traffic and other minor offenses without conducting any inquiry into their ability to pay and without conducting any inquiry into alternatives to imprisonment, as required by the United States Constitution.  At any moment, a person with financial resources in the Plaintiffs' positions could have paid a sum of cash and been released from jail.

331.     Defendant maintained and continues to maintain a policy and practice of (i) imprisoning, or threatening to imprison, people, including Plaintiffs, when they cannot afford to pay the debts allegedly owed from traffic and other minor offenses, (ii) directing its police officers to issue fine-laden citations for minor infractions in an effort to raise city revenues, (iii) encouraging the prosecution and incarceration of indigent Plaintiffs who were unable to pay fines, and (iv) keeping people, including Plaintiffs, in jail unless and until they are able to pay arbitrarily determined (and constantly shifting) sums of money.

332.     Defendant's actions violated, and continue to violate, Plaintiffs' rights, and the rights of others similarly situated, under the Fourteenth Amendment to the United States Constitution.  Defendant is liable under 42 U.S.C. § 1983.

333.     As a direct result of Defendant's unlawful practices, Plaintiffs and others similarly situated have suffered extensive damages, including, but not limited to, pain and suffering, anxiety, anguish, feeling of unjust treatment, fear, and lost earnings.

## COUNT II
### Violation of the Sixth and Fourteenth Amendments—Failure to Provide Adequate Counsel

334.     Plaintiffs incorporate by reference all previous and subsequent paragraphs of this complaint as if fully set forth herein.

335.     Defendant, through its police department, municipal court system, city prosecuting attorneys' office, and jail, violated Plaintiffs' rights, and the rights of others similarly situated, to the effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution.  Plaintiffs, and others similarly situated, have been and continue to be imprisoned by Defendant in connection with debt-collection proceedings in which those people jailed are not afforded counsel.

336.     Defendant's policy and practice of not providing adequate counsel at hearings in which indigent people are ordered to be imprisoned in the Defendant's jail for unpaid debts (which are, in turn, based on payment plans arising from traffic and other violations at which the jailed individuals also were unrepresented), violates the Sixth and Fourteenth Amendments to the United States Constitution.  Defendant is liable under 42 U.S.C. § 1983.

337.     As a direct result of the Defendant's unlawful practices, Plaintiffs and others similarly situated have suffered extensive damages, including, but not limited to, pain and suffering, anxiety, anguish, feeling of unjust treatment, fear, and lost earnings.

## COUNT III
### Violation of the Fourteenth Amendment—Indefinite and Arbitrary Detention

338.     Plaintiffs incorporate by reference all previous and subsequent paragraphs of this complaint as if fully set forth herein.

339.     The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits incarcerating people indefinitely and without adequate procedural protections.  Defendant, through its police department, municipal court system, city prosecuting attorneys' office, and jail, has engaged in a policy and practice of jailing the Plaintiffs and others similarly situated without any meaningful legal process through which they can challenge their detention by keeping them confined in Defendant's jail unless and until they can make arbitrarily and inconsistently established cash payments, in violation of the Fourteenth Amendment. Defendant is liable under 42 U.S.C. § 1983.

340.     As a direct result of Defendant's unlawful practices, Plaintiffs and others similarly situated have suffered extensive damages, including, but not limited to, pain and suffering, anxiety, anguish, feeling of unjust treatment, fear, and lost earnings.

## COUNT IV
### Violation of the Fourth and Fourteenth Amendments—Issuance of Invalid Warrants

341.     Plaintiffs incorporate by reference all previous and subsequent paragraphs of this complaint as if fully set forth herein.

342.     Defendant's policy and practice, which it implements through its through its police department, municipal court system, city prosecuting attorneys' office, and jail, is to issue and serve arrest warrants against those who have not paid their debt from old judgments in traffic and other minor cases.  These warrants are sought, issued, and served without any inquiry into the person's ability to pay even when Defendant has prior knowledge that the person is impoverished and unable to pay the debts or possesses other valid defenses.

343. These warrants are regularly sought, issued, and served without any finding of probable cause that the person has committed the elements of any offense. Defendant chooses to pursue warrants instead of issuing summons even when it has spoken to people on the phone or in person and has the opportunity to notify them to appear in court.

344. Defendant enforces a policy of allowing wealthy residents or residents who can afford to hire an attorney to remove their warrants but refusing to remove warrant. Moreover, Defendant's policy and practice of not presenting arrestees in court or unreasonably delaying presentment for days or weeks for no legitimate reason is unlawful.

345. These practices violate the Fourth and Fourteenth Amendments and result in a deprivation of fundamental liberty without adequate due process. Defendant is liable under 42 U.S.C. § 1983.

346. As a direct result of the Defendant's unlawful practices, Plaintiffs and others similarly situated have suffered extensive damages, including, but not limited to, pain and suffering, anxiety, anguish, feeling of unjust treatment, fear, and lost earnings.

## COUNT V
### Violation of the Fourteenth Amendment—Threats of Incarceration to Collect Debts

347. Plaintiffs incorporate by reference all previous and subsequent paragraphs of this complaint as if fully set forth herein.

348. The United States Supreme Court has held that, when a government seeks to recoup costs of prosecution from indigent defendants—for example, the cost of appointed counsel—it may not take advantage of its position to impose unduly restrictive methods of collection solely because the debt is owed to the government and not to a private creditor.

349. By incarcerating the Plaintiffs and threatening to incarcerate them, Defendant, acting through its through its police department, municipal court system, city prosecuting

attorneys' office, and jail, takes advantage of its control over the machinery of the penal and police systems to deny debtors the statutory protections that every other debtor may invoke against a private creditor. This coercive policy and practice constitutes invidious discrimination and violates the fundamental principles of equal protection of the laws. Defendant is liable under 42 U.S.C. § 1983.

350. As a direct result of the Defendant's unlawful practices, Plaintiffs and others similarly situated have suffered extensive damages, including, but not limited to, pain and suffering, anxiety, anguish, feeling of unjust treatment, fear, and lost earnings.

## COUNT VI
## Violation of the Fourteenth Amendment—Deplorable and Unconstitutional Jail Conditions

351. Plaintiffs incorporate by reference all previous and subsequent paragraphs of this complaint as if fully set forth herein.

352. The unsafe, unsanitary, inhumane, and dangerous conditions of confinement in the St. Ann Jail constitute impermissible punishment unrelated to any criminal judgment. Even if they had been imposed after valid conviction, the conditions would constitute cruel and unusual treatment. The deplorable and excessively harsh conditions in the Defendant's jail are unnecessary to accomplish any legitimate government objective and shock the conscience of any reasonable person concerned with human dignity and liberty.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court issue the following relief:

a. Certification of the Declaratory and Injunctive Class and Subclasses and the Damages Class, as defined above;

b. A declaratory judgment that Defendant violated, and continues to violate, Plaintiffs' Fourteenth Amendment due process and equal protection rights by imprisoning them for their inability to pay a debt without conducting

any meaningful inquiry into their ability to pay or into any alternatives to incarceration;

c.      A declaratory judgment that Defendant violated, and continues to violate, Plaintiffs' rights under the Sixth and Fourteenth Amendments by imprisoning them without appointing adequate counsel at the proceedings that led to their incarceration;

d.      A declaratory judgment that Defendant violated, and continues to violate, Plaintiffs' constitutional rights by holding them indefinitely and arbitrarily in jail independent of any valid legal process;

e.      A declaratory judgment that Defendant violated, and continues to violate, Plaintiffs' Fourth and Fourteenth Amendment rights by issuing and serving arrest warrants without probable cause to believe that the elements of an offense had been committed, with unreasonable delay prior to presentment, and without providing pre-deprivation of liberty process where such process is easily available to Defendant;

f.      An order and judgment permanently enjoining Defendant from enforcing the above-described unconstitutional policies and practices against Plaintiffs and others similarly situated;

g.      A declaratory judgment that Defendant violated Plaintiffs' equal protection rights by imposing harsh debt collection measures not imposed on debtors whose creditors are private entities;

h.      A declaratory judgment that Defendant violated Plaintiffs' rights by subjecting them to unconstitutional jail conditions;

i.      A judgment compensating the Plaintiffs and others similarly situated for the damages that they suffered as a result of Defendant's unconstitutional and unlawful conduct; and

j.      An order and judgment granting reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and 18 U.S.C. § 1595, and any other relief this Court deems just and proper.

Dated:  July 21, 2017                    Respectfully submitted,


By:_____/s/ S. Zachary Fayne_____
         S. Zachary Fayne (admitted *pro hac vice*)
         ARNOLD & PORTER KAYE SCHOLER LLP
         Three Embarcadero Center, 10th Floor
         San Francisco, CA 94111
         Tel:  (415) 471-3114
         Fax:  (415) 471-3400
         Zachary.Fayne@apks.com

         David B. Bergman *(*admitted *pro hac vice*)
         Seth J. Wiener *(*admitted *pro hac vice*)
         ARNOLD & PORTER KAYE SCHOLER LLP
         601 Massachusetts Ave., N.W.
         Washington, D.C. 20001
         Tel:  (202) 942-5000
         Fax:  (202 942-5999
         David.Bergman@apks.com
         Seth.Wiener@apks.com

         Thomas B. Harvey (MBE #61734MO)
         Michael-John Voss (MBE #61742MO)
         Blake A. Strode (MBE #68422MO)
         Nathaniel Carroll (MBE #67988MO)
         Brendan Roediger, *Of Counsel* (MBE #6287213IL)
         ARCHCITY DEFENDERS, INC.
         1210 Locust Street
         Saint Louis, MO 63103
         Tel: (855) 724-2489
         Fax:  (314) 925-1307
         tharvey@archcitydefenders.org
         mjvoss@archcitydefenders.org
         bstrode@archcitydefenders.org
         ncarroll@archcitydefenders.org
         broedige@slu.edu

         *Attorneys for Plaintiffs*